**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

LAUREL D. LIBBY, State Representative of
Maine House District 90, RONALD P.
LEBEL, WENDY MUNSELL, JASON
LEVESQUE, BERNICE FRASER, RENE
FRASER, and DONALD DUBUC,

   Plaintiffs,

          v.

RYAN M. FECTEAU, in his official capacity
as Speaker of the Maine House of Representa-
tives, and ROBERT B. HUNT, in his official
capacity as Clerk of the House,

   Defendants.

Case No. 1:25-cv-83

INJUNCTIVE RELIEF SOUGHT

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................. iii

INTRODUCTION ............................................................................................................................... 1

BACKGROUND .................................................................................................................................. 2

ARGUMENT ....................................................................................................................................... 5

I.    Plaintiffs are likely to succeed on the merits. ..................................................................... 5

    A.    The censure violates Libby's First Amendment right of free speech. .................... 5

    B.    The censure violates Plaintiffs' Fourteenth Amendment rights. ........................... 10

    C.    The censure violates the Guarantee Clause. ............................................................ 16

II.   The remaining preliminary injunction factors favor relief. ............................................. 19

CONCLUSION .................................................................................................................................. 20

CERTIFICATE OF SERVICE ......................................................................................................... 21

# TABLE OF AUTHORITIES

## Cases

*Ammond v. McGahn*,
390 F. Supp. 655 (D.N.J. 1975) ............................................................................. 11

*Arlene Ocasio v. Comision Estatal de Elecciones*,
486 F. Supp. 3d 478 (D.P.R. 2020) ......................................................................... 20

*Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*,
490 F.3d 1 (1st Cir. 2007) ...................................................................................... 19

*Baker v. Carr*,
369 U.S. 186 (1962) ........................................................................................... 16-17

*Barton v. Clancy*,
632 F.3d 9 (1st Cir. 2011) ........................................................................................ 8

*Bd. of Elections for Franklin Cnty. v. State ex rel. Schneider*,
191 N.E. 115 (Ohio 1934) ...................................................................................... 19

*Bl(a)ck Tea Soc'y v. City of Bos.*,
378 F.3d 8 (1st Cir. 2004) ...................................................................................... 20

*Blue Rio LLC v. Thomas*,
2017 WL 4863091 (S.D.N.Y. Oct. 26) .................................................................. 12

*Bonas v. Town of N. Smithfield*,
265 F.3d 69 (1st Cir. 2001) .................................................................. 10-11, 13-14

*Bond v. Floyd*,
385 U.S. 116 (1966) ............................................................................................. 6, 8

*Boquist v. Courtney*,
32 F.4th 764 (9th Cir. 2022) ................................................................................. 5-9

*Brandenburg v. Ohio*,
395 U.S. 444 (1969) ................................................................................................ 7

*Bush v. Gore*,
531 U.S. 98 (2000) ............................................................................................ 15-16

*Cent. Me. Power Co. v. Me. Comm'n on Gov'tal Ethics & Election Pracs.*,
721 F. Supp. 3d 31 (D. Me. 2024) ......................................................................... 20

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942) ................................................................................................ 7

*Conservation Comm'n of the Town of Westport v. Beaulieu*,
2008 WL 4372761 (D. Mass. Sept. 18) ................................................................... 6

*Corp. Techs., Inc. v. Harnett*,
731 F.3d 6 (1st Cir. 2013) ........................................................................................ 5

*Counterman v. Colorado*,
600 U.S. 66 (2023) .................................................................................................. 7

*Cox Broad. Corp. v. Cohn*,
  420 U.S. 469 (1975) ..................................................................6

*Crowley v. Local No. 82, Furniture & Piano Moving*,
  679 F.2d 978 (1st Cir. 1982) ...................................................20

*Davignon v. Hodgson*,
  524 F.3d 91 (1st Cir. 2008) .......................................................9

*Del. Valley Fish Co. v. Fish & Wildlife Serv.*,
  2009 WL 1706574 (D. Me. June 12) .........................................20

*Democratic Party of Wis. v. Vos*,
  966 F.3d 581 (7th Cir. 2020) ...................................................16

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
  472 U.S. 749 (1985) ..................................................................6

*Duncan v. McCall*,
  139 U.S. 449 (1891) ................................................................18

*Duncan v. Poythress*,
  657 F.2d 691 (5th Cir. Unit B Sept. 1981) ..............................13

*Dunn v. Blumstein*,
  405 U.S. 330 (1972) ................................................................14

*Espiritu v. Comision Estatal de Elecciones*,
  2024 WL 4362434 (D.P.R. Oct. 1) ...........................................20

*Gattineri v. Town of Lynnfield*,
  58 F.4th 512 (1st Cir. 2023) ..................................................5, 9

*Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*,
  457 U.S. 596 (1982) ..................................................................7

*Grajales v. P.R. Ports Auth.*,
  682 F.3d 40 (1st Cir. 2012) .....................................................10

*Griffin v. Burns*,
  570 F.2d 1065 (1st Cir. 1978) .................................................13

*Hous. Cmty. Coll. Sys. v. Wilson*,
  595 U.S. 468 (2022) ...............................................................6-9

*Jenevein v. Willing*,
  493 F.3d 551 (5th Cir. 2007) .....................................................6

*Kerr v. Hickenlooper*,
  744 F.3d 1156 (10th Cir. 2014) ...........................................16-17

*Koontz v. St. Johns River Water Mgmt. Dist.*,
  570 U.S. 595 (2013) ................................................................12

*Kucinich v. Forbes*,
  432 F. Supp. 1101 (N.D. Ohio 1977) ..................................11, 14

*Largess v. Supreme Jud. Ct. of Mass.*,
  373 F.3d 219 (1st Cir. 2004) ................................................ 16-18

*LULAC v. Abbott*,
  601 F. Supp. 3d 147 (W.D. Tex. 2022) ................................ 20

*LWV of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) ................................................ 19

*LWV of Ohio v. Brunner*,
  548 F.3d 463 (6th Cir. 2008) ................................................ 15

*Lyman v. Baker*,
  954 F.3d 351 (1st Cir. 2020) ................................................ 14

*Maloy v. Ballori-Lage*,
  744 F.3d 250 (1st Cir. 2014) .................................................. 9

*McBreairty v. Sch. Bd. of RSU 22*,
  616 F. Supp. 3d 79 (D. Me. 2022) ...................................... 20

*Melville v. Town of Adams*,
  9 F. Supp. 3d 77 (D. Mass. 2014) .......................................... 6

*Mich. State A. Philip Randolph Inst. v. Johnson*,
  833 F.3d 656 (6th Cir. 2016) ................................................ 19

*Michel v. Anderson*,
  14 F.3d 623 (D.C. Cir. 1994) ............................ 8, 10, 13, 15

*Miller v. Town of Hull*,
  878 F.2d 523 (1st Cir. 1989) ................................. 5-6, 8-10

*Monserrate v. N.Y. State Senate*,
  695 F. Supp. 2d 80 (S.D.N.Y. 2010) .................................. 12

*Nev. Comm'n on Ethics v. Carrigan*,
  564 U.S. 117 (2011) ............................................................ 11

*New York v. United States*,
  505 U.S. 144 (1992) ..................................................... 16, 19

*Nieves v. Bartlett*,
  587 U.S. 391 (2019) .............................................................. 5

*Ortolano v. City of Nashua*,
  2025 WL 509258 (D.N.H. Feb. 14) .................................... 10

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ................................................................ 6

*Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*,
  235 F.3d 1243 (10th Cir. 2000) ............................................ 6

*Powell v. McCormack*,
  395 U.S. 486 (1969) ...................................... 13-14, 17-18

*Purcell v. Gonzalez,*
 549 U.S. 1 (2006) .................................................................................................. 20

*Reynolds v. Sims,*
 377 U.S. 533 (1964) ................................................................................ 10-11, 14-16

*Riley v. Nat'l Fed'n of the Blind of N.C.,*
 487 U.S. 781 (1988) .............................................................................................. 12

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan,*
 397 F.3d 56 (1st Cir. 2005) ................................................................................... 19

*Roth v. United States,*
 354 U.S. 476 (1957) ................................................................................................ 6

*Seamons v. Snow,*
 84 F.3d 1226 (10th Cir. 1996) ............................................................................. 12

*Sindicato Puertorriqueno de Trabajadores v. Fortuño,*
 699 F.3d 1 (1st Cir. 2012) ..................................................................................... 19

*United States v. Alvarez,*
 567 U.S. 709 (2012) ................................................................................................ 6

*Walters v. Bos. City Council,*
 676 F. Supp. 3d 26 (D. Mass. 2023) ..................................................................... 19

*We the People PAC v. Bellows,*
 519 F. Supp. 3d 13 (D. Me. 2021) ........................................................................ 20

*Werkheiser v. Pocono Twp.,*
 780 F.3d 172 (3d Cir. 2015) ............................................................................... 6, 8

*Wesberry v. Sanders,*
 376 U.S. 1 (1964) ............................................................................................ 10, 14

*Westfield High Sch. L.I.F.E. Club v. City of Westfield,*
 249 F. Supp. 2d 98 (D. Mass. 2003) ..................................................................... 20

*Williams v. Salerno,*
 792 F.2d 323 (2d Cir. 1986) ................................................................................. 19

*Wood v. Georgia,*
 370 U.S. 375 (1962) ................................................................................................ 6

*Yick Wo v. Hopkins,*
 118 U.S. 356 (1885) .............................................................................................. 10

**Statutes**

5 MRS §4601 ............................................................................................................... 2

5 MRS §4602(1)(A) .................................................................................................... 2

5 MRS §4602(1)(B) .................................................................................................... 2

P.L. 2021, Ch. 366 ...................................................................................................... 2

**Constitutional Provisions**

Me. Const. art. IV, pt. 1, §4................................................................................................ 13, 18

Me. Const. art. IV, Pt. 1, §6 ...............................................................................................12

Me. Const. art. IV, pt. 3, §4..........................................................................................13-14, 18

U.S. Const. art. IV, §4........................................................................................................16

**Legislative Authorities**

Cong. Rsch. Serv., *Expulsion, Censure, Reprimand, and Fine:*
*Legislative Discipline in the House of Representatives* (2016),
https://perma.cc/T2P8-5Q55 ..........................................................................................7

*Deschler's Precedents of the United States House of Representatives,*
H. Doc. 94-661, 94th Cong., 2d Sess., Vol. 3, Ch. 12 (1994),
https://perma.cc/M3ZL-9P9R ............................................................... 8, 11-13, 18

H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025),
https://perma.cc/JU85-VNTS...........................................................................................3

*Jefferson's Manual and Rules of the House of Representatives* (118th Cong., 2023),
https://perma.cc/U78W-KZ2G.........................................................................................8

*Legislative Code of Ethics*, Me. House Reps.,
https://perma.cc/RF43-JPA2 ..........................................................................................15

*Legislators' Handbook*, 132nd Me. Legis (23rd ed., 2024),
https://perma.cc/RGN5-33TP ...........................................................................................9

**Regulatory Authorities**

Exec. Order No. 14,201, 90 Fed. Reg. 9279 (Feb. 5, 2025)...............................................2

**Other Authorities**

2 Debates on the Federal Constitution (J. Elliot ed. 1876).............................................17

Erwin Chemerinsky, *Cases Under the Guarantee Clause Should be Justiciable,*
65 U. Colo. L. Rev. 849 (1994) ......................................................................................18

II *Works of James Wilson* (Andrews ed. 1896) ...............................................................9

Mary Patterson Clarke, *Parliamentary Privilege in the American Colonies*
(Da Capo Press ed. 1971) ..............................................................................................7

*The Federalist No. 21* ........................................................................................................19

*The Federalist No. 43* ........................................................................................................18

*The Federalist No. 85* ........................................................................................................18

Thomas A. Smith, Note, *The Rule of Law and the States:*
*A New Interpretation of the Guarantee Clause*, 93 Yale L.J. 561 (1984) ......................17

## INTRODUCTION

Thousands represented by Maine Representative Laurel Libby are now without a voice or a vote in their legislature. Libby's votes won't be counted—not for something she said or did on the House floor but for raising a matter of public concern on Facebook. Libby, a vocal critic of Maine's policy allowing boys to compete in girls' sports, recently took to social media to highlight the state indoor track and field state championship. A male student who now identifies as transgender took first place in girls' pole vault and propelled the team to win the overall track and field state championship. Libby's social media posts went viral and captured national attention, including in Washington.

Swift retaliatory action followed. Led by Speaker Ryan Fecteau, the Maine House censured Libby along a party-line vote. The resolution called her posts "reprehensible," unethical, and "incompatible with her duty and responsibilities as a Member of th[e] House." The censure resolution said Libby must "publicly apologize." When Libby refused, the House Speaker prohibited her from speaking or voting on the House floor. Votes for House District 90 will not be counted by the House Clerk.

Whatever one thinks of boys competing in girls' sports, no one disputes that Maine's policy is worthy of debate. As Governor Janet Mills just put it: "If [lawmakers] wish to change [Maine's policy], they have the authority to change it." "It's worthy of a debate, a full, democratic debate." Compl. ¶66. Indeed, bills targeting the policy are moving through the House. Yet Libby, one of the House's staunchest advocates on the issue, now cannot speak or vote on that legislation or anything else that comes before the House.

Defendants' actions are unconstitutional. The First Amendment protects Libby from government retaliation for her speech just like any citizen. While legislatures have historically disciplined their members by verbal reprimand, stripping them of voting rights is another matter. The U.S. House of Representatives, for example, recognizes it may not constitutionally deprive sitting members of their right to vote. For good reason, illustrated here: District 90 has no vote in the House, indefinitely. Such

arbitrary disenfranchisement, beyond what the Maine Constitution permits, violates the Fourteenth Amendment and the Guarantee Clause. Preliminarily enjoining Defendants will restore the status quo for thousands in House District 90 excluded from the democratic process.

## BACKGROUND

**A.** Girls' sports have been at the forefront of public debate for the past several years. Compl. ¶22. Most Americans oppose boys who identify as transgender participating in girls' sports. ¶23. They see the inherent physical advantages males have over females, which can present serious safety risks. ¶24. More than half the States limit girls' sports to biological girls. ¶25. But not Maine.

In 2021, Maine enshrined protections for "gender identity" across Maine law. P.L. 2021, Ch. 366. Maine law guarantees students can "participate in all extracurricular activities without discrimination because of … gender identity." 5 MRS §4601. Maine law also prohibits "[e]xclud[ing] a person from participation in" any "extracurricular … activity" or "[d]eny[ing] a person equal opportunity in athletic programs" based on "gender identity." *Id.* §4602(1)(A)-(B).

Participation of transgender individuals in girls' sports was a major issue in the 2024 presidential election. Compl. ¶28. Voters resonated with President Trump's campaign promise to ban it. *Id.* And shortly after he took office, Trump signed an executive order to rescind federal funds from educational programs that permit biological boys to compete in girls' sports. ¶29; Exec. Order No. 14,201, 90 Fed. Reg. 9279 (Feb. 5, 2025). Yet Maine said it would continue to allow it. Compl. ¶30.

**B.** Representative Laurel Libby (R-Auburn) represents Maine's House District 90. ¶10. A mother of five, including three girls, Libby has a been a staunch advocate of protecting the rights of Maine girls in athletics. ¶2. She is an outspoken critic of Maine's state policy. *Id.*

On February 17, 2025, Libby posted on Facebook about the state track and field championship. ¶31. The championship was a public event, and the names, schools, and photos of participants were all publicly reported and accessible online. ¶¶32-33. Libby observed that the first-place girls' pole

vaulter previously competed in boys' pole vault and placed fifth. ¶31. The post showed the athlete on the boys' medal podium side-by-side with the athlete on the girls' podium this year. *Id.* The male student's first-place pole vault finish propelled Greely High School's girls' team to win the overall state championship by one point. ¶34.

Libby's post went viral. ¶35. She appeared on national television and radio broadcasts and continued to post on social media, criticizing Maine's policy and calling on the federal government to enforce Trump's executive order. ¶36. President Trump threatened to withhold federal funding, federal agencies began investigating, and the U.S. Attorney General warned of legal action. ¶¶37-41.

With Maine's policy in the national spotlight, Maine House Speaker Ryan Fecteau asked Libby to delete her initial Facebook post, but Libby refused. ¶42. Fecteau then publicly responded to Libby by urging Mainers to "reject hateful rhetoric from divisive politicians." ¶43. He framed Libby's social media activity as an issue of "privacy of Maine kids" that can "be downright dangerous for the young person involved" and "impact their health and their safety." ¶44. Yet Fecteau has posted many photos of minors on Facebook, including from public athletic events. ¶62. Here too, the photos Libby shared were already available online from a widely publicized state athletic event. ¶¶32-33.

**C.** On February 25, Speaker Fecteau led the effort to censure Libby for her initial Facebook post. ¶50; *see* H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025), https://perma.cc/JU85-VNTS. The censure resolution passed along party lines by a vote of 75-70. The resolution stated that Libby "posted a statement criticizing the participation of transgender students in high school sports"; the "post has received national attention that she has amplified by appearing on national television and radio broadcasts"; and the "post named the minor and used photos of the minor without that minor's consent, in an effort to advance her political agenda." Compl. ¶50. The resolution found Libby's conduct to be "reprehensible," "in direct violation of our code of ethics," and "incompatible with her duty and responsibilities as a Member of this House and the public trust and high standards incumbent in that

office." *Id.* The resolution stated that Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." *Id.*

Several Republicans expressed disagreement. Minority Leader Representative Billy Bob Faulkingham decried the resolution as "a mockery of the censure process," "set[ting] a standard that the majority party, when they're displeased with a social media post that upsets them, can censure a member of the minority party and by a majority vote, … without them giving an apology, keep them out of the Legislature." ¶52. He observed that each of the three prior censures in the Maine Legislature's history concerned speech or conduct *within the statehouse. Id.*; *see* ¶53. Representative Jennifer L. Poirier raised free-speech concerns and sought clarification on whether members who reposted Libby's post can "expect censures to come forth on them as well." ¶¶54-55. Fecteau responded, "I'm not aware of any other censures." ¶55.

Speaking in her defense, Libby emphasized that the state championship "was a public event" and the male student's "photos are posted publicly on multiple websites." ¶56. She explained that "folks are upset" because the post "exposed truth" that "there are boys participating in girls' sports" and "taking the place of girls." *Id.* After the resolution passed, Fecteau summoned Libby to the well of the chamber, lectured her on the House's ethics standards, and offered her an opportunity to apologize, which Libby declined. ¶57. Fecteau then found Libby in violation of House Rule 401(11), which provides that a member who "is guilty of a breach of any of the rules and orders of the House … may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction." ¶¶57-58.

The censure drew swift condemnation from the *Boston Globe*, the *Wall Street Journal*, congressmembers, national free-speech organizations, and other prominent voices. ¶¶63-64. On March 1, the start of women's history month, hundreds of Mainers came to the capitol to march in protest of Maine's transgender sports policy, some holding signs in support of Libby. ¶65. Even Governor Mills

ceded some ground to Libby: "If [lawmakers] wish to change [Maine's policy], they have the authority to change it, but you don't change it by executive order or by wishing it differently," she said. "It's worthy of a debate, a full, democratic debate." ¶66.

**D.** Libby, joined by House District 90 constituents, brought this suit to restore House District 90's vote in the House. Without relief, the censure will indefinitely deprive Libby of the ability to speak or vote on the House floor on behalf of thousands of constituents. ¶59. House District 90 has no vote on important measures soon coming before the Legislature, including the state budget, tax reform, and mental health care policies, among others. ¶¶67-70; *see* Lebel Decl. ¶¶7-8; Munsell Decl. ¶¶7-8; Levesque Decl. ¶¶7-8; R. Fraser Decl. ¶¶7-8; B. Fraser Decl. ¶¶7-8; Duboc Decl. ¶¶7-8.

**ARGUMENT**

Plaintiffs are entitled to a preliminary injunction if they make four showings: likely success on the merits, irreparable harm absent relief, the equities weigh in their favor, and an injunction serves the public interest. *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 9 (1st Cir. 2013). Plaintiffs make all four.

**I.     Plaintiffs are likely to succeed on the merits.**

**A.     The censure violates Libby's First Amendment right of free speech.**

"The First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 587 U.S. 391, 398 (2019) (cleaned up). Elected officials may raise First Amendment retaliation claims. *Boquist v. Courtney*, 32 F.4th 764, 774 (9th Cir. 2022); *see Miller v. Town of Hull*, 878 F.2d 523, 532-33 (1st Cir. 1989). To prevail, Libby must show she "engaged in constitutionally protected conduct," she was "subjected to an adverse action," and "the protected conduct was a substantial or motivating factor in the adverse action." *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023). Libby makes all three showings.

**1.** Libby's conduct is protected First Amendment speech. Her social media posts and media appearances shined a spotlight on a hotly debated issue at the center of Maine and national politics.

*E.g.*, Compl. ¶¶35-36. Libby expressed "ideas for the bringing about of political and social changes." *Roth v. United States*, 354 U.S. 476, 484 (1957). And she did so on social media—"the most important place[] … for the exchange of views" today. *Packingham v. North Carolina*, 582 U.S. 98, 104 (2017). Libby's speech "is the essence of self-government" and lies "at the heart of the First Amendment's protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59 (1985) (plurality op.).

The fact that Libby is an elected official does not deprive her speech of protection. *See Miller*, 878 F.2d at 532-33. "The First Amendment surely promises an elected representative … the right to speak freely on questions of government policy." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022); *accord Wood v. Georgia*, 370 U.S. 375, 394-95 (1962). Indeed, "[t]he manifest function of the First Amendment in a representative government requires that legislators be given the widest latitude to express their views on issues of policy." *Bond v. Floyd*, 385 U.S. 116, 135-36 (1966). Legislators are "obligat[ed] to take positions on controversial political questions so that their constituents can be fully informed by them," "be better able to assess their qualifications for office," and "be represented in governmental debates by the person they have elected to represent them." *Id.* at 136-37.[1]

Nor does the nature of Libby's post eliminate First Amendment protection. While Fecteau criticized Libby for posting the name and photo of a minor, names and photos from the state championship were already well publicized, and the post violated no laws. Compl. ¶¶32-33, 45-46, 48. There is no invasion-of-privacy exception to the First Amendment. *See United States v. Alvarez*, 567 U.S. 709, 717-18 (2012) (plurality op.); *see also Cox Broad. Corp. v. Cohn*, 420 U.S. 469, 494-95 (1975) (holding First Amendment protected publication of rape victim's identity already in the public record from invasion-

---

[1] As an elected official, Libby is not subject to the *Garcetti-Pickering* test for public employees, even if one were to overlook that her speech occurred outside the House. *See Boquist*, 32 F.4th at 780 (holding *Garcetti-Pickering* inapplicable to elected officials); *Phelan v. Laramie Cnty. Cmty. Coll. Bd. of Trs.*, 235 F.3d 1243, 1247 (10th Cir. 2000) (same); *Melville v. Town of Adams*, 9 F. Supp. 3d 77, 102 (D. Mass. 2014) (same); *Conservation Comm'n of the Town of Westport v. Beaulieu*, 2008 WL 4372761, at *4 (D. Mass. Sept. 18) (similar); *see also Jenevein v. Willing*, 493 F.3d 551, 558 (5th Cir. 2007) (declining to "draw directly upon the *Pickering-Garcetti* line of cases for … employees elected to state office"); *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 179 (3d Cir. 2015) (observing *Garcetti*'s rationale is, "to some extent, inapplicable to elected officials").

of-privacy suit); *cf. Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 607-08 (1982) (rejecting state interest in "safeguarding the physical and psychological well-being of a minor" where "the names of the minor victims were already in the public record"). And insofar as Fecteau invoked student safety, Libby's reposting of a publicly available photo from a highly publicized statewide sports event comes nowhere near the unprotected categories of "'fighting' words," *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942), incitement, *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969), or "true threats," *Counterman v. Colorado*, 600 U.S. 66, 74 (2023). Libby's speech is constitutionally protected.

**2.** The censure constitutes adverse action. Neither history nor contemporary doctrine suggests a duly elected representative can be stripped of her voting rights for her speech. *See Wilson*, 595 U.S. at 474-75, 477.

**a.** There is no "[l]ong settled and established practice," *id.* at 474-77, of stripping legislators of voting rights as part of a censure consistent with the First Amendment or other federal constitutional provisions. There was no consensus that legislatures could "exclude members indefinitely from their seats" during colonial times. Mary Patterson Clarke, *Parliamentary Privilege in the American Colonies* 200 (Da Capo Press ed. 1971). There was no "unanimity" because such a power to exclude indefinitely is "fundamentally connected with the franchise, which was supposed to be guaranteed by the common law," so "persons who upheld the common law took exception." *Id.* That view holds true today.

In the U.S. House, censures generally are only verbal censures. Cong. Rsch. Serv., *Expulsion, Censure, Reprimand, and Fine: Legislative Discipline in the House of Representatives* 10-16 (2016), https://perma.cc/T2P8-5Q55. That form of a censure goes nowhere near the censure of Libby, which strips her and her constituents of a vote in the House indefinitely. The Maine censure contravenes "the prevailing view … that members of the legislature do not have the power to suspend members and therefore deprive them of the right to vote." *Boquist*, 32 F.4th at 783. The U.S. House, consistent with the "weight of authority," does not even consider itself to have such a power "to deprive a

Member of the right to vote." *Jefferson's Manual and Rules of the House of Representatives* 401, §672 (118th Cong., 2023), https://perma.cc/U78W-KZ2G; *see Michel v. Anderson*, 14 F.3d 623, 630 (D.C. Cir. 1994) (explaining that the House cannot lawfully "deprive any *member* of the right to vote in the Committee of the Whole (or in a standing committee)"). Indeed, the U.S. House has found numerous "constitutional impediments" to depriving a sitting member of her right to vote. *Deschler's Precedents of the United States House of Representatives*, H. Doc. 94-661, 94th Cong., 2d Sess., Vol. 3, Ch. 12, §§15-15.1, at 1737-41 (1994), https://perma.cc/M3ZL-9P9R (*Deschler's*).

The Supreme Court, moreover, has held that a state legislature's refusal to seat an elected representative after he criticized government policy violated the First Amendment. *See Bond*, 385 U.S. at 136-37. And the First Circuit has held that the First Amendment protects elected officials from being "suspended because of the position they took" when "speaking out" and "voting on a controversial public issue." *Miller*, 878 F.2d at 532-33. The censure performs essentially the same function here: Libby is indefinitely prohibited from speaking or voting on matters coming to the House floor. It is a *de facto* expulsion. In light of the foregoing history, even if there were some early history of legislatures stripping members of voting rights in response to their speech on public issues, there is every "reason to think the First Amendment was designed or commonly understood to upend this practice." *Wilson*, 595 U.S. at 475; *see Boquist*, 32 F.4th at 783.

**b.** Contemporary doctrine confirms Libby's censure is adverse action. Retribution for speech is sufficiently adverse if it "would have a chilling effect on the [plaintiff's] exercise of First Amendment rights." *Barton v. Clancy*, 632 F.3d 9, 29 (1st Cir. 2011). Retaliation against elected officials is adverse action where it "interferes with their ability to adequately perform their elected duties." *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 181 (3d Cir. 2015). To be sure, legislatures have authority to censure members. But that power has limits. The Supreme Court has upheld such censures when they "did not prevent [an official] from doing his job" and "did not deny him any privilege of office." *Wilson*, 595

U.S. at 579-80 (involving only verbal reprimand as a censure). But the censure here deprives Libby and her constituents of a voice and a vote in the House indefinitely.

Barring Libby from speaking or voting on the House floor prevents her from doing her job and denies her privileges of her office. *See id.* A "legislator's role is essentially that of proposing, considering and enacting laws." *Legislators' Handbook* 2, 132nd Me. Legis. (23rd ed., 2024), https://perma.cc/RGN5-33TP. "The right to vote freely enables legislators 'to consummate their duty to their constituents.'" *Miller*, 878 F.2d at 533. The Founders considered robust debate on the legislative floor "indispensably necessary" to "the practice of government." II *Works of James Wilson* 38 (Andrews ed. 1896). Yet Libby can no longer perform these basic legislative functions. Because the censure "deprives [Libby] of authority [s]he enjoyed by virtue of h[er] popular election" and "prevents h[er] from enjoying the full range of rights and prerogatives that came with having been publicly elected," it constitutes adverse action. *Boquist*, 32 F.4th at 777 (cleaned up).

**3.** There should be no dispute that Libby's speech motivated the censure. The third prong asks whether Defendants harbored "retaliatory animus" that "was the 'but-for' cause of [Libby's] injuries, 'meaning that the adverse action against [her] would not have been taken absent the retaliatory motive.'" *Gattineri*, 58 F.4th at 515. Because "smoking gun proof of unconstitutional retaliation is rarely available … telltale clues from the circumstances" suffice. *Maloy v. Ballori-Lage*, 744 F.3d 250, 253 (1st Cir. 2014) (cleaned up).

The censure resolution is "smoking gun proof" of retaliatory animus and but-for causation. The resolution on its face censures Libby because of her protected speech on Facebook. Compl. ¶50. It takes issue with Libby's viewpoint—"criticizing the participation of transgender students in high school sports." *Id.* And it complains that Libby "amplified" the "national attention" "by appearing on national television and radio broadcasts to discuss." *Id.* It is clear such adverse action would not have occurred "but for the plaintiff's speech." *Davignon v. Hodgson*, 524 F.3d 91, 106 (1st Cir. 2008).

The circumstances only confirm the retaliatory animus underlying the censure. Fecteau urged Libby to delete her Facebook post soon after she posted it. Compl. ¶42. After Libby turned the national spotlight on Maine's transgender sports policy, Fecteau publicly addressed her post, pledging "to stand up to elected officials who violate the privacy of youth for cheap political stunts." ¶44. The censure quickly followed. *See, e.g.*, *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 50 (1st Cir. 2012) ("close temporal proximity" showed "animus was a motivating factor"). And while several representatives "reposted" Libby's exact post, Fecteau took no action against them and disclaimed any forthcoming censures. Compl. ¶55; *see, e.g.*, *Ortolano v. City of Nashua*, 2025 WL 509258, at *4 (D.N.H. Feb. 14) (holding lack of action against similarly situated individuals supported retaliation). "The entire course of conduct by the defendants supports the conclusion" that Libby faced adverse action "because of the position [she] took" on boys participating in girls' sports. *Miller*, 878 F.2d at 533.

## B. The censure violates Plaintiffs' Fourteenth Amendment rights.

"No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Thus, "the right to vote—the wellspring of all rights in a democracy—is constitutionally protected." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001); *see Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1885) (voting "is regarded as a fundamental political right, because [it is] preservative of all rights"). The Constitution "protects the right of all qualified citizens to vote" in state elections, and the Equal Protection Clause ensures "all who participate in the election are to have an equal vote." *Reynolds v. Sims*, 377 U.S. 533, 554, 557-58 (1964). That promise of equality does not end on election day. It would be an empty promise if constituents had no vote, let alone an equal vote, on the House floor after election day. *See Michel*, 14 F.3d at 626 ("It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor."). But

exactly that has transpired in Maine. The deprivation of voting rights for House District 90 violates the Fourteenth Amendment in the following four ways.

**1.** Denying Libby a vote in the House disenfranchises Plaintiffs and thousands of others in House District 90. In our representative democracy, a legislator's vote "is not personal to" her but instead "belongs to the people." *Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011). When she casts her vote, she casts it "as trustee for [her] constituents." *Id.* That "vote is the commitment of [her] apportioned share of the legislature's power to the passage or defeat of a particular proposal." *Id.* at 125-26. But Defendants have taken that vote away from the people of House District 90.

The censure unconstitutionally deprives Plaintiffs of representation in the House in violation of the Equal Protection Clause. It creates "two classes of voters": those in House District 90 who effectively have no representation in the House and those in every other district who do. *Kucinich v. Forbes*, 432 F. Supp. 1101, 1116 (N.D. Ohio 1977); *see also Bonas*, 265 F.3d at 74 (identifying equal protection denial when there is "evidence that a particular category of … voters will suffer disproportionately" (citing *Reynolds*, 377 U.S. at 558)). This "across-the-board disenfranchisement" for voters in House District 90 "betokens an utter breakdown of the electoral process." *Bonas*, 265 F.3d at 75. Courts have thus held that suspending or excluding a lawmaker and depriving constituents of representation violates the Equal Protection Clause. *See Kucinich*, 432 F. Supp. at 1116-17 (holding suspension of councilmember violated equal-protection "right to representation"); *Ammond v. McGahn*, 390 F. Supp. 655, 660 (D.N.J. 1975) (excluding state senator from caucus such that she could not "effectively participate fully in the legislative process" "deprived her constituents of the Equal Protection of the law" (citing *Reynolds*, 377 U.S. at 555)), *rev'd on mootness grounds*, 532 F.2d 325 (3d Cir. 1976).

Likewise, the U.S. House has concluded that it may not strip members of their voting rights because it would unconstitutionally deprive constituents of their representative vote. *Deschler's* 1739. In rejecting a proposed mandatory deprivation of voting rights for certain members, the U.S. House

observed the need to "preserve the right to representation of the constituents of the Member's district." *Id.* at 1738. Stripping members of their votes would "deprive[] the district, which the Member was elected to represent, of representation," "effectively disenfranchis[ing]" those "who elected that person to represent them" and "undermin[ing] the basic interest of a constituency in their representative government." *Id.* at 1738-39. So too here.

Even more problematic, Plaintiffs are left disenfranchised for at least the remainder of the 132nd Legislature and perhaps *indefinitely* should Libby seek and win reelection. While vacancies arise and leave constituents temporarily unrepresented, the Maine Constitution provides a remedy: "the vacancy may be filled by a new election." Me. Const. art. IV, Pt. 1, §6. Thus, traditional vacancies leave constituents disenfranchised only temporarily. *Cf. Monserrate v. N.Y. State Senate*, 695 F. Supp. 2d 80, 91 (S.D.N.Y. 2010) (finding only "slight" "burden on voting rights" when special election was immediately called to fill a vacancy). But here, the disenfranchisement will continue indefinitely. Until she apologizes to the Speaker's liking, Libby cannot speak or vote on the House floor.[2] There are no grounds to declare a vacancy in House District 90 or otherwise expel Libby and call for a special election; Libby was lawfully elected and remains fully qualified to serve her district. *Infra* I.B.2. There is thus no constitutional mechanism for House District 90 to regain representation in the Maine House absent restoration of Libby's privileges as a member. *See Deschler's* 1739 (explaining "there can be no replacement for the punished member" absent expulsion, so "a constituency would be left without a voice in the House … for the duration of the Congress"). Libby's punishment causes irreparable

---

[2] Any such forced apology would raise its own constitutional questions, including whether that apology amounts to an unconstitutional condition or unconstitutionally compelled speech. *See, e.g., Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) (unconstitutional conditions doctrine bars coercively withholding benefits from those who exercise fundamental rights); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796-97 (1988) (explaining First Amendment "necessarily compris[es] the decision of both what to say and what *not* to say"); *see also Seamons v. Snow*, 84 F.3d 1226, 1236-39 (10th Cir. 1996) (holding student stated free-speech claim where he was removed "from the football team because he refused to apologize for informing authorities of [a hazing] incident"); *Blue Rio LLC v. Thomas*, 2017 WL 4863091, at *4 (S.D.N.Y. Oct. 26) (holding plaintiffs stated free-speech claim where mayor "required an apology for statements plaintiffs made to the press before [he] would issue [building] permits" to them).

constitutional harm to all in her district and is irreconcilable with the Equal Protection Clause and its fundamental guarantee that all will have an equal voice in their legislature.

**2.** For similar reasons, the disenfranchisement of House District 90's constituents also violates due process. The Due Process Clause of the Fourteenth Amendment forbids state officials from eliminating fundamental voting rights in violation of state law. *See Bonas*, 265 F.3d at 75; *Duncan v. Poythress*, 657 F.2d 691, 704 (5th Cir. Unit B Sept. 1981). Just as voters cannot be disenfranchised on election day, *see, e.g.*, *Bonas*, 265 F.3d at 75, they cannot be disenfranchised after election day, *cf. Michel*, 14 F.3d at 626. But that is the effect of Libby's punishment here. Defendants are denying her district a vote in the House indefinitely, effectively excluding Libby from the House contrary to the Maine Constitution. That deprivation of fundamental voting rights, *supra* I.B.1, violates due process. *See, e.g.*, *Bonas*, 265 F.3d at 75-76; *Griffin v. Burns*, 570 F.2d 1065, 1078-79 (1st Cir. 1978).

The Maine Constitution sets forth the qualifications for House members. Me. Const. art. IV, pt. 1, §4. Libby meets all of them: she is a U.S. citizen; she is over age 21; and she has long been a resident of Maine and her district. *See id.*; Compl. ¶10. The Maine Constitution also sets forth the only circumstance in which qualified members may be expelled: "with the concurrence of 2/3" of House members. Me. Const. art. IV, pt. 3, §4. Interpreting similar provisions of the federal Constitution, the U.S. House concluded that "the only way" it could exclude a congressman from representing his district "would be on a two-thirds vote on expulsion." *Deschler's* 1738-39. The same rules apply here. If the House wishes to expel Libby, then it needs the concurrence of two-thirds of its members. Short of that, Libby is entitled an equal vote on behalf of her constituents, no different than all other qualified members. Those who ratified the Maine Constitution already decided the minimum requirements of membership in the House; having met those qualifications, neither Libby nor her constituents may be denied a vote in the House indefinitely. *See, e.g.*, *Powell v. McCormack*, 395 U.S. 486, 522-48 (1969) (concluding the same for the federal Constitution's qualifications provision after exhausting historical

precedent); *Kucinich*, 432 F. Supp. at 1116-17. Whatever the House's power to "punish," Me. Const. art. IV, pt. 3, §4, it cannot extend to the indefinite exclusion of a member (and her constituents) from the official votes of the House. *See, e.g.*, *Powell*, 395 U.S. at 548. Just as state officials cannot cancel elections in violation of state law, *Bonas*, 265 F.3d at 78, state officials cannot cancel the votes of a duly elected representative in violation of the Maine Constitution's provisions for House membership.

**3.** Denying House District 90 a vote in the House also unconstitutionally dilutes Plaintiffs' voting rights as compared to other Mainers in other districts. The right to vote "can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. The "democratic principle" of "one person, one vote" "stands for the 'idea that every voter is equal to every other voter in his State.'" *Lyman v. Baker*, 954 F.3d 351, 364-65 (1st Cir. 2020). So, "when qualified voters elect members of [a legislature] each vote [must] be given as much weight as any other vote." *Wesberry*, 376 U.S. at 7. "[O]ne's right to vote is impaired to an unconstitutional degree when the weight of one's vote is substantially diluted in comparison with the votes of citizens living elsewhere in the state." *Lyman*, 954 F.3d at 365.

Defendants have broken that promise of equality. On election day, Mainers cast equal votes for their respective House representatives across the State, and those in District 90 elected Libby. But now, it is as though that vote never transpired. Thousands in Libby's district lack the representation that every other House district enjoys as critical legislation comes before the House floor, including the State's biennial budget and Libby's own mental health bill, among many others. Compl. ¶¶69-70. While those outside House District 90 have a say in the ongoing legislative process, Libby's constituents do not. *See, e.g.*, *Kucinich*, 432 F. Supp. at 1116-17. That broken promise is no different than if Plaintiffs had not participated "on an equal basis with other citizens" across Maine on election day. *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Denying House District 90 a vote in the House "contracts the value of some votes and expands that of others." *Wesberry*, 376 U.S. at 7.

That the "dilution occurs after the voters' representative is elected" is immaterial. *Michel*, 14 F.3d at 626. Equal protection applies to "the initial allocation of the franchise" and "the manner of its exercise." *Bush v. Gore*, 531 U.S. 98, 104 (2000). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05. As the D.C. Circuit has observed, "It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor." *Michel*, 14 F.3d at 626. Just as the Maine House could not reduce the strength of District 90's vote by one-half, it cannot reduce District 90's vote to nothing. *See Reynolds*, 377 U.S. at 555-58.

**4.** Finally, Defendants have disenfranchised House District 90 and diluted its constituents' votes on arbitrary terms. States are "obligat[ed] to avoid arbitrary and disparate treatment of the members of its electorate." *Bush*, 531 U.S. at 105; *see also Reynolds*, 377 U.S. at 557 (explaining "arbitrary and capricious action" can violate equal protection). But here, Defendants deprived Plaintiffs of their vote arbitrarily. The three other censures in the Maine Legislature's nearly 200-year history concerned speech or conduct in the statehouse that disrupted the decorum of the House. Compl. ¶53. As for the cited ethics rules that Libby purportedly violated, those rules say nothing about members' social media activity outside the statehouse. ¶52; *see Legislative Code of Ethics*, Me. House Reps., https://perma.cc/RF43-JPA2. Indeed, Speaker Fecteau himself has posted many photos of minors on Facebook, for reasons that are at least in part political. Compl. ¶62. And Fecteau disclaimed forthcoming censures of other members who reposted Libby's exact post. ¶55. Thus, "[t]he problem inheres in the absence of specific standards to ensure … equal application." *Bush*, 531 U.S. at 106. Defendants unconstitutionally "utilize[d] 'non-uniform rules, standards, and procedures' that result[ed] in 'massive disenfranchisement and unreasonable dilution of the vote.'" *LWV of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008). That arbitrary deprivation violates the Equal Protection Clause.

**C. The censure violates the Guarantee Clause.**

Barring an elected representative from speaking and voting on behalf of her constituents also denies Plaintiffs their constitutionally guaranteed republican form of government. *See* U.S. Const. art. IV, §4. Described above, the punishment effectively deprives House District 90 of its representation in the House even though Libby meets the Maine Constitution's qualifications to serve and even though there has been no two-thirds vote to expel her. *Supra* I.B.2. In flouting these state constitutional requirements, Defendants violate the federal Guarantee Clause by transgressing the Maine Constitution's provisions for its chosen republican form of government.

**1.** Plaintiffs' Guarantee Clause claim is justiciable. As the Supreme Court has observed, "not all claims under the Guarantee Clause present nonjusticiable political questions." *New York v. United States*, 505 U.S. 144, 185 (1992); *Largess v. Supreme Jud. Ct. of Mass.*, 373 F.3d 219, 229 (1st Cir. 2004) (noting "several members of the Supreme Court have suggested that federal courts can indeed review the internal allocations of power in a state government under the text of this clause" (citing *Bush*, 531 U.S. at 112 (Rehnquist, C.J., concurring))). As with any justiciability question, this Court must look to the particular facts and circumstances of Plaintiffs' claim to ascertain whether courts may resolve it, or whether it is too "'political' in nature" and devoid of "judicially manageable standards." *Reynolds*, 377 U.S. at 582; *see, e.g.*, *Kerr v. Hickenlooper*, 744 F.3d 1156, 1181 (10th Cir. 2014) ("the specific Guarantee Clause claim asserted in this case is not barred by the political question doctrine"), *vacated on other grounds*, 576 U.S. 1079 (2015); *Democratic Party of Wis. v. Vos*, 966 F.3d 581, 589 (7th Cir. 2020) (noting district court "went too far in saying that no Guarantee Clause claim" is justiciable). No justiciability concerns bar consideration of Plaintiffs' narrow claim here.

Plaintiffs' claim is not "political" so as to remove it from this Court's jurisdiction. Guarantee Clause claims are *not* "per se non-justiciable." *Kerr*, 744 F.3d at 1176. The clause references the "United States" broadly, which includes Article III courts. *Id.*; *see also Baker v. Carr*, 369 U.S. 186, 244 n.2 (1962)

(Douglas, J., concurring) (reading the clause to be "enforceable only by Congress or the Chief Executive is not maintainable"). As in *Kerr*, Plaintiffs' claim regarding their deprivation of representation in the Maine House, contrary to the Maine Constitution's requirements, presents a "narrow issue" with no textual commitment to a coordinate branch of the federal government. 744 F.3d at 1177. It bears little resemblance to claims implicating "the relationship between the judiciary and the coordinate branches of the Federal Government," which have been held nonjusticiable. *Baker*, 369 U.S. at 210.

There are also judicially manageable standards to adjudicate Plaintiffs' claim, and no other justiciability concerns preclude review. *See Kerr*, 744 F.3d at 1177-81. Plaintiffs do not ask, for example, to second-guess whether the Maine Constitution adequately affords its citizens a republican form of government. *Cf. Largess*, 373 F.3d at 227. They ask only whether state officials must stick to that chosen form of government, consistent with the Guarantee Clause. *See* Thomas A. Smith, Note, *The Rule of Law and the States: A New Interpretation of the Guarantee Clause*, 93 Yale L.J. 561, 565-73 (1984) (explaining federal courts under the Guarantee Clause could "be limited to scrutinizing state actions for their consistency with state constitutions"); *see also, e.g.*, *Kerr*, 744 F.3d at 1173 (distinguishing cases "involv[ing] wholesale attacks on the validity of a state's government" from "a challenge to a single provision of a state constitution"). Plaintiffs contend that Defendants' acts are inconsistent with Maine's constitutional provisions essential to guaranteeing Mainers a republican form of government. *Infra* I.C.2. Just as the federal courts are competent to adjudicate violations of similar provisions under the federal Constitution, *Powell*, 395 U.S. at 548, so too can this Court adjudicate Plaintiffs' claim.

**2.** Plaintiffs have shown a Guarantee Clause violation. While the outer bounds of the clause are the subject of extensive academic debate, *see Largess*, 373 F.3d at 226 (collecting authorities), there is little dispute over the core of its guarantee. At the heart of any republican form of government is, in Alexander Hamilton's words, "that the people should choose whom they please to govern them." 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876). It is the people who "set bounds to

their own power" in their written state constitutions. *Duncan v. McCall*, 139 U.S. 449, 461 (1891). At a minimum, it is a guarantee of the people's sovereignty over their government in place of a monarchy. *See* Erwin Chemerinsky, *Cases Under the Guarantee Clause Should be Justiciable*, 65 U. Colo. L. Rev. 849, 867 (1994) (discussing *The Federalist No. 43* (Madison) and *The Federalist No. 85* (Hamilton)).

This case presents a paradigmatic violation of that guarantee: thousands living within the boundaries of House District 90 have no vote in the House. That deprivation amounts to the sort of "egregious circumstance[]" that violates the Guarantee Clause. *Largess*, 373 F.3d at 227. Defendants' actions deprive Plaintiffs of "the distinguishing feature" of a republican form of government "to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *Duncan*, 139 U.S. at 461.

Defendants' actions cannot be squared with Maine's chosen constitutional provisions guaranteeing a republican form of government. Described above, Libby meets all constitutional requirements for serving in the House. Me. Const. art. IV, pt. 1, §4. If the House wishes to strip her right to vote on behalf of House District 90 indefinitely, then it must muster "the concurrence of 2/3" of its members to expel her. Me. Const. art. IV, pt. 3, §4. Interpreting similar provisions in the federal Constitution, the U.S. House concluded that "the only way that there could be a mandatory exclusion from the exercise of the right of any Congressman to represent his district … would be on a two-thirds vote on expulsion." *Deschler's* 1738-39; *accord Powell*, 395 U.S. at 550 (holding "the House was without power" to exclude a member "not ineligible to serve under any provision of the Constitution").

The Court need only find that Libby's punishment goes beyond what these state constitutional provisions would permit and, in turn, violates the Guarantee Clause. State republican government includes "limit[s] by written constitutions" and "bounds to their own power … against the sudden impulses of mere majorities." *Duncan*, 139 U.S. at 461; *see Bd. of Elections for Franklin Cnty. v. State ex rel.*

*Schneider*, 191 N.E. 115, 120 (Ohio 1934) (noting state constitutional violations implicated Guarantee Clause). The Guarantee Clause repels "domestic dangers," including by "[u]surpation," which may sometimes *threaten the existence of the State constitutions*" that the people have put in place. *The Federalist No. 21* (Hamilton) (emphasis added). Defendants' actions pose a "realistic risk of altering the form or the method of functioning of [the State's] government" by depriving thousands of their chosen representative and therefore violate the Guarantee Clause. *New York*, 505 U.S. at 186.

## II.  The remaining preliminary injunction factors favor relief.

**A.** Plaintiffs will suffer irreparable harm absent relief. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 21 (1st Cir. 2007). Because Libby has shown likely "success on the merits of [her] First Amendment claim, it follows that the irreparable injury component of the preliminary injunction analysis is satisfied as well." *Sindicato Puertorriqueno de Trabajadores v. Fortuño*, 699 F.3d 1, 15 (1st Cir. 2012). The same goes for Plaintiffs' remaining claims. The legislative session is ongoing while thousands in House District 90 are left without a vote. Such abridgments of "fundamental voting rights" and the right to equal representation impose "irreparable injury" warranting "immediate relief." *Walters v. Bos. City Council*, 676 F. Supp. 3d 26, 47 (D. Mass. 2023) (quoting *LWV of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014)); *see Mich. State A. Philip Randolph Inst. v. Johnson*, 833 F.3d 656, 669 (6th Cir. 2016) ("A restriction on the fundamental right to vote … constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (similar).

These constitutional harms "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). As each day of the legislative session passes, the House will vote on consequential measures, for which "there can be no do-over and no redress." *LWV of N.C.*, 769 F.3d at 247; *see Westfield High Sch. L.I.F.E. Club v. City of Westfield*,

249 F. Supp. 2d 98, 127 (D. Mass. 2003). Plaintiffs could well "be without [a] properly elected representative[]" indefinitely—"an injury that cannot be compensated with damages, making it irreparable." *LULAC v. Abbott*, 601 F. Supp. 3d 147, 182 (W.D. Tex. 2022).

**B.** The equities and public interest also favor Plaintiffs. "[P]rotecting rights to free speech is ipso facto in the interest of the general public." *McBreairty v. Sch. Bd. of RSU 22*, 616 F. Supp. 3d 79, 98 (D. Me. 2022). Indeed, "freedom of political expression[] is vital to the health of our democracy." *Bl(a)ck Tea Soc'y v. City of Bos.*, 378 F.3d 8, 15 (1st Cir. 2004). The public also has a "strong interest in exercising the 'fundamental political right' to vote." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006); *see Espiritu v. Comision Estatal de Elecciones*, 2024 WL 4362434, at *14 (D.P.R. Oct. 1) (noting "strong public interest supporting broad voter participation"); *Arlene Ocasio v. Comision Estatal de Elecciones*, 486 F. Supp. 3d 478, 484 (D.P.R. 2020) (noting "public interest in ensuring citizens their constitutional right to vote").

Defendants, on the other hand, will not be harmed by an injunction restoring the status quo and ensuring Libby's right to speak and vote on behalf of thousands of constituents. Defendants have no legitimate interest in enforcing a resolution that violates the First Amendment. *See We the People PAC v. Bellows*, 519 F. Supp. 3d 13, 52-53 (D. Me. 2021), *aff'd*, 40 F.4th 1 (1st Cir. 2022). And "the public interest could not be served by allowing enforcement of an unconstitutional" action. *Cent. Me. Power Co. v. Me. Comm'n on Gov'tal Ethics & Election Pracs.*, 721 F. Supp. 3d 31, 56 (D. Me. 2024).[3]

## CONCLUSION

The Court should grant Plaintiffs' motion for preliminary injunction.

---

[3] The Court should exercise its discretion to waive Rule 65's bond requirement because "the vindication of 'important federal rights' is at issue." *Del. Valley Fish Co. v. Fish & Wildlife Serv.*, 2009 WL 1706574, at *11 (D. Me. June 12); *see Westfield*, 249 F. Supp. 2d at 129; *accord Crowley v. Local No. 82, Furniture & Piano Moving*, 679 F.2d 978, 1001 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984). There is also no financial cost associated with an injunction against Defendants.

Dated: March 11, 2025

Respectfully submitted,

/s/ *Patrick Strawbridge*

Taylor A.R. Meehan\*
Daniel M. Vitagliano\*†
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com

Patrick Strawbridge (Bar No. 10024)
 *Lead Counsel*
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

\*Certificates for admission *pro hac vice*
forthcoming
†Supervised by principals of the firm
admitted to practice in VA

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2025, I electronically filed a true and correct copy of Plaintiffs' motion for preliminary injunction through the Court's CM/ECF system and will serve a copy on each Defendant according to the Federal Rules of Civil Procedure.

/s/ *Patrick Strawbridge*