# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

LAUREL D. LIBBY, State Representative of
Maine House District 90, RONALD P. LEBEL,
WENDY MUNSELL, JASON LEVESQUE,
BERNICE FRASER, RENE FRASER, and
DONALD DUBUC,

                         Plaintiffs,

        v.

RYAN M. FECTEAU, in his official capacity
as Speaker of the Maine House of
Representatives, and ROBERT B. HUNT, in
his official capacity as Clerk of Maine House,

                         Defendants.

Civil Action No. 1:25-cv-00083-MRD

---

## DEFENDANTS' MOTION TO DISMISS
### Fed. R. Civ. P. 12(b)(1)
### Fed. R. Civ. P. 12(b)(6)

---

AARON M. FREY
Attorney General

Kimberly L. Patwardhan
Jonathan R. Bolton
Assistant Attorneys General
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel. (207) 626-8800
kimberly.patwardhan@maine.gov
jonathan.bolton@maine.gov

Defendants Speaker of the Maine House of Representatives and Clerk of the House have shown in their opposition to Plaintiffs' motion for preliminary injunction (ECF No. 28) that Plaintiffs' claims against them arising from her censure for breaching the Legislative Code of Ethics are barred by absolute legislative immunity. Defendants have further shown Plaintiffs' First Amendment, Equal Protection, Due Process, and Guarantee Clause claims are not just unlikely to succeed but fail as a matter of law. For the reasons stated in that opposition and below, the Court should dismiss Plaintiffs' complaint in its entirety.

## Background

The factual summary below is derived from the Complaint's allegations, which, for purposes of this motion, are assumed to be true to the extent they are non-speculative and non-conclusory. *Lyman v. Baker*, 954 F.3d 351, 360 (1st Cir. 2020). Also referenced is information in official legislative records. *See Pitta v. Medeiros*, 90 F.4th 11, 14 n.1 (1st Cir. 2024) ("On a motion to dismiss, we may consider documents which are of undisputed authenticity, official public records, central to the plaintiff's claim, or sufficiently referred to in the complaint.").

On February 17, 2025, Rep. Libby made public posts to Facebook and X identifying a transgender high-school student by first name and school and including photographs of the student. Compl. ¶ 31. Some of the other students in the photos—but not the transgender student—were blurred out. *Id*. The post identified the student in the context of criticizing the student's participation in a girl's high school sporting event. *Id.* The post "went viral." *Id.* ¶ 35.

Speaker of the House Ryan Fecteau requested that Rep. Libby take down the post. Compl. ¶ 42. Rep. Libby refused. *Id.* The Speaker expressed concern for the privacy of the student and the impact on "their health and their safety, at school, and in their communities." *Id.* ¶ 44.

On February 25, 2025, the Maine Legislature voted to censure Libby for her Facebook post. *Id.* ¶ 50. The censure resolution found Rep. Libby's conduct to be "reprehensible and in direct

violation of our code of ethics." *Id.*; *see* H.R. 1 (132nd Legis.), *available at* https://www.mainelegislature.org/legis/bills/getPDF.asp?paper=HR0001&item=1&snum=132. Following passage of the censure resolution, the Speaker admonished Rep. Libby and offered her an opportunity to apologize. *Id.* ¶ 57. When she failed to do so, the Speaker found Rep. Libby in violation of House Rule 401(11), which provides:

> **Breach of rules**. When any member is guilty of a breach of any of the rules and orders of the House and the House has determined that the member has violated a rule or order, that member may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction.

H.R. Rule 401(11), 132nd Leg. No one, including Rep. Libby, appealed the Speaker's ruling to the full House at the time,[1] but since then, the full House has twice voted against suspending the application of Rule 401(11) to Rep. Libby.[2]

At present, Rep. Libby cannot participate in floor debates or vote on matters under consideration by the full House. Compl. ¶ 59. Those restrictions will end once she apologizes, H.R. Rule 401(11), or if the House votes by two-thirds to dispense with Rule 401(11), *see* H.R. Rule 523, 132nd Leg. (Me.), or when the 132nd Legislature ends. *See SC Testing Tech., Inc. v. Dep't of Env't Prot.*, 688 A.2d 421, 425 (Me. 1996) ("[t]he Legislature may not enact a law that purports to bind a future Legislature"). Plaintiffs do not allege that Rep. Libby has lost any other legislative privileges, such as her committee assignment, her pay, her ability to introduce legislation, and her ability to make motions on the floor. In fact, since her censure, she has made

---

[1] *Me. Leg. Archived Hearings & Meetings: House Chamber*, 132nd Legis., at 7:10:50-7:11:25 p.m. (Feb. 25, 2025), https://legislature.maine.gov/audio/#house_chamber?event=92233&startDate=2025-02-25T10:00:00-05:00.

[2] *Me. Leg. House Roll Call No. 33: Motion to Suspend Rule 401 Part 11*, 132nd Legis. (Mar. 20, 2025), https://www.mainelegislature.org/LawMakerWeb/rollcall.asp?ID=280096679&chamber=H&serialnumber=33; *Me. Leg. Archived Hearings & Meetings: House Chamber*, 132nd Legis., at 11:39:40-11:40:35 a.m. & 11:43:09-11:48:04 a.m. (Mar. 25, 2025), https://legislature.maine.gov/Audio/#house_chamber?event=93387&startDate=2025-03-25T10:00:00-04:00.

motions on the floor of the House,[3] participated in her assigned committee,[4] and voted on bills before her assigned committee.[5] She also has presented written and oral testimony before other committees of jurisdiction in the Maine Legislature.[6]

*History of the House's Censure Rule*

House Rule 401(11) was adopted by unanimous consent of all members of the House in December of 2024. *See* Summary of H.O. 1 (132nd Legis.), at https://www.mainelegislature.org/LawMakerWeb/summary.asp?ID=280095348. The rule requires a legislator to "make satisfaction" following a breach of rules to avoid loss of speaking and voting privileges and is of ancient origins. The rule can be traced back to at least 1802, when it provided "When any Member shall be guilty of the breach of either of the orders aforesaid, and the House has determined he has so transgressed, he shall not be allowed to speak or vote until he has made satisfaction, unless by which of excuse for the same." *See* Massachusetts House Rules, ¶ 28 (1802), *available at* https://tinyurl.com/y584ht25; *see also Coffin v. Coffin*, 4 Mass. 1, 22 (1808). When Maine gained statehood by separating from Massachusetts in 1820, the first Maine House retained the rule in

---

[3] *See, e.g.*, *Me. Leg. Archived Hearings & Meetings: House Chamber*, 132nd Legis., at 2:44:32-2:45:10 p.m., 3:47:03-3:47:51 p.m., 3:59:01-3:59:42 p.m., 4:07:52-4:08:30 p.m., & 4:13:13-4:13:53 p.m. (Mar. 25, 2025), https://legislature.maine.gov/Audio/#house_chamber?event=93386&startDate=2025-03-20T10:00:00-04:00.
[4] *See Me. Leg. Archived Hearings & Meetings: Room 202, Labor Comm.*, 132nd Legis., at 3:34:20-3:52:00 (Mar. 4, 2025), https://legislature.maine.gov/Audio/#202?event=93529&startDate=2025-03-04T13:00:00-05:00.
[5] *See Me. Leg. Archived Hearings & Meetings: Room 202, Labor Comm.*, 132nd Legis., at 3:50:05 (Mar. 4, 2025), https://legislature.maine.gov/Audio/#202?event=93529&startDate=2025-03-04T13:00:00-05:00. *See also Me. Leg. Bill Tracking, L.D. 703, An Act to Establish a Health Care Gap Year Program for Recent College Graduates*, https://legislature.maine.gov/billtracker/#Paper/703?legislature=132 (notating Rep. Libby voted Ought Not To Pass on L.D. 703 on or about March 19, 2025).
[6] *See, e.g., An Act to Lower Energy Costs by Repealing the Law Setting Out the State's Goals for Consumption of Electricity from Renewable Resources: Hearing on L.D. 444 Before the J. Standing Comm. on Energy, Utils. & Tech.*, 132nd Legis. (Mar. 4, 2025) (written testimony submitted by Rep. Libby on L.D. 444, which she sponsored), *available at* https://legislature.maine.gov/backend/app/services/getDocument.aspx?doctype=test&documentId=185154; *Me. Leg. Archived Hearings & Meetings: Room 211, Energy, Utils. & Tech. Comm.*, 132nd Legis., at 3:01:50-3:13:07 p.m. (Mar. 4, 2025) (oral testimony presented by Rep. Libby on L.D. 444, which she sponsored), https://legislature.maine.gov/audio/#211?event=93675&startDate=2025-03-04T13:00:00-05:00.

substantially similar form.[7] It has remained part of the Maine House rules, with minor variations, since that time.[8] Other legislative bodies, including the Connecticut General Assembly and the Arizona House of Representatives follow substantially the same rule.[9]

Legislative restrictions on members' privileges stretch back to colonial times. During the colonial era, it was commonplace for legislative bodies to impose punishments such as imprisonment, suspension, and forced apology for rule breaches. *See* M.P. Clarke, *Parliamentary Privilege in the American Colonies* 190 (1971) (*Parliamentary Privilege*). Around 1784, for example, the Massachusetts House suspended Maine Rep. Jeremiah Learned of Oxford while he was under indictment for "seditiously and riotously opposing the collection of public taxes." Luther S. Cushing, *Reports of Contested Elections* at 13 (1834), *available at* https://tinyurl.com/a5xdkrxv. Similarly, around 1808, Maine Rep. John Waite of Falmouth was "suspended from exercising the duties of a member" based on his conviction for forgery. *Id.* at 50.

In recent years, there have been three censures of Maine Representatives prior to Rep. Libby, all of which involved their speech. *See* Compl. ¶ 53. Two representatives were censured in 2024 for remarks on the House floor. House Journal (Apr. 11, 2024) at 1723–24. Both apologized. *Id.* In 2001, a representative was censured for verbally abusing another member in the hallway outside the House chamber. House Journal (Feb. 8, 2001) at 145. He also apologized.[10]

---

[7] *See* House Rules, ch. 2, ¶ XV (1820) ("When any Member shall be guilty of the breach of either of the Rules and Orders of the House, and the House has determined he has so transgressed, he shall not be allowed to speak or vote until he has made satisfaction, unless by way of excuse for the same."), filed as ECF No. 28-1.

[8] *See, e.g.*, Rules and Orders of the House ¶ 21 (1860), available at https://tinyurl.com/4hc44zmv; Rules of the House ¶ 18 (1969), available at https://tinyurl.com/3apystjw.

[9] *See* Rules and Precedents of the General Assembly of Connecticut, House Rules ¶ 18; Senate Rules ¶ 16 (2023), available at https://tinyurl.com/yc9zdn7c; Rules of the Arizona House of Representatives, 56th Legislature, Rule 1(B), available at https://tinyurl.com/34xvvj3c; *see also* Rule 26, Standing Rules of the Assembly of the State of Florida (1872), available at https://tinyurl.com/4jnec2p3; Rules and Orders, ¶ 26, Journal of the House of Representatives of the Territory of Washington (1854), available at https://tinyurl.com/bdz6jkrp.

[10] The resolutions and portions of House journals concerning these censures, which are subject to judicial notice as official legislative records, have been compiled by the Maine Legislature at the following link: https://legislature.maine.gov/discipline-of-maine-legislators.

**Argument**

To survive a motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Guadalupe-Baez v. Pesquera*, 819 F.3d 509, 514 (1st Cir. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The analysis has two steps. First, the Court should "separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." *Id.* (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d 220, 224 (1st Cir. 2012)). Second, the Court should determine whether "the well-pleaded facts, taken in their entirety, permit 'the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678). If the well-pleaded facts "do not permit the court to infer more than the mere possibility of misconduct," the complaint should be dismissed. *Iqbal*, 556 U.S. at 679. "The make-or-break standard . . . is that the combined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief." *Sepulveda-Villarini v. Dep't of Educ. of P.R.*, 628 F.3d 25, 29 (1st Cir. 2010). This analysis requires the court to draw upon "its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

The "same basic principles apply" to a motion to dismiss for lack of subject-matter jurisdiction. *Harper v. Rettig*, 46 F.4th 1, 5 (1st Cir. 2022) (quoting *Lyman*, 954 F.3d at 359). However, a "district court may 'resolv[e] . . . factual disputes between the parties' 'in order to determine its own jurisdiction.'" *Me. Mar. Acad. v. Fitch*, 425 F. Supp. 3d 24, 28 (D. Me. 2019) (quoting *Valentin v. Hosp. Bella Vista*, 254 F.3d 358, 363 (1st Cir. 2001)).

**I.    The complaint should be dismissed because Defendants enjoy absolute legislative immunity for their actions.**

Legislative immunity protects legislators and staff from suit for their legislative conduct. Legislative conduct includes voting, adoption and enforcement of rules governing legislative

proceedings, punishing a member for misconduct. Because all the actions Plaintiffs challenge are legislative acts, *see* Compl. ¶¶ 75, 84–86, 91–93, 101, 104–106, the Speaker and the Clerk are protected by legislative immunity against all of Plaintiffs' claims.

### A.    Principles of legislative immunity.

"[L]egislative immunity is an analogue to the Speech and Debate Clause[11] of the federal Constitution that reflects the importance that Anglo-American law traditionally has placed on protecting 'legislators acting within their traditional sphere' from being subject to suit." *Cushing v. Packard*, 30 F.4th 27, 36 (1st Cir. 2022) (en banc) (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)) , *cert. denied* 143 S. Ct. 308 (2021); *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23, 28 (1st Cir. 1996) ("[A]bsolute [legislative] immunity affords protection not only from liability but from suit."). The "immunity enables officials to serve the public without fear of personal liability. Not only may the risk of liability deter an official from proper action, but the litigation itself 'creates a distraction and forces legislators to divert their time, energy, and attention from their legislative tasks to defend the litigation.'" *Sable v. Myers*, 563 F.3d 1120, 1123–24 (10th Cir. 2009) (quoting *Supreme Court of Va. v. Consumers Union of the U.S.*, 446 U.S. 719, 733 (1967)).

Although the doctrine of legislative immunity springs from the federal constitution, the Supreme Court has extended its protections to state, regional, and local legislators. *Bogan v. Scott-Harris*, 523 U.S. 44, 48–49 (1998). Accordingly, state "legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities," even where the remedy sought is limited to declaratory or injunctive relief. *Id.* The immunity extends not only to legislators, but to legislative aides and staff "insofar as the conduct of the latter would be a protected legislative

---

[11] The Speech and Debate Clause of the United States Constitution provides: "for any Speech or Debate in either House, [Senators and representatives] shall not be questioned in any other Place. U.S. Const. Art. I § 6, cl. 1. Maine's Constitution contains a similar provision entitled "freedom of debate": "no member shall be liable to answer for anything spoken in debate in either House, in any court or place elsewhere." Me. Const. art. IV, pt, 3, § 8.

act if performed by the [legislator her]self." *Gravel v. United States*, 408 U.S. 606, 618 (1972); *see also Massie v. Pelosi*, 72 F.4th 319, 323 (D.C. Cir. 2023) (concluding House Sergeant-at-Arms and Chief Administrative Officer were engaged in legislative acts when they enforced a U.S. House resolution through fines and salary garnishment), *cert. denied* 144 S. Ct. 1005 (2024).

The only relevant inquiry in a legislative immunity analysis is whether the challenged conduct was legislative in nature, meaning "acti[on] in a field where legislators traditionally have power to act," *Tenney*, 341 U.S. at 379, or an "integral step[] in the legislative process," *Bogan* 523 U.S. at 55; *see also Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880) (legislative acts are those "things generally done in a session of the House by one of its members in relation to the business before it"). Legislative immunity thus protects matters pertaining "to the consideration and passage or rejection of proposed legislation" and "other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625.

In determining whether challenged conduct is protected by legislative immunity, "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54–55 (rejecting Court of Appeals position that conduct "was not legislative because their actions were specifically targeted at respondent"); *Tenney*, 341 U.S. at 377 ("The claim of an unworthy purpose does not destroy the privilege."); *Torres-Rivera v. Calderon-Serra*, 412 F.3d 205, 214 (1st Cir. 2005) ("there can be no inquiry into legislative motive no matter how corrupt"). "Immunity attaches even if a plaintiff alleges that a member has violated internal rules or the Constitution." *Massie*, 72 F.4th at 323–24; *Bogan*, 523 U.S. at 46–47, 55 (holding legislative immunity barred a First Amendment retaliation claim). For example, in *Tenney*, the Supreme Court held that legislative immunity barred a suit against state legislators even as to allegations that defendants intended "to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights." 341 U.S. at 371.

**B.     All the conduct challenged by Plaintiffs are legislative acts that are protected by legislative immunity.**

The House "is 'expressly empower[ed]' to enact internal rules and punish members for violating those rules." *Massie*, 72 F.4th at 322 (quoting *Kilbourn*, 103 U.S. at 189–90). The power to punish members "is the primary power by which legislative bodies preserve their 'institutional integrity' without compromising the principle that citizens may choose their representatives." *Whitener v. McWatters*, 112 F.3d 740, 744 (4th Cir. 1997).

Here, the House adopted the resolution censuring Rep. Libby pursuant to its constitutional authority to "punish its members for disorderly behavior." Me. Const. art. IV, pt. 3, § 4; *accord* U.S. Const. art. I, § 5, cl. 2 (providing the same). The House adopted its rules pursuant to its constitutional authority to "determine the rules of its proceedings." Me. Const. art. IV, pt. 3, § 4. The censure resolution and the adoption and application of House Rule 401(11)—all of which resulted from votes of the entire Maine House—are squarely within the jurisdiction of the House and are legislative acts.

It does not matter that the punishment imposed by the House precludes Rep. Libby from voting on the House floor or engaging in debate on the House floor. The relevant distinction is between legislative acts and nonlegislative acts, not between forms of discipline. *See Gravel*, 408 U.S. at 625. As long as an act is "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings" or "with respect to other matters which the Constitution places within the jurisdiction of either House," it is protected. *See id.* That is true even if the act is performed by the House Clerk (instead of a Representative), *see id.* at 616–17, and even if a plaintiff alleges (like Plaintiffs do here) that the challenged conduct is unconstitutional. In other words, legislators "and their aides are immune from liability for their actions within the legislative sphere, even though their conduct, if performed in other than

legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 510 (1975) (cleaned up).

Thus, the punishment imposed numerous courts have determined that punishments imposed by legislative bodies on their members are legislative acts and persons are immune from suit for engaging in those acts.[12] The Maine House's adoption and enforcement of legislative rules are likewise legislative acts protected by legislative immunity, *see Massie*, 72 F.4th at 322–23 (adoption and enforcement of a House rule were legislative acts), even if those rules affect member voting, *McCarthy v. Pelosi*, 5 F.4th 34, 39-41 (D.C. Cir. 2021) (concluding legislative immunity barred review of enactment or enforcement of resolution that enabled United States House Members to cast votes by proxy), *cert. denied* 142 S. Ct. 897 (2022).

The First Circuit is in accord. In *National Association of Social Workers v. Harwood* the court addressed a challenge to a rule adopted by the Rhode Island House of Representatives that banned "both lobbyists and lobbying from the floor of the House while the House is in session." 69 F.3d 622, 625 (1st Cir. 1995). Excluded lobbyists filed suit against the Speaker and the head doorkeeper challenging the rule on First Amendment and Fourteenth Amendment grounds. *Id.* at 626–27. While plaintiffs prevailed at trial, *id.*, the First Circuit reversed on grounds of legislative immunity, *id.* at 628. The court reasoned that:

> Where, as here, a legislative body adopts a rule, not invidiously discriminatory on its face, that bears upon its conduct of frankly legislative business, we think that the doctrine of legislative immunity must protect legislators and legislative aides who

---

[12] *Gamrat v. McBroom*, 822 F. App'x 331, 334 (6th Cir. 2020) ("the House's expulsion of Gamrat was legislative activity, regardless of any bad faith, and Gamrat cannot sue the House Defendants for participating in that process"), *cert. denied* 141 S. Ct. 1700 (2021); *Rangel v. Boehner*, 785 F.3d 19, 24 (D.C. Cir. 2015) (holding House disciplinary proceedings are legislative acts that "fall comfortably within the scope of the Speech or Debate Clause"), *cert. denied* 577 U.S. 873 (2015); *Whitener v. McWatters*, 112 F.3d 740, 740, 744 (4th Cir. 1997) (holding "a legislative body's discipline of one of its members is a core legislative act" and concluding "disciplinary action taken by [a county legislative body] against one of its members" was protected by legislative immunity).

do no more than carry out the will of the body by enforcing the rule as a part of their official duties.

*Id.* at 631 (citation omitted). *Harwood* teaches that when actors, like Defendants, adhere to and enforce legislatively adopted rules, their acts are legislative and protected by immunity. *See id.*

In *Cushing v. Packard*, 30 F.4th 27, the First Circuit also held that the enforcement of a legislative rule was protected by legislative immunity, even when legislators claimed the rule prevented them from voting and participating. In 2021, the New Hampshire House of Representatives adopted rules that did not permit remote participation; attempts to change the rule to allow virtual participation were voted down by the body. *See id.* at 33–34. Several medically vulnerable members of the New Hampshire House filed a § 1983 suit against their Speaker. *Id.* at 34. They challenged the rule prohibiting remote participation on federal statutory grounds, *id.* at 34–35, effectively arguing that they were prevented from carrying out their legislative obligations to their constituents. The en banc First Circuit concluded that the Speaker's conduct, i.e., determinations about applicable rules and procedures for casting votes, was protected by legislative immunity. *Id.* at 49 ("voting by Members itself constitutes a legislative act" (cleaned up)). The same applies here.

The Court also rejected the argument that the challenged conduct was of such an "extraordinary character" that it should not be protected by legislative immunity. *Id.* at 50–51. The "standard for an 'act' to be deemed of 'extraordinary character' is a most demanding one," such as ordering execution of an official by bill of attainder, as the Long Parliament did, or converting a legislative body into a court of capital punishment. *Id.* (quoting *Kilbourn*, 103 U.S. at 204).

That standard was not met in *Cushing*, and it is not met here. As in *Cushing*, Defendants are "follow[ing]—rather than depart[ing] from—existing House rules that were overwhelmingly passed and that were predicated on a general handbook for setting such rules for all legislatures

10

generally." *Id.* at 51. House Rule 401(11) has been a rule of the Maine House since 1820, and has been applied at least three times in modern history. While Rep. Libby cannot currently engage in certain acts,[13] Plaintiffs do not allege that she is precluded from other legislative acts, such as committee work, presenting motions on the House floor, and testifying on bills in public hearings. *See supra* nn.7-10.

The case presented is far from the "high bar that *Kilbourn* plainly intended to set for stripping seemingly protected acts from the cover [that legislative] immunity confers." *Cushing*, 30 F.4th at 52. To conclude otherwise risks not only "intruding into internal state legislative affairs[,] but also" the prescient warning from *Cushing*: that "warring sides in partisan state legislators' battles" will "improperly enlist[] federal judges to participate in them." *Id.*; *Monserrate v. New York State Senate*, 599 F.3d 148, 157 (2d Cir. 2010) ("Prudence dictates that a federal court should exercise a respectful reluctance to interfere in the measures taken by a state legislature to regulate its affairs, discipline its members, and protect its integrity and good name.").

## II.    The complaint should alternatively be dismissed for failure to state a claim.

### A.    Plaintiffs' First Amendment claim should be dismissed for failure to state a claim.

Rep. Libby incorrectly presumes that as a state legislator, she can raise a First Amendment retaliation claim against Defendants based on the *votes* of the Maine House. She may not. Count I of the Complaint should therefore be dismissed for failure to state a claim.

#### 1.    *Censures and reprimands of legislators generally do not violate the First Amendment.*

The Supreme Court has made clear verbal censures or reprimands of legislators are not violations of the First Amendment. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 475 (2022).

---

[13] Rep. Libby could, of course, vote and debate on the House floor again if she complied with the censure resolution and issued an apology.

Such censures are a "form of speech by elected representatives," *id.* at 479, and are not materially adverse action. Further, history and practice in colonial times and in the early days of the United States demonstrate that legislatures routinely censured their members "for views they expressed and actions they took both within and without the legislature." *Id.* at 475 (cleaned up).

    2.   *Restrictions upon legislators' voting are not restrictions upon legislators' protected speech.*

Rep. Libby does not have a First Amendment right to vote, as a legislator, on any particular piece of legislation. *See Nevada Commission on Ethics v. Carrigan*, 564 U.S. 117 *passim* (2011). In *Carrigan*, the Supreme Court concluded that a state's mandatory recusal statute that precluded state legislators from debating or voting on legislation upon which they had a disqualifying conflict of interest was not a violation of the First Amendment. 564 U.S. at 121–28. As Justice Scalia explained:

> But how can it be that restrictions upon legislators' voting are not restrictions upon legislators' protected speech?  The answer is that a legislator's vote is the commitment of his apportioned share of the legislature's power to the passage or defeat of a particular proposal. The legislative power thus committed is not personal to the legislator but belongs to the people; *the legislator has no personal right to it.*

564 U.S. at 125–26 (emphasis added). The same holds true here. Rep. Libby does not have a First Amendment right to vote on any particular piece of legislation that comes before the House, and absent a right to vote she has no right to debate those bills. *See also id.* at 121–22 ("If Carrigan was constitutionally excluded from voting, his exclusion from advocating at the legislative session was a reasonable time, place, and manner limitation" (cleaned up)).

In any event, the only reason Rep. Libby cannot currently vote on the House Floor is her admitted refusal to "make satisfaction" to the House by way of apology. Compl. ¶¶ 6, 50. Although Rep. Libby insists that she has been "suspended" or "excluded" from her seat—she only alleges to have been deprived of two of the many legislative privileges that members enjoy, such as serving

on committees, sponsoring legislation, and making motions on the House floor. Thus, unlike in *Boquist v. Courtney*, 32 F. 4th 764, 773 (9th Cir. 2022), Rep. Libby has not been excluded from the House Floor.

Regardless, historical practice supports that legislative bodies have the power to suspend a member.[14] *See Carrigan*, 564 U.S. at 122–25 (relying in part of the long history of recusal rules in law in this country applicable to legislators, none of which were ever thought to violate the First Amendment). Even though the U.S. House no longer chooses to suspend members, it has recognized that its authority to punish its members for disorderly behavior is not limited to expulsion or censure, but also includes "fine and suspension." H. Rept. No. 90-27, 90th Cong. 1st Sess., at 28 (1967).

History and practice also demonstrate that colonial legislative bodies, in exercising their authority to punish members, also routinely compelled their own members to apologize for their words or conduct by "forced apology." *Parliamentary Privilege* at 104–5, 190. The practice of requiring legislators to apologize for their misconduct against the body continued after 1789,[15] and

---

[14] In 1902, the U.S. Senate found two members in contempt for a physical altercation. A Senate committee described the ruling as having the effect of "suspend[ing] their functions as Senators," a punishment "clearly within the power of the Senate." *See* U.S. Senate, *The Censure Case of John L. McLaurin and Benjamin R. Tillman of South Carolina*, *available at* https://www.senate.gov/about/powers-procedures/censure/090Tillman_Laurin.htm. In 1905, the Wisconsin Senate suspended a member for eight months. I Wis. Sen. Journ., 47th Sess. at 862-641 (1905). *See also supra* at 3; *Pine v. Commonwealth*, 93 S.E. 652, 655 (Va. 1917) (explaining express legislative power to punish members for disorderly conduct in Virginia Constitution did not "inhibit the house from exercising other powers, such as the suspension of a member, or the imposition of a penalty for neglect of duty."); Rules of the Mass. Sen., 194th Gen. Ct., Rule 12A (available discipline for Senate Rule violation includes "reprimand, censure, temporary or permanent removal from the position of committee chair or other position of authority, suspension with or without pay, or expulsion"), *available at* https://malegislature.gov/Laws/Rules/Senate.

[15] The U.S. Congress compelled apologies of its members either through forma censure, threat of censure, or threat of investigation. In June of 1838, two members of the U.S. House voluntarily apologized for breach of order and decorum in the face of an impending vote on a resolution that would have required them to "apologize for violating its privileges and offending its dignity." 2 A. Hinds, Precedents of the House of Representatives § 1648 at 1121–22 (1907) (Hinds). In 1843, the U.S. Senate voted not to censure Senator Tappan for disclosing confidential treaty materials to a newspaper in part because he "apologized and acknowledged his wrongdoing." A. Butler & W. Wolff, United States Senate: Election, Expulsion, and Censure Cases 1793–1990 at 47 (1995). In 1868, the U.S. House censured a member for offensive words used during debate, which required the member to "retract or explain his words and make a satisfactory apology." Hinds, § 1248 at 799–800; *see also* Hinds, §§ 1257, 1646-47, 1657 at 808–10, 1120–21 1135–

it exists today.[16] Thus, requiring Rep. Libby to apologize is not only well within the power of the Maine House, but is consistent with established practice.[17] *See* Carrigan, 564 U.S. at 122–25.

**B.    Plaintiffs' equal protection claim should be dismissed for failure to state a claim.**

Rep. Libby and her constituents argue that her censure violates equal protection under the Fourteenth Amendment. This claim should be dismissed for failure to state a claim.

Courts considering equal protection challenges to legislative punishments have applied the familiar *Anderson-Burdick* balancing test used to assess voting and ballot-access restrictions. *See Monserrate*, 599 F.3d at 155. Under this "sliding scale" approach, courts must assess the "burdens, if any, placed on a plaintiff's constitutionally protected rights" and then evaluate "the precise interests put forward by the state as justifications for the burdens." *Libertarian Party of N.H. v. Gardner*, 638 F.3d 6, 14 (1st Cir. 2011). A state's "important regulatory interests" are "generally sufficient" to permit "[r]easonable, non-discriminatory restrictions" on constitutional rights. *Id.* Only "severe restrictions" require the provision to be narrowly tailored to serve a compelling governmental interest. *Id.*

The House's interests furthered by the censure are compelling. "It is fundamental that a legislature has an important interest in upholding its reputation and integrity." *Monserrate*, 599 F.3d at 155. Here, the damage Rep. Libby inflicted on the House's reputation and integrity was considerable. The Legislative Code of Ethics recognizes the obligation of members to protect the

---

37. In 1917, the Wisconsin Senate voted to censure a member and require him to sign a pre-drafted apology for his conduct; the member was expelled when he refused to sign. Wis. Sen. Journ., 53rd Sess. at 597–601 (1917).

[16] *See supra* at 3. *See also* Rules of Order of the Louisiana Senate, 50th Reg. Sess. § 6.3(D), *available at* https://tinyurl.com/2ve333xa; (2025); Rules of Order of the Louisiana House of Representatives, 50th Reg. Sess. § 5.2(D), *available at* https://tinyurl.com/4h6w3v7b; Okla. H. Jour., 59th Leg., 1st Reg. Sess. at 506–7 (Mar. 7, 2023) (censuring House member and stripping them of all committee assignments until they publicly apologized).

[17] As argued in Section B *infra*, the House's actions also satisfy the *Anderson-Burdick* balancing test, which would apply if Rep. Libby's First Amendment claim was otherwise cognizable.

"security, safety, health, prosperity and general well-being" of those they serve." *See* Legislative Code of Ethics, available at https://legislature.maine.gov/senate/legislative-code-of-ethics/9723. In violation of that Code, Rep. Libby singled out a child based on their gender identity and, without the child's consent, nationally publicized their name, school, and photograph, in the course of condemning the child's participation in a school event. Rep. Libby did so despite the child's right under Maine law, as a member of a protected class, to participate in the activity "without discrimination." 5 M.R.S.A. § 4602. Given such egregious facts, the House had a strong interest in repairing the damage to its reputation and integrity by censuring Rep. Libby for her misconduct.

On the other side of the ledger, the burden on Rep. Libby and her constituents is reasonable and non-discriminatory. Rep. Libby alleges only that she has been prevented from speaking and voting on the House floor. Compl. ¶ 59. She thus remains free to further the interests of her constituents in many ways: she can sponsor legislation, testify at hearings, deliberate and vote in her assigned committee, make motions on the House floor, use legislative staff and services, and provide constituent services. What is more, Rep. Libby can recover her full privileges at any time by apologizing. In short, the burden on Plaintiffs is, at most, modest.

A decision by the Second Circuit confirms that Rep. Libby's equal protection claim lacks merit. In *Monserrate v. New York State Senate*, that court considered whether the expulsion of a member of the New York Senate for a domestic violence conviction violated the equal protection rights of the member's constituents. 599 F.3d at 156. After noting the plaintiffs' concession that vacancies created by death or resignation of a member—which create the same disparity between districts as an expulsion—do not raise equal protection issues, the Second Circuit explained that "concession or no concession, the voters of every Senatorial District are alike subject to the expulsion of their elected representative." *Id.* at 157. Plaintiffs were therefore required to show "invidious bias" against the voters of the member's district in order to demonstrate that the

legislation violated equal protection. *Id.*

Rep. Libby's censure similarly was not some bespoke procedure designed to target her constituents. Not only does Rule 401(11) apply to all members of the current House, it has applied to every House member in Maine's history as a state. Rep. Libby also acknowledges that other members have been subject to censures in recent years for similar conduct. *See* Compl. ¶ 53. The complaint contains no allegations that the censure was some sort of pretext to diminish the power of voters in House District 90. Absent allegations of such "invidious bias," *Monserrate*, 599 F.3d at 157, there can be no equal protection violation.

Finally, the Complaint asserts that the censure violates equal protection because it allegedly reflects "arbitrary and disparate treatment." Compl. ¶ 85. This claim essentially asks this Court to review the Legislature's internal decisions in the same manner it would review final agency action by an executive branch agency. But under the political question doctrine, "courts generally refuse to scrutinize a legislature's choice of or compliance with internal rules and procedures." *Brown v. Hansen*, 973 F.2d 1118, 1122 (3d Cir. 1992); *see also Berry v. Crawford*, 990 N.E.2d 410, 421 (Ind. 2013) ("where a particular function has been expressly delegated to the legislature by our Constitution without any express constitutional limitation or qualification, disputes arising in the exercise of such functions are inappropriate for judicial resolution."). The Court should refuse Plaintiffs' invitation to referee such internal determinations and instead rule the questions of whether the censure is "arbitrary" or amounts to "disparate treatment" to be nonjusticiable.

Even if these matters were justiciable, Plaintiffs have not shown a violation of any constitutional principle. They cite to *Bush v. Gore* for the proposition that "arbitrary and disparate treatment" of legislators might violate the Constitution. Compl. ¶ 85. But *Bush* expressly limited its holding "to the present circumstances," which involved ballot-counting procedures in the 2000 presidential race. *Bush v. Gore*, 531 U.S. 98, 109 (2000). It has no applicability here.

In any event, the allegations in the complaint do not establish any "arbitrary and disparate treatment." While prior recent censures happen to have involved internal conduct, Compl. ¶ 53, the Code of Ethics expressly covers conduct outside of the State House. *See* Legislative Code of Ethics. Moreover, legislators could have reasonably decided that Rep. Libby's authoring and posting of the post was more worthy of censure than other members' decisions to merely share the pre-existing post. *See* Compl. ¶ 55. They also reasonably could have drawn a distinction between social media posts showing unnamed children in uncontroversial contexts, *see id.* ¶ 60, and Rep. Libby's post naming and depicting a child in an inflammatory context that would foreseeably jeopardize the child's health and safety. In any event, the House votes as a body on motions before it; there were no other censure motions proposed.

### C.    Plaintiffs' due process claim should be dismissed for failure to state a claim.

The Complaint also contends that Rep. Libby's censure violates due process. Specifically, Plaintiffs contend, citing *Bonas v. Town of North Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001), that the censure works "a total and complete disenfranchisement of the electorate" by constituting a "de facto expulsion" in violation of the two-thirds vote requirement in the Maine Constitution. Compl. ¶¶ 90–91. But, even assuming *Bonas* applies outside the elections context, the censure neither violates the Maine Constitution nor amounts to a "total and complete disenfranchisement" of Rep. Libby's constituents.

First, the notion that enforcement of Rule 401(11) against a legislator unwilling to "make satisfaction" constitutes an unconstitutional "de facto expulsion" by majority vote ignores that the Maine Constitution was adopted contemporaneously with the Rule. *See* ECF No. 28-1. This shows that the Framers themselves saw no incompatibility between allowing conditional revocation of voting and speaking privileges by majority vote while requiring a two-thirds vote for expulsion. The compatibility of these provisions is further confirmed by the longstanding use of punishments

such as suspension and forced apology from the colonial era to modern times.

Second, Rep. Libby's punishment cannot be characterized as a "total and complete disenfranchisement" of her constituents. *Bonas*, 265 F.2d at 75. Rep. Libby does not dispute that she still enjoys most of her legislative privileges and can regain her full privileges at any time.

**D.    Plaintiffs' Guarantee Clause claim should be dismissed for failure to state a claim.**

Count IV alleges that the censure violates the Guarantee Clause. But it is doubtful that the Supreme Court views Guarantee Clause claims as justiciable. It has rejected all Guarantee Clause claims presented to date, typically on grounds that they present nonjusticiable political questions. *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 223 (1962). Most recently, it rejected an argument that it understood as grounded in the Guarantee Clause by flatly stating that "[t]his Court has several times concluded . . . that the Guarantee Clause does not provide the basis for a justiciable claim." *Rucho v. Common Cause*, 588 U.S. 684, 718 (2019). *Rucho* suggests that the Court no longer agrees with previous dicta, *see, e.g.*, *New York v. United States*, 505 U.S. 144, 185 (1992), leaving the door open to a justiciable Guarantee Clause claim.

Moreover, while the First Circuit has so far declined to adopt a categorical bar on Guarantee Clause claims, it has made clear that a justiciable claim would require a truly remarkable showing. The Court has noted that the "bare language of the Clause does not directly confer any rights on individuals vis-á-vis the states." *A.C. by Waithe v. McKee*, 23 F.4th 37, 47 (1st Cir. 2022) (quoting *Largess v. Supreme Jud. Ct. for State of Mass.*, 373 F.3d 219, 224 n.5 (1st Cir. 2004)). Thus, any such claim could "perhaps" be justiciable only "in the most egregious circumstances," in which there are "real threats" to the state's republican government. *Largess*, 373 F.3d at 227; *see also Democratic Party of Wisconsin v. Vos*, 966 F.3d 581, 590 (7th Cir. 2020) (plaintiffs failed to show "an existential threat" to republican government). Examples suggested by the court of such

"egregious circumstances" include "the establishment of a monarchy by a state," "permanent martial law," and "the hostile takeover of one branch by another." *Largess*, 373 at 225 & 227.

Nothing like that is at issue here. Maine has not become a monarchy or declared permanent martial law. The House continues to function as a majoritarian body. The censure itself, approved by majority vote after due deliberation, shows the body's republican character.

Perhaps more importantly, all members of the House remain fully accountable to the citizens of Maine. There is no violation of the Guarantee Clause when states "retain the ability to set their legislative agendas and when state government officials remain accountable to the local electorate." *Kerpen v. Metro. Washington Airports Auth.*, 907 F.3d 152, 163 (4th Cir. 2018) (quoting *New York*, 505 U.S. at 186) (cleaned up). Here, if Maine people are displeased by the actions of members who voted for censure, they can organize against them in the next election and vote them out of office. If they support Rep. Libby's conduct, they may likewise support for re-election her and those who supported her conduct. Since the current Legislature cannot bind a future Legislature, *see SC Testing Tech., Inc. v. Dep't of Env't Prot.*, 688 A.2d 421, 425 (Me. 1996), the censure's terms would not apply in a new Legislature even if Rep. Libby never apologizes. In short, a censure conditionally restricting a single member's ability to vote and debate for a limited time while leaving her myriad other ways to pursue her constituents' interests does not pose any "real threat" to republican governance in Maine.

Libby's Guarantee Clause claim also fails for a second, independent reason. State governments as they existed at the time of the Founding "are each presumed to have been 'Republican' within the meaning of the Guarantee Clause." *Largess*, 373 F.3d at 227; *accord Minor v. Happersett*, 88 U.S. 162, 176 (1874); Federalist No. 43 (J. Madison). The historical record shows that legislative punishments much harsher than the censure at issue here, including suspension and even imprisonment, were accepted at the time of the Founding. What is more,

House Rule 401(11), requiring members in breach to "make satisfaction," itself dates back to the Founding era and can be found in the past and present rules of legislative bodies around the country. *See* n.9, *supra*. Because House Rule 401(11) reflects norms of state legislative governance prevalent when the U.S. Constitution was ratified, its enforcement cannot as a matter of law violate the Guarantee Clause

### Conclusion

The Court should dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim.

Date:  April 1, 2025

Respectfully submitted,

AARON M. FREY
Attorney General


/s/ Kimberly L. Patwardhan
KIMBERLY L. PATWARDHAN
Assistant Attorney General
kimberly.patwardhan@maine.gov

JONATHAN R. BOLTON
Assistant Attorney General
jonathan.bolton@maine.gov

Office of the Attorney General
6 State House Station
Augusta ME  04333-0006
Tel. (207) 626-8800