# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MAINE

| | |
|---|---|
| LAUREL D. LIBBY, State Representative of Maine House District 90, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER, RENE FRASER, and DONALD DUBUC,<br><br>Plaintiffs,<br><br>v.<br><br>RYAN M. FECTEAU, in his official capacity as Speaker of the Maine House of Representatives, and ROBERT B. HUNT, in his official capacity as Clerk of the House,<br><br>Defendants. | Case No. 1:25-cv-00083 |

**[PROPOSED] *AMICUS CURIAE* BRIEF OF FOUNDATION FOR INDIVIDUAL RIGHTS AND EXPRESSION IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**INTEREST OF AMICUS CURIAE**

The Foundation for Individual Rights and Expression ("FIRE") is a nonpartisan nonprofit that defends the individual rights of all Americans to free speech and free thought—the essential qualities of liberty. Since 1999, FIRE has successfully defended individual rights through public advocacy, strategic litigation, and participation as *amicus curiae* in cases that implicate expressive rights under the First Amendment. In June 2022, FIRE expanded its public advocacy beyond the university setting and now defends First Amendment rights both on campus and in society at large. FIRE seeks to vindicate First Amendment rights without regard to the speakers' political views. *See, e.g.*, *Trump v. Selzer*, No. 4:24-cv-449 (S.D. Iowa filed Dec. 17, 2024); *Volokh v. James*, 656 F. Supp. 3d 431 (S.D.N.Y. 2023), *appeal pending*, No. 23-356 (2d Cir. argued Feb. 16, 2024); *Novoa v. Diaz*, No. 22-13994 (11th Cir. argued June 14, 2024), *appealing sub nom. Pernell v. Bd. of Governors of the State Univ. Sys.*, 641 F. Supp. 3d 1218 (N.D. Fla. 2022).

**ARGUMENT**

With a slim majority, members of the majority party in the Maine House of Representatives stripped a member of the minority of her right to vote and to speak on the floor, all because they disagree with her viewpoint over a widely debated public issue. Not only is the punishment an end-run around the super-majoritarian provisions of the Maine Constitution,[1] it is also an egregious violation of the First Amendment.

The House majority punished Representative Laurel Libby for sharing images of a transgender student athlete while criticizing the participation of transgender athletes in women's sports—core political speech about important matters of public concern. The Constitution fully protects sharing politically salient images, even if Rep. Libby's colleagues find them provocative

---

[1] *See e.g.,* Me. Const. art. IV, § 2 (veto override), § 4 (expulsion), § 16 (emergency legislation); *id.* art. X, § 4 (constitutional amendment).

or inappropriate. The use of images to make political points follows a venerable American tradition utilized by many speakers throughout our nation's history, including the advocates for the Civil Rights Movement and the Anti-War Movement who used evocative images to start national conversations and change public opinion.

There is little question the House majority targeted Rep. Libby because of her viewpoint. Had she shared a post praising rather than criticizing participation in the event, the House majority would not have censored her. This is deeply troubling. What the majority did to Rep. Laurel Libby they can do to every member of the minority, censoring and excluding members based on speech that enjoys fundamental First Amendment protection. Libby's punishment and the threat it highlights are an affront to liberty and to the people of the State of Maine, no matter what party is in power. The Court should grant Plaintiffs' motion for injunctive relief.

**1.0    Photographs Are Entitled to First Amendment Protections and Serve Essential Communicative Purposes.**

The House majority punished Rep. Libby for her protected speech on a matter of public concern. The Constitution forbids this result. As set forth in the preambulatory clauses to the censure resolution, Rep. Libby (a) posted the photographs of a transgender high school championship athlete to social media; (b) identified that student-athlete as transgender; and (c) made a political statement criticizing the participation of transgender students in female sports. For doing so, the legislature censured Rep. Libby and barred her from voting and speaking on the House floor until and unless she removed the photographs and apologized for posting them.

//
//
//



The First Amendment unquestionably protects Rep. Libby's post. There is "practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs" and "public issues." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (citations and quotations marks omitted). "The right to disseminate such 'core political speech' on one's social media account is 'an area highly protected by the First Amendment.'" *Leuthy v. LePage*, No. 1:17-cv-00296-JAW, 2018 U.S. Dist. LEXIS 146894, at *41 (D. Me. Aug. 29, 2018) (quoting *Rideout v. Gardner,* 838 F.3d 65, 75 (1st Cir. 2016)).

Photographs, as a medium of expression, fall squarely within the ambit of the Constitution's protections. "[A]ll manner of speech–from 'pictures, films, paintings, drawings, and engravings'… qualify for the First Amendment's protections." *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (citation omitted). Photographs convey messages with clarity, seriousness, and emotional depth that words alone often cannot achieve. They serve as context and justification

for a speaker's view. In doing so, they offer insight where words alone are inadequate. A familiar adage puts it best: A picture is "worth a thousand words." *Rideout*, 838 F.3d at 76.

The First Circuit's decision in *Rideout* highlights the important value of photos used to "engage[] in core political speech*." Id.* at 75. Because images capture moments and convey emotions, they have "a special communicative value." *Id.* In *Rideout,* that value took the form of a voter's special ability to communicate frustration at the slate of candidates by posting a ballot filled with his dog's name. *Id.* at 70. By sharing the photo, the plaintiff eliminated potential doubts about the seriousness of his protest—doubts that would remain if he'd simply said, "I'd rather vote for my dog than these candidates."[2]

As the ballot selfie at issue in *Rideout* demonstrates, pictures provide essential context for a speaker's message—without it, listeners may misunderstand the speech. *See Whiddon v. Buzzfeed, Inc.*, 638 F. Supp. 3d 342, 352 (S.D.N.Y. 2022) (noting that the use of photos alongside text "enhance[d] the ability of the reader to understand the text" and "allow[ed] the reader to form an opinion.") (citation omitted). Visual media provide concrete and tangible evidence that allows an audience to trust a speaker's editorialization and to form their own opinion based on the raw image, rather than taking the speaker's word for it. *Id.* A speaker may hyperbolize, lie, or posture their speech, but the photo provides a concrete check that allows a speaker to quickly establish credibility. In *Berge v. School Committee of Gloucester*, the First Circuit vindicated a citizen's First Amendment right to publish a video of government officials comporting themselves

---

[2]  *Amicus* FIRE is currently representing Susan Hogarth in a challenge to North Carolina's prohibition on ballot selfies after she received a letter from the State Board of Elections demanding that she take down her photo from X. *See Hogarth v. Brinson Bell*, Case No. 5:24-cv-00481 (E.D.N.C.). In Hogarth's case, she took a ballot selfie in order to show pride in supporting her preferred candidates and to increase awareness of the third-party candidates she supports (among other reasons). *Id.* Verified Complaint ¶ 9, *Hogarth*, No. 5:24-cv-00481, ECF No. 1.

irrationally. 107 F.4th 33 (1st Cir. 2024). When Mr. Berge posted a video of their tantrums, the officials unconstitutionally threatened criminal sanctions against him. *Id.* at 36–37. However, a mere description of their conduct would not have led to the same public scrutiny.

Photographs and videos also communicate the gravity of a situation to an audience in uniquely powerful ways. This is precisely the reason that pictures and videos of police interactions have proliferated and become increasingly critical parts of accountability campaigns. Cases upholding the right to photograph and record public police encounters have highlighted that recordings assist public discourse. *See, e.g., Gericke v. Begin,* 753 F.3d 1, 7 (1st Cir. 2014); *Glik v. Cunniffe*, 655 F.3d 78, 82 (1st Cir. 2011); *Berge*, 107 F.4th at 36–37. Using words to describe an officer's use of excessive force can be ineffective relative to an image or video showing the violation.

Images have shaped narratives, caste a spotlight on injustice, and fueled movements throughout American history. The publication of powerful pictures has started and galvanized nationwide anti-war protests, civil rights advancements, and political movements of all stripes. And like Rep. Libby's post, many of these iconic images featured minors. Take for instance the Little Rock Nine. A famous picture shows fifteen-year-old black high school student Elizabeth Eckford walking through a mob of white protesters in an initially failed effort to attend school. The image spread across the nation and became one of the most famous images of the Civil Rights Movement.[3] Words alone fully capture neither the resolve on Eckford's face, nor the mob's vitriol.

---

[3] Erin Blakemore, *The Story Behind the Famous Little Rock Nine "Scream Image"* History (Apr. 1, 2025), https://www.history.com/news/the-story-behind-the-famous-little-rock-nine-scream-image; *see also* Ronald K.L. Collins, Tragedy on Trial: the Story of the Infamous Emmett Till Murder Trial (2024).



Another iconic controversial image featuring a minor child is "The Terror of War," commonly known as "Napalm Girl," which shows a 9-year-old Vietnamese girl fleeing naked from a deadly napalm attack. More than 20 leading US newspapers featured the image on their front page and won its photographer, Nick Ut, the Pulitzer Prize.[4] The image so effectively captured the horrors of war and galvanized the anti-war movement that President Richard Nixon accused it of being staged.[5]

---

[4] Oscar Holland, *'Napalm Girl' at 50: The story of the Vietnam War's defining photo*, CNN (June 9, 2022), https://www.cnn.com/style/article/napalm-girl-50-snap/index.html; *but see Sundance Documentary Disputes Who Took 'Napalm Girl' Photo in Vietnam*, Associated Press (Jan. 27, 2025), https://www.nbcnews.com/news/asian-america/sundance-documentary-stringer-disputes-took-napalm-girl-photo-vietnam-rcna189410 (discussing dispute over who took the famous photograph and a recent documentary discussing the dispute).
[5] Holland, *supra* note 4.



More recently, proponents of gun control have utilized images of victims and survivors of the Sandy Hook Elementary School shooting and other school shootings to illustrate the senselessness of gun violence.[6] And an image of a police officer leading young children away from the school came to define the horrors of that day:[7]



---

[6] Sandy Hook Promise, *Teenage Dream*, YouTube (Sep. 13, 2021), https://www.youtube.com/watch?v=T254_J8Vcvw; Sandy Hook Promise, *Emma's Story*, YouTube (Sep. 20, 2021), https://www.youtube.com/watch?v=Wm3RM2-CnwQ&list=PL_BUjxjTMxcw4k9DwacfBlTdHdaLjB_Hl&index=8

[7] Adam McCauley, *The Story Behind the Iconic Photograph from Sandy Hook*, TIME (Dec. 20, 2012), https://time.com/3449676/the-story-behind-the-iconic-photograph-from-sandy-hook/

Likewise, protestors against racial injustice and profiling utilized an image of Treyvon Martin, a 17-year-old shot and killed by George Zimmerman due to alleged racial profiling on their signs and t-shirts:[8]



As these examples show, images can provoke discomfort, challenge prevailing narratives, or force society to reckon with injustice. At times, a photo's communicative power will magnify a speaker's controversial or painful words. Yet the fact that a photograph or its use may offend or disturb does not strip it of constitutional protection. Instead, that powerful reaction underscores the necessity of protecting controversial expression in our free society. As the Supreme Court explained, "[s]peech is powerful. It can stir people to action, move them to tears of both joy and sorrow," but rather than censor, we "[a]s a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 460–61 (2011).

Rep. Libby's use of images represent an attempt to put a spotlight on what she believes to be an injustice and galvanize supporters to action. Because she shared images rather than merely words, Rep. Libby could make her point about a contentious public issue in a concrete and visually striking manner. Even though her post provoked discomfort and offended some who saw it, there

---

[8] Elizabeth Dias, *Faces of Protest for Trayvon Martin*, TIME (April 16, 2012), https://time.com/3787805/faces-of-protest-for-trayvon-martin/

- 9 -
[Proposed] *Amicus Curiae* Brief of Foundation for Individual Rights and Expression

is no question her speech enjoys the full protections of the First Amendment just like those other historical and contemporary examples.

**2.0    Like All Speech, Photographs' First Amendment Protection Does Not Change Even If Used in Offensive Ways.**

The Maine House explicitly and unconstitutionally retaliated against Rep. Libby for the content and viewpoint of her speech. The First Amendment "guarantees not only freedom from government censorship, but also freedom from official retaliation on the basis of protected speech." *Mattei v. Dunbar*, 217 F. Supp. 3d 367, 373 (D. Mass. 2016) (*citing Hartman v. Moore*, 547 U.S. 250, 256 (2006)). Our commitment to free expression requires us—especially so—to protect speech that is unpopular, painful to hear, or inspires anger. The Supreme Court recognized that those moments are when free speech "serve[s] its high purpose." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949). The very idea of free speech necessitates protection primarily when it is "provocative and challenging." *Id*. And the democratic expression of ideas requires a breathing room that includes controversial speech. Indeed, our Constitution provides "no room … for a more restrictive view." *Id.*

As a "bedrock principle … the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson,* 491 U.S. 397, 414 (1989). This is the "point of all speech protection … to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Hurley v. Irish–American Gay, Lesbian and Bisexual Grp. of Bos.,* 515 U.S. 557, 574 (1995) (citations omitted),

As the Supreme Court has reinforced, "disfavoring ideas that offend discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 588 U.S. 388, 396 (2019) (citations and internal quotation marks omitted). "A viewpoint need not be political; any form of support or opposition to an idea could be considered a viewpoint." *Marshall v. Amuso*, 571 F.

Supp. 3d 412, 421 (E.D. Pa. 2021) (quoting *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring in part) ("The First Amendment's viewpoint neutrality principle protects more than the right to identify with a particular side. It protects the right to create and present arguments for particular positions in particular ways, as the speaker chooses.")). "Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.* 418 U.S. 323, 339-40 (1974).

Content- and viewpoint-based restrictions are subject to strict scrutiny. *See McCullen v. Coakley*, 573 U.S. 464, 478 (2014). This daunting standard "requires the government to demonstrate that the restriction" advances a "compelling interest" and is "narrowly tailored to achieve that interest." *Signs for Jesus v. Town of Pembroke*, 977 F.3d 93, 101 (1st Cir. 2020) (*quoting Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015)); *accord R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992). The House majority's demands for Rep. Libby to "accept full responsibility" and issue a compelled apology before she can vote or speak on the floor serve no compelling interest and are not narrowly tailored.

The House's retaliatory actions against Rep. Libby were plainly viewpoint-based. And even though some in the House claimed identifying a minor warranted a censure, the House's past behavior disproves that claim. Take, for example, when Rep. Vicki Doudera welcomed student sports champions, and the Maine House published a photograph of and named a fifth-grade chess champion.[9] Sharing photographs celebrating the successes of student-athletes is commonplace and generally uncontroversial. The *Portland Press Herald* published a series of photos of the high

---

[9] *See Doudera Welcomes State Champions to State House*, Maine House Democrats (Apr. 8, 2022), https://www.maine.gov/housedems/news/doudera-welcomes-state-champions-state-house.

school student-athletes who competed in the state championship (including the pole vault competition at issue).[10]

Had Rep. Libby celebrated the student's victory, it is difficult to imagine she would have been censured or silenced. The only reason Rep. Libby's post drew the ire of the House and resulted in her censure and silencing is that she criticized rather than celebrated the student. This is blatant viewpoint discrimination. If laudatory speech cannot be silenced, neither can critical speech.

While the censuring resolution claims (with zero support) that political use of the photographs "may endanger the minor" and "continued to bring media attention to the minor," this rationale does not justify censoring Rep. Libby. The student was already the subject of attention and the press had already publicized the student's victory.[11] Moreover, Rep. Libby has a clearly established right to publish lawfully-acquired information. *See, e.g., Bartnicki v. Vopper*, 532 U.S. 514 (2001); *Berge*, 107 F.4th at 43; *Jean v. Mass. State Police*, 492 F.3d 24 (1st Cir. 2007).[12] If

---

[10] *See* Nathan Fournier, *Greely Sweeps Class B Indoor Track and Field Titles*, PORTLAND PRESS HERALD (Feb. 17, 2025), https://www.pressherald.com/2025/02/17/greely-sweeps-class-b-indoor-track-and-field-titles/

[11] Moreover, speaking on matters of public concern generally outweighs asserted privacy interests. *See, e.g.*, *Fla. Star v. B.J.F.*, 491 U.S. 524 (1989); *Daury v. Smith*, 842 F.2d 9, 14 (1st Cir. 1988). The Supreme Court has established a robust First Amendment right to publish information—even illegal information—and has built strong, tall, and obvious barriers against any governmental intrusion into that right. *See, e.g.*, *Fla. Star*, 491 U.S. 524; *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97 (1979); *Okla. Publ'g Co. v. Dist. Ct. in & for Okla. Cnty.*, 430 U.S. 308 (1977); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976); *Cox Broad. Corp. v. Cohn*, 420 U.S. 469 (1975); *Mia. Herald Publ'g Co. v. Tornillo*, 418 U.S. 241 (1974); *Org. for a Better Austin v. Keefe*, 402 U.S. 415 (1971); *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971) ("Pentagon Papers"); *N.Y. Times Co. v. Sullivan*, 376 U.S. 254 (1964); *Grosjean v. Am. Press Co.*, 297 U.S. 233 (1936); *Near v. Minnesota ex rel. Olson*, 283 U.S. 697 (1931).

[12] This Court should not follow another court of this District in erroneously concluding that the personal interests of government officials might overcome a citizen's First Amendment rights. *See McBreairty v. Brewer Sch. Dep't*, No. 1:24-cv-00053-LEW, 2025 U.S. Dist. LEXIS 4842, *6–7 (D. Me. Jan. 10, 2025).

one "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order." *Daily Mail*, 443 U.S. at 103. As *Cox Broadcasting Corp. v. Cohn* established, even publishing the name of a minor rape victim is protected. 420 U.S. 469, 492 (1975). Publishing an image of a minor who was already in the spotlight for winning a competitive championship is likewise protected.

To be clear, individual members of the Maine House of Representatives are free to voice their displeasure at Rep. Libby's post, and the collective body may voice its displeasure without violating Rep. Libby's rights. *See Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 479 (2022) (holding mere censure was not an adverse action when it "did not prevent" the elected official "from doing his job" and "did not deny him any privilege of office"). But the government cannot retaliate against Rep. Libby, stop her from doing her job, and effectively disenfranchise her constituents merely because her speech elicits strong emotions or challenges dominant perspectives—or even because the House majority dislikes Rep. Libby's views. *Bond v. Floyd*, 385 U.S. 116, 137 (1966) (disqualifying a representative because of their speech violated the First Amendment). The First Amendment demands that we tolerate—even confront—unpleasant truths rather than allow the state to sanitize public discourse to avoid controversy or discomfort. Moreover, as the Supreme Court explained in *Bond*, elected officials "have an obligation to take positions on controversial political questions" both to inform and vigorously represent their constituents. *Id.* at 136-37. By barring Rep. Libby from voting or speaking on the floor of the House, the House majority went far beyond merely expressing displeasure and veered into blatantly unconstitutional viewpoint-based retaliation. The Court should issue a preliminary injunction to prevent this ongoing and irreparable harm to Rep. Libby and her constituents.

## CONCLUSION

For these reasons, *amicus curiae* Foundation for Individual Rights and Expression believes the Court should grant the Plaintiff's motion for preliminary injunction.

Dated: April 3, 2025.                                  Respectfully Submitted,

/s/ Robert J. Morris                                   Marc J. Randazza (*pro hac vice forthcoming*)
Robert J. Morris, II (ME Bar No. 010402)                 *Lead Counsel*
HOUSER, LLP                                            RANDAZZA LEGAL GROUP, PLLC
400 TradeCenter, Suite 5900                            30 Western Avenue
Woburn, MA 01801                                       Gloucester, MA 01930
Tel: (339) 203-6498                                    Tel: (888) 887-1776
Email: rmorris@houser-law.com                          Email: ecf@randazza.com

                                                       Attorneys for Amicus Curiae,
                                                       Foundation for Individual Rights
                                                       and Expression

Case No. 1:25-cv-00083

## CERTIFICATE OF SERVICE

I hereby certify that, on April 3, 2025, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/ Robert J. Morris  
Robert J. Morris