## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| Laurel D Libby, et al., ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> Ryan M Fecteau, et al., ) <br> Defendant. ) <br> ) | C.A. No. 25-cv-83-MRD |

## MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.[*]

Participation in sports by transgender students is one of many policies that law makers around the country are fiercely debating. In Maine, "individual[s] at . . . educational institution[s]" have an equal opportunity and civil right to "participate in all educational . . . programs . . . and all extracurricular activities [including athletic programs] without discrimination because of sex, sexual orientation or gender identity, a physical or mental disability, ancestry, national origin, race, color or religion." Me. Rev. Stat. Ann. tit. 5, §§ 4601, 4602 (2021). Maine House Representative Laurel Libby self-identifies as "an outspoken critic of Maine's state policy allowing boys who identify as transgender to compete in girls' sports." Compl. at ¶ 2 (ECF No. 1). As part of her advocacy against this policy, Representative Libby generates social media content that she posts across various social media platforms including but not limited to Facebook. One such post, described below, earned her a

---

[*] Of the District of Rhode Island, sitting by designation.

formal censure by her colleagues in the Maine House of Representatives and a corresponding sanction prohibiting her from speaking or voting on the House floor until she apologizes for her post. Aggrieved, she and six of her constituents filed suit in this court, claiming that the imposition of this sanction is a violation of their constitutional rights under the First, Fourth, and Fourteenth Amendments. The plaintiffs collectively moved for a preliminary injunction to prevent the enforcement of the sanction. The defendants, House Speaker Ryan Fecteau and House Clerk Robert Hunt, assert that legislative immunity shields them from liability for these claims. For the reasons explained in detail below, the court concludes that legislative immunity bars the claims in this case. In short, Speaker Fecteau's imposition of the sanction plainly identified in the House of Representatives Rule that governs when House members are found in breach of House rules is a legislative act that does not, according to binding caselaw and within the context of this censure, qualify for the narrow exception carved out for conduct of an extraordinary character. The court, therefore, denies the motion for preliminary injunction.

## I.    BACKGROUND

Before summarizing the sequence of events which led to this litigation, the court starts by setting the table with some additional details about the parties and laying out the relevant rules of procedure for Maine legislators. Plaintiff Laurel Libby represents House District 90 in the current session – the 132nd – of the Maine Legislature, her third consecutive term in this elected position. Compl. at ¶ 10; Libby Decl. ¶¶ 2-3 (ECF No. 34-1). Plaintiffs Ronald P. Lebel, Wendy Munsell, Jason

Levesque, Bernice Fraser, Rene Fraser, and Donald Duboc reside within Maine House District 90 and voted in the last state legislative election. Constituents' Decls. at ¶ 3 (ECF Nos. 8-1 – 8-6). Defendant Ryan Fecteau represents House District 132 in the 132nd Maine Legislature, his fifth term in this elected position, and serves as the elected Speaker of House. Fecteau Decl. at ¶¶ 2-3 (ECF No. 29). All the court knows about defendant Robert Hunt is that he is serving as the Clerk of the House. Compl. at ¶ 18.

Pursuant to *Mason's Manual of Legislature Procedure*, "[a] legislative body has the right to regulate the conduct of its members and may discipline a member as it deems appropriate, including reprimand, censure or expulsion." Section 561(1) (2020). The Maine Constitution confers upon the State Legislature the sole authority to promulgate its own rules of procedure. Fecteau Decl. at ¶ 5. *See* Me. Const. Art. IV, Pt. 3, § 4 ("Each House may determine the rules of its proceedings, punish its members for disorderly behavior, and, with the concurrence of 2/3, expel a member, but not a 2nd time for the same cause."). Pursuant to this express authority, the 132nd Maine Legislature adopted its House Rules on December 4, 2024.[1] House Rule 401 details the "[r]ights and duties of members." Fecteau Decl. Ex. A at 12 (ECF No. 29-1). Rule 401(11) covers "'breach of rules" and states, in its entirety:

> When any member is guilty of a breach of any of the rules and orders of the House and the House has determined that the member has violated

---

[1] The Rules adopted on this day were the same as those which governed the previous legislative session and were passed by consent of the entire House after no members requested a roll-call vote when provided with the opportunity to do so. Fecteau Decl. at ¶ 6.

> a rule or order, that member may not be allowed to vote or speak, unless
> by way of excuse for the breach, until the member has made satisfaction.

Fecteau Decl. Ex. A at 13.[2]   Members of the House are also governed by the

Legislative Code of Ethics adopted by the 100th Legislature and amended by the

127th Legislature.  The Code of Ethics, in its entirety, states:

> Legislative service is one of democracy's worthiest pursuits. A Maine
> Legislator is charged with civility and responsible conduct inside and
> outside of the State House commensurate with the trust placed in that
> Legislator by the electorate.
>
> In a free government, a Legislator is entrusted with the security, safety,
> health, prosperity, respect and general well-being of those the Legislator
> serves and with whom the Legislator serves.
>
> To work well, government requires a bond of trust and respect between
> citizens and their Legislators. With such a trust, high moral and ethical
> standards producing the public's confidence, with the reduction to a
> minimum of any conflict between private interests and official duties,
> should be observed.
>
> No Maine Legislators will accept any employment that will impair their
> independence and integrity of judgment nor will they exercise their
> position of trust to secure unwarranted privileges for themselves or for
> others.  The Maine Legislator will be ever mindful of the ordinary citizen
> who might otherwise be unrepresented and will endeavor
> conscientiously to pursue the highest standards of legislative conduct
> inside and outside of the State House.

Fecteau Decl. Ex B (ECF No. 29-2).

With these details laid out, the following is the sequence of events which led to

this cause of action and pending motion, as alleged in the complaint and declared by

---

[2] This particular rule seems to have been in place since at least 1820, when the
rules governing the first session of the Maine House of Representatives included the
same protocol with almost identical wording.  Defs.' Opp'n Ex. 1 at 2, 8 (section XV)
(ECF No. 28-1).

the parties in support of their respective positions.  On February 17, 2025, Representative Libby used her official Representative Laurel Libby Facebook account to create a post which included the juxtaposition of two photos and some commentary. Compl. at ¶ 31.  Each photo shows three adolescent student athletes standing side-by-side on a winner's podium, wearing athletic attire, and either holding a ribbon or a medal in their hand or wearing a medal around their neck.  *Id.* ¶ 31.  One student athlete in each photo is highlighted by way of double yellow lines encircling them from head to toe.  *Id.* ¶ 31.  In the right-side photo, the two student athletes not highlighted by circles have their faces blurred out; in the left photo, the faces of all three students are clearly visible.  *Id.* ¶ 31.  The text above the photos in the post states:

> UPDATE:  We've learned that just *ONE* year ago [athlete] was competing in boy's pole vault…that's when he had his 5th place finish. So all of this transpired in the last year, with the full blessing of the Maine Principals' Association.
>
> Two years ago, [athlete] tied for 5th place in boy's pole vault.  Tonight, "[athlete]" won 1st place in the girls' Maine State Class B Championship.

*Id.* ¶ 31.[3]

On February 18, 2025, Speaker Fecteau, "concern[ed] that publicizing the student's identity would threaten the student's health and safety," contacted Representative Libby twice (once by letter, once by phone call) to ask that she delete

---

[3] The court sees no reason to repeat the name of the targeted student athlete here.  Also, the original photographer or source of the photos is not clear, though the court understands each to have been published prior to Representative Libby's post.

the Facebook post.  Fecteau Decl. at ¶¶ 13-14; Compl. at ¶ 42.[4]  At the next scheduled session of the House, February 25, 2025, Representative Matt Moonen presented "House Resolution Relating to the Censure of Representative Laurel D. Libby of Auburn by the Maine House of Representatives."  Fecteau Decl. at ¶ 17, Ex. D (ECF No. 29-4).  The Resolution summarized the Facebook post, the national attention that Representative Libby received for her post, and her decision not to remove the post after hearing concerns about the minor's safety as a result of the post.  Fecteau Decl. Ex. D.  The Resolution also cited excerpts from the Code of Ethics and pronounced Representative Libby's actions as "in direct violation" of the Code of Ethics.  *Id.*  The Resolution resolves that Representative Libby is "censured by the House of Representatives for just cause" and "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine."  *Id.*

House members engaged in debate over the introduced Resolution and then adopted it by a vote of 75-70.[5]  Fecteau Decl. ¶ 18.  Speaker Fecteau called Representative Libby to the well of the House, "lectured her on the House's ethics standards, and offered her an opportunity to apologize."  Compl. at ¶ 57.  Representative Libby declined to apologize and Speaker Fecteau found her in violation of Rule 401(11), *id.*, announcing she would "not be able to cast a vote or

---

[4] Speaker Fecteau's letter articulated his concern with Representative Libby sharing the student's name, school, and photo as a "risk[ to] their health and safety" and as a "violat[ion of] one of the long held political traditions of 'leaving kids out of it.'"  Fecteau Decl. Ex. C (ECF No. 29-3).

[5] *Archived Hearings & Meetings: House Chamber,* 5:57:35-7:03:40 PM, Me. Leg. (Feb. 25, 2025), https://bit.ly/43tBMp4.

speak on the floor until [she] comes back into compliance with House Rule 401 part 11," *Archived Hearings & Meetings: House Chamber*, 7:11:02-7:11:11 PM, Me. Leg. (Feb. 25, 2025), https://bit.ly/43tBMp4.  According to Speaker Fecteau, he "exercised [his] duty as Speaker to rule her in violation of House Rule 401(11), and therefore barred her from casting a vote or participating in debate on the House floor until she made satisfaction by coming into compliance with the Resolution."  Fecteau Decl. ¶ 20.  "No member, including Rep. Libby, made any objection to [his] ruling."  *Id.* ¶ 21.

On March 11, 2025, Representative Libby and six of her constituents from District 90 filed a verified complaint in this court pursuant to 42 U.S.C. § 1983 against Speaker Fecteau and Clerk Hunt, in their official capacities, claiming that barring Representative Libby from speaking on the House floor or voting on legislation violated fundamental rights protected by the U.S. Constitution.  Compl. at 1.  In Count I, Representative Libby alleges the sanction is an action taken in retaliation for her posts on social media and violates her First Amendment right to free speech.  *Id.* ¶¶ 72-76.  In Count II, Representative Libby (along with the six constituents from District 90) allege that the sanction is a result of arbitrary and disparate treatment, impinges on the "one person, one vote" principle, and effectively disenfranchises the constituents in violation of the Fourteenth Amendment's Equal Protection clause.  *Id.* ¶¶ 84-86.  In Count III, all plaintiffs claim the sanction is also excluding Representative Libby from the office to which she was duly elected and depriving her constituents of a vote for state representative in violation of the Fourteenth Amendment's Due Process clause's protection against fundamental unfairness in the

electoral process. *Id.* ¶¶ 89-94. In Count IV, all plaintiffs allege that the sanction deprives Representative Libby of the privileges of her office and deprives her constituents of representation in the House in violation of Article IV, § 4 of the U.S. Constitution which "guarantees to every State . . . a Republication Form of Government. *Id.* ¶¶ 101-05. The plaintiffs seek a declaratory judgment that the sanction infringes their constitutional rights as alleged in each count, an injunction barring the enforcement of the sanction against Representative Libby, and attorneys' fees and costs pursuant to 42 U.S.C. § 1988. *Id.* at 28.

In their Motion for Preliminary Injunction, the plaintiffs ask this court to preliminarily enjoin the defendants from enforcing the sanction Speaker Fecteau imposed while the parties litigate the merits of the plaintiffs' claims. The defendants opposed the motion and the plaintiffs filed a reply to the defendants' opposition. The court heard argument on April 4, 2025.[6]

## II.    LEGAL STANDARD

A preliminary injunction may be granted when a plaintiff demonstrates "four long-established elements." *Santiago v. Municipality of Utuado*, 114 F.4th 25, 34-35 (1st Cir. 2024). First, "the probability of the movant's success on the merits of their

---

[6] The court is also in receipt of a letter the plaintiffs filed on Friday, April 11. ECF No. 38. The court reminds the plaintiffs that the briefing schedule entered by the court was requested by the plaintiff in a consent motion that the plaintiff filed two days after filing the motion for preliminary injunction. The court confirmed with the parties, during a chambers conference held on April 18, that the briefing timeline proposed in the consent motion was indeed satisfactory to all and the court scheduled the hearing on the earliest date suggested by the parties. The plaintiff's letter, filed one week after the hearing, neglects to mention these details.

claim(s)." *Id.* (quoting *Rosario-Urdaz v. Rivera-Hernandez*, 350 F.3d 219, 221 (1st Cir. 2003)). Second, "the prospect of irreparable harm absent the injunction." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). Third, "the balance of the relevant equities (focusing upon the hardship to the movant if an injunction does not issue as contrasted with the hardship to the nonmovant if it does)." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). Fourth, "the effect of the court's action on the public interest." *Id.* (quoting *Rosario-Urdaz*, 350 F.3d at 221). "The movant's likelihood of success on the merits is the element that 'weighs most heavily in the preliminary injunction calculus.'" *Id.* at 35 (quoting *Me. Forest Prods. Council v. Cormier*, 51 F.4th 1, 5 (1st Cir. 2022)).

## III. DISCUSSION

As previewed above, the defendants contend that they are immune from this lawsuit under the doctrine of legislative immunity. Defs.' Opp'n at 1 (ECF No. 28). The court must address this threshold issue before considering the parties arguments about the preliminary injunction factors. If legislative immunity applies, then the court must deny the motion for preliminary injunction because the plaintiffs will not meet the weighty likely-to-succeed-on-the-merits-of-their-claims element of the preliminary injunction standard. *See Santiago*, 114 F.4th at 42 (ending the preliminary-injunction analysis after concluding the plaintiff-appellant would not prevail on this factor).

For those readers not familiar with this form of immunity from suit, the Supreme Court has long considered legislators (and often, but not always, their staff)

absolutely immune from being sued for their legislative acts. *Cushing v. Packard*, 30 F.4th 27, 36-37 (1st Cir. 2022) (en banc). The immunity has some guardrails, however. It "protects 'only purely legislative activities,'" *Nat'l Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 630 (1st Cir. 1995) (quoting *United States v. Brewster*, 408 U.S. 501, 507 (1972)), and "does not attach to the activities that are merely 'casually or incidentally related to legislative affairs,'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528), or to administrative actions that "fall outside the 'legitimate legislative sphere,'" *Harwood*, 69 F.3d at 630, 631 n.9 (quoting *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491, 503 (1975)). In addition to these limitations, immunity does not protect legislative activities that are deemed of an "extraordinary character," *Cushing*, 30 F.4th at 50 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)), a vaguely defined but rarely applied concept to circumvent the immunity shield. The court will take a deeper dive into this immunity and its common law limitations after setting out the parties' broad arguments about whether the defendants are entitled to legislative immunity from the plaintiffs' claims.

According to the defendants, the action the plaintiffs challenge as violating their constitutional rights – barring Representative Libby from speaking or voting on the House floor – was a legislative act entitled to the protection of legislative immunity. Defs.' Opp'n at 4, 6-7. The defendants assert that the "extraordinary character" exception is not met here because Speaker Fecteau imposed the sanction in strict adherence to a centuries-old rule of House procedure, and because Representative Libby has not been barred from performing all legislative work on

behalf of her district.   Defs.' Opp'n at 9 (citing Fecteau Decl. ¶¶ 27-38)).   The defendants contend that for this court to apply the "extraordinary character" exception, thereby removing the legislative immunity shield, would result in this court taking an impermissible step into another branch of government's jurisdiction and traversing into a political battle in which the court should not involve itself. Defs.' Opp'n at 9-10.

The plaintiffs counter that this action was not legislative in nature but an administrative action that falls outside the sphere of protection conferred by legislative immunity.   Pls.' Reply at 1 (ECF No. 34).   The imposition of the sanction stripping Representative Libby's voice and vote from the House floor is not, according to the plaintiffs, an action that the courts would consider to be part of the legislative process.   Pls. Reply at 1-2.   During the hearing on the pending motion, the plaintiffs also argued that stripping a House representative of what they consider her core responsibilities to her district – speaking on the House floor and voting – is so blatantly unconstitutional that the Speaker's imposition of this sanction must fall into the narrow exception for "extraordinary" conduct to which the courts have indicated legislative immunity will not apply.   Apr. 4, 2025 Hearing Tr. ("Tr.") at 5:15-21, 6:3-5, 6:14-19, 9:2-4 (ECF No. 37).

This threshold issue is a narrow one because the plaintiffs are clear that they are challenging the sanction imposed and "not the wisdom of the underlying censure,

as unwise as it may be." Pls.' Reply at 2.[7]  While the appellate courts have explored many contours of legislative immunity, the situation presented in this case does not fit squarely into any of these courts' past discussions and applications of this absolute immunity.  And so this court will start its deeper dive into the issue by describing some of the contours of this doctrine as it understands the Supreme Court and First Circuit to have defined them, beginning with the basic philosophy behind legislative immunity before moving onto the distinctions between legislative acts and nonlegislative (or administrative) acts and describing the amorphous exception for extraordinary conduct.

The original source of legislative immunity is the Speech and Debate Clause of the U.S. Constitution.  *Cushing*, 30 F.4th at 36; *Harwood*, 69 F.3d at 629 (acknowledging that "state legislators and their surrogates enjoy a parallel immunity from liability for their legislative acts"); *see also Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) (noting that "state and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities").  The First Circuit highlights this immunity as

> serv[ing] an important democratic end notwithstanding that it insulates
> elected representatives from legal challenges for certain of their official
> actions.  For that reason, we must be cognizant – as the [Supreme] Court
> has instructed us to be – of the risks associated with failing to respect
> the traditional scope of legislative immunity, bounded though it is, out

---

[7] During the hearing on the pending motion, the plaintiffs repeated that their constitutional challenges are only to the imposition of the sanction – the "prohibition on her speaking on the floor and casting a vote to represent her constituents" – and not on the Resolution censuring Representative Libby for the Facebook post.  Tr. at 11:9-16, 14:24-25.

of respect for legislative freedom and thus democratic self-government.

*Cushing*, 30 F.4th at 52; *see Harwood*, 69 F.3d at 630 ("absolute immunity . . . afforded . . . to protect the integrity of the legislative process by insuring the independence of individual legislators."). "In reading the Clause broadly [courts] have said that legislators acting within the sphere of legitimate legislative activity 'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.'" *Eastland*, 421 U.S. at 503 (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967)). It is well-settled that legislative immunity may apply against claims (such as those we have here) which "seek only declaratory or prospective injunction relief." *Cushing*, 30 F.4th at 37 (citing *Sup. Ct. of Va. v. Consumers Union of the U.S., Inc.*, 446 U.S. 719, 732 (1980)).

As mentioned above, the entitlement to legislative immunity is restricted in two ways and the court will consider each separately. First, immunity is reserved for actions that are legislative in nature. As Justice Thomas wrote on behalf of the unanimous Supreme Court, "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. As an obvious example, "'voting by Members' itself constitutes a legislative act." *Cushing*, 30 F.4th at 49 (quoting *Gravel v. United States*, 408 U.S. 606, 624 (1972)). The case law is clear that legislative acts include a broad swath of conduct, including "any act 'generally done in a session of the House by one of its members in relation to the business before it.'" *Harwood*, 69 F.3d at 630 (quoting *Kilbourn*, 103 U.S. at 204); *Eastland,* 421 U.S. at 503 (holding that subpoenas issued pursuant to

an investigation related to a legitimate task of Congress fell within the "sphere of legitimate legislative activity").

As already previewed, the plaintiffs' position is that the challenged conduct is not part of the House's "general policymaking" role but an administrative act because Representative Libby was "targeted . . . specifically for the content of her speech made on her own time outside the Legislature." Pls.' Reply at 2. The plaintiffs argue that "denying Representative Libby's right to speak or vote in the House is not 'an integral part' of the House's 'deliberative and communicative processes'" and therefore outside the scope of acts that are considered legislative. Pls.' Reply at 1 (quoting *Gravel*, 408 U.S. at 625). There is no immunity, say plaintiffs, "for acts not 'essential to legislating' even if undertaken under the auspices of a resolution" "nor [for] the House clerk's act of counting (or not counting) votes." Pls.' Reply at 3 (first quoting *Gravel*, 408 U.S. at 621, and then citing *Powell v. McCormack*, 395 U.S. 486, 504 (1969)).

Common law does indeed instruct that "[a]cts undertaken by legislators that are administrative in nature do not 'give rise to absolute immunity from liability in damages under § 1983.'" *Negron-Gaztambide v. Hernandez-Torres*, 35 F.3d 25, 26, 28 (1st Cir. 1994) (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). "'Employment decisions generally are administrative' except when they are 'accomplished through traditional legislative functions' such as policymaking and budgetary restructuring that 'strike at the heart of the legislative process.'" *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 8 (1st Cir. 2000) (quoting *Rateree v. Rockett,* 852 F.2d 946, 950-51 (7th Cir. 1988)). In *Negron-Gaztambide*, the Circuit identified "two

tests for distinguishing between legislative and administrative activity." 35 F.3d at 28 (quoting *Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984)).

> The first test focuses on the nature of the facts used to reach the given decision. If the underlying facts on which the decision is based are 'legislative facts,' such as 'generalizations concerning a policy or state of affairs,' then the decision is legislative. If the facts used in the decisionmaking are more specific, such as those that relate to particular individuals or situations, then the decision is administrative. The second test focuses on the 'particularity of the impact of the state action.' If the action involves establishment of a general policy, it is legislative; if the action 'singles out specifiable individuals and affects them differently from others,' it is administrative.

*Id.* (quoting *Cutting*, 724 F.2d at 261). At first blush, the application of the plain language of these tests might indicate that the imposition of the sanction on Representative Libby is an administrative act because she was "single[d] out" and "affect[ed] differently than others." *Id.* (quoting *Cutting*, 724 F.2d at 261). However, these two tests have been applied to situations readily distinguishable to the case before the court.

In *Negron-Gaztambide*, the challenged act was the head of the House of Representatives terminating a librarian who worked in the Legislative Library in the Commonwealth of Puerto Rico allegedly because of that employee's political affiliation. 35 F.3d at 26, 28. In *Cutting*, the Circuit Court tacitly concluded (while remanding for further proceedings due to an insufficiently developed record) that a local planning board's rejection of a developer's plans for a subdivision was an administrative act. 724 F.2d at 260, 260 n.1, 261. And, in *Acevedo-Garcia*, the Circuit Court held that the execution of a layoff plan was an administrative act because the actions taken to implement the plan "targeted specific individuals" and "affected

particular individuals differently from others."   204 F.3d at 9; *but see id.* at 8 (distinguishing the conduct at issue in *Bogan*, 523 U.S. at 55, where the Supreme Court held legislative immunity did apply when an employee's termination was effected through the adoption of an ordinance which eliminated the department that employed the plaintiff and not through targeting specific individuals).

These cases demonstrate the application of the test first articulated in *Cutting* to causes of action in which the plaintiff was either a former employee of the legislature whose employment had been terminated after a turnover in political party majority or a public citizen before a local board seeking approval of a land development plan, but **not** where the challenged conduct occurred during a legislative session and the legislative body was applying a black-letter house rule.   At no time do the plaintiffs explain to the court why any of the cases which applied the aforementioned tests are closer analogues to the plaintiffs' situation than the cases in which the First Circuit considered challenges to procedural rules.   After all, when the Circuit considered a challenge by groups of lobbyists to a house rule prohibiting lobbyists from sitting around the perimeter of the Rhode Island House of Representatives' floor during session, it decided that when the court is

> dealing with a procedural rule adopted by a house of the legislature as a whole for the management of its own business . . . [the court is] not concerned with whether the adoption of the rule comprises a legislative act – that is transparently clear – but, rather, with whether that act is more than 'casually or incidentally related' to core legislative functions.

*Harwood*, 69 F.3d at 631 n.9 (quoting *Brewster*, 408 U.S. at 528).

In this case, focusing as this court must on the nature of the action and not on the motivation or intent behind it, *Bogan*, 523 U.S. at 54, Speaker Fecteau was not terminating an employee or unilaterally deciding on a proposal for economic development. Rather, he executed the will of the body of the House of Representatives pursuant to the Resolution passed by a majority vote after full debate. The Resolution censured the Representative's conduct as a breach of the governing Code of Ethics and demanded that she issue an apology. When she did not, Speaker Fecteau imposed the precise sanction articulated in the Rule that governs members' conduct. There is, therefore, no doubt that these actions were "done in a session of the House by one of its members in relation to the business before it." *Harwood*, 69 F.3d at 630 (quoting *Kilbourn*, 103 U.S. at 204). As such, the nature of the Speaker's conduct falls "within the 'legitimate legislative sphere,'" *Eastland*, 421 U.S. at 503 (quoting *Kilbourn*, 103 U.S. at 204), and is not "merely 'casually or incidentally related to legislative affairs,'" *Cushing*, 30 F.4th at 49 (quoting *Brewster*, 408 U.S. at 528). Indeed, the Circuit Court has been clear that it is

> beyond serious dispute that enforcing a duly enacted legislative rule which [affects conduct] on the House floor during House sessions is well within the legislative sphere [because] [s]uch a restriction necessarily affects the manner in which the House conducts its most characteristic legislative functions, *e.g.,* debating and voting. A rule that colors the very conditions under which legislators engage in formal debate is indubitably part and parcel of the legislative process, and the acts of House officials (whether or not elected members) in enforcing it are therefore fully protected against judicial interference by the doctrine of legislative immunity.

*Harwood*, 69 F.3d at 632 (concluding the enforcement of a House rule prohibiting lobbyists from seating on the perimeter of the House floor was a legislative act). The rule applied here affects one censured member of the House and not an entire class of non-legislators as in *Harwood*, but the sentiment expressed above applies with equal force because the sanction imposed does in fact affect debating and voting on measures before the House during full House sessions while the sanction is in place. The court's conclusion that the plaintiffs are challenging a legislative act is also in line with the Circuit's reasoning in *Cushing* that legislative acts include situations where "the injunctive relief that the plaintiffs seek is, on their own account, relief that must run against a legislator directly to be effective." 30 F.4th at 49.

With this conclusion that the challenged conduct is to a legislative act, the court moves on to the second restriction on legislative immunity: the exception for conduct of an "extraordinary character." The court starts with a close examination of the relevant cases and the parties' arguments related to the application of these cases, and then considers the precise details provided by the parties about the process by which Speaker Fecteau imposed the sanction on Representative Libby.

As the Supreme Court has long recognized, "[l]egislative immunity does not, of course, bar all judicial review of legislative acts." *Powell*, 395 U.S. at 503. The case law carves out an exception to the entitlement to legislative immunity for "things done, in the one House or of the other, of an extraordinary character, for which the members who take part in the act may be held legally responsible." *Cushing*, 30 F.4th at 50 (quoting *Kilbourn*, 103 U.S. at 204). Broadly speaking, "[t]here may be some

conduct, even within the legislative sphere, that is so flagrantly violative of fundamental constitutional protections that traditional notions of legislative immunity would not deter judicial intervention." *Harwood*, 69 F.3d at 634. The Supreme Court has not identified precisely what conduct would clear the "high bar" set by this exception, but suggests that a "perversion of [legislative] powers [for] a criminal purpose [such as 'imitating the Long Parliament in the execution of the Chief Magistrate of the nation, or to follow the example of the French assembly in assuming the function of a court for capital punishment'] would be screened from punishment by the constitutional provision for freedom of debate." *Cushing*, 30 F.4th at 51 (quoting *Kilbourn*, 103 U.S. at 204-05).[8] The Circuit instructs that "the assessment of when a given act that, though seemingly legislative in nature, is nonetheless 'of an extraordinary character' that makes it unworthy of the immunity's protection must be sensitive to context." *Id.* at 52 (quoting *Kilbourn*, 103 U.S. at 204). This court must therefore "ensure that [its] focus is on the character of the legislative act being challenged." *Id.*

---

[8] The dissenting opinion in *Cushing* pointed out that the Supreme Court "has never addressed a case in which it has held the extraordinary-character exception to apply." *Cushing*, 30 F.4th at 56 (Thompson, J., dissenting). "As examples of potentially extraordinary legislative acts, the Supreme Court has hypothesized a legislature that 'execut[es] . . . the Chief Magistrate of the nation, or . . . assum[es] the function of a court for capital punishment.'" *Id.* at 57 (quoting *Kilbourn*, 103 U.S. at 204-05). The dissent further explained that "[w]e have similarly pondered a legislature that 'votes to allow access to its chambers to members of only one race or to adherents of only one religion,' suggesting these might veer into the orbit of the extraordinary-character exception." *Id.* (quoting *Harwood*, 69 F.3d at 634).

The First Circuit closely examined the notion of the extraordinary-character exception in *Cushing*. 30 F.4th at 50-53. The plaintiffs – all members of the New Hampshire House of Representatives with "medical conditions and other limitations" and "disabilit[ies] plac[ing] them at greater risk than the general public for serious complications or death from COVID-19" – introduced a "proposal . . . to amend the House rules to permit virtual proceedings of the full House." *Id.* at 32-33, 35. The House voted on the proposal and rejected it. *Id.* at 32-34. A few plaintiffs sent letters to the House Speaker (and others), requesting reasonable accommodations so that they could participate remotely in House proceedings, all to no avail. *Id.* at 34. The plaintiffs sued the Speaker, alleging that his refusal to allow them to participate remotely in official House sessions (which had the consequence of keeping them from voting on bills before the House) violated Title II of the Americans with Disabilities Act, § 504 of the Rehabilitation Act as well as the Fourteenth Amendment. *Id.* at 34-35, 49. The Circuit grappled with whether the Speaker's denial of some legislators' requests for accommodations to procedural rules were of such extraordinary character that the NH House Speaker would not be entitled to legislative immunity for the claims made against him. *Id.* at 52. The First Circuit, sitting en banc, concluded that the "extraordinary character" exception had not been met in part because the plaintiffs' claims asserting a Fourteenth Amendment violation was "not in and of itself suffic[ient] . . . under the *Kilbourn* standard" to obliterate the shield of legislative immunity. *Id.* at 50-52. The Circuit cautioned that the Supreme Court's jurisprudence on legislative immunity indicated that courts needed "to be wary of

construing *Kilbourn* in a manner that would deem even such a 'quintessentially legislative act' as the decision by the Speaker of the House to follow [its] rules . . . to be beyond the protection of the immunity that has been historically afforded to such an act." *Id.* at 53 (quoting *McCarthy v. Pelosi*, 5 F.4th 34, 39 (D.C. Cir. 2021)).

Here, like in *Cushing*, the House took a vote on a formal request from a member. The Speaker then enforced the will of the majority of the body by enforcing the plainly written sanction articulated in the rule. As in *Cushing*:

> [T]he plaintiffs [here] take aim at conduct by the Speaker that involves a decision to follow -- rather than depart from -- existing House rules that were overwhelmingly [here, unanimously] passed . . . . The challenged conduct by the Speaker . . . involves adhering to existing rules rather than making new ones.

*Id.* at 51. The court also sees similarities to the issue presented and reasoning expressed in *Harwood*: "[A] legislative body adopt[ed] a rule, not invidiously discriminatory on its face," and Speaker Fecteau did "no more than carry out the will of the body by enforcing the rule as part of [his] official duties." 69 F.3d at 631. The plaintiffs assert that these cases are inapposite because each "concerned a generally applicable procedural rule," Pls.' Reply at 3-4, but the plaintiffs fail to acknowledge that their case is also about the application of a procedural rule. The court agrees with the plaintiffs that neither *Cushing* nor *Harwood* foreclose a future case that could present extraordinary conduct to which immunity would not apply. Pls.' Reply at 4. Neither case defined what that conduct would be, though the Circuit indicated that a category of such conduct would be met if "legislators engaged in conduct so clearly exceeding the powers delegated to them." *Cushing*, 30 F.4th at 51.

The plaintiffs also assert that the sanction imposed on Representative Libby is "punitive enforcement" that disenfranchises her constituents and reflects "invidious viewpoint discrimination" which "so flagrantly violat[es] fundamental constitutional protections" that the immunity shield cannot protect the defendants from their suit. Pls.' Reply at 4.  The unconstitutional application of the sanction identified in Rule 401(11) to Representative Libby, according to the plaintiffs, must be reviewed by this court because the rule may not "trump the constitution" and Speaker Fecteau acted outside the scope of his power.  Tr. at 14:16-18, 35:18-21.  The appellate courts have, however, put to rest any notion that legislative immunity could be circumvented simply because a plaintiff alleges a claim for a constitutional violation.  While the First Circuit has acknowledged it would draw the line at "flagrant violat[ions] of fundamental constitutional protections," *Harwood*, 69 F.3d at 634 (implying a house rule excluding all members of one race or one religion would be so flagrantly violative as to qualify for the exception) (citing *Kilbourn*, 103 U.S. at 204), it has also relied on more recent discussions by the Supreme Court to generalize "that immunity is not forfeited simply because the activities, if unprotected, might violate a plaintiff's constitutional rights," *id.* (holding that a House Rule – and alleged selective enforcement – prohibiting lobbyists from sitting around the perimeter of the House floor did not "even closely approach" the border of the extraordinary character exception).  Moreover, the Supreme Court has said that to believe the judiciary will intervene to protect First Amendment rights as soon as allegations are made that congressional action has infringed these rights "ignores the absolute nature of the

- 22 -

speech or debate protection and our cases which have broadly construed that protection." *Eastland*, 421 U.S. at 509-510.  The Supreme Court has also stated that immunity applies even if the legislators' "conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes."  *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) (holding congressional committee members immune from suit for alleged violations of, among other things, privacy rights when those defendants' actions were limited to conducting hearings, preparing the report, authorizing its publication). Furthermore, the courts are not "to oversee the judgment of the [legislative body] . . . to impose liability on its Members if [it] disagree[s] with their legislative judgment." *Id.* at 313.  And, in a case specifically considering whether the application of a statute pertaining to legislator recusal rules (which had the effect of barring a legislator from voting on certain legislative proposals) was an infringement on the legislator's First Amendment rights, the Court declared that "restrictions upon legislators' voting are not restrictions upon legislators' protected speech" because "a legislator's vote is the commitment of [their] apportioned share of the legislature's power to the passage or defeat of a particular proposal.  The legislative power thus committed is not personal to the legislator but belongs to the people; the legislator has no personal right to it." *Nevada Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 125-26 (2011) (Scalia, J.).

What all this means is that the court has no indication that the Circuit or Supreme Court would conclude that Speaker Fecteau's imposition of the sanction pursuant to House Rule 401(11) is of such an extraordinary character that it would

decline to leave up the shield of legislative immunity.  Recall that the plaintiffs are not challenging Rule 401(11) itself, but only the imposition of the sanction identified in this rule on Representative Libby.  If the Circuit was not moved by the New Hampshire Speaker's enforcement of its procedural rule with the effect of forcing members to choose between their health and/or physical ability to be present in person for sessions and the ability to perform the responsibilities of their elected position, *see Cushing*, 30 F.4th at 50-52, then the court does not see how it can conclude that prohibiting an elected member of the House from speaking or voting on the House floor is of such an extraordinary character.  The court takes the prudent course of exercising judicial restraint especially because the case law does not indicate this should be the first case to clear the high bar for applying this exception to a legislator's conduct.

The plaintiffs warn that if the court allows immunity to shield the defendants here, then the defendants could next "prohibit Asian-American representatives from making floor speeches or voting, silence those in same-sex marriages or interracial marriages, or prohibit voting by women."  Pls.' Reply at 4.  The Circuit Court in *Harwood* was also presented with a "parade of horribles" – there "a hypothetical legislature that votes to allow access to its chambers to members of only one race or to adherents of only one religion" – which prompted the reminder that there is a border past which immunity would not apply.  *Harwood*, 69 F.3d at 634.  But the court need not explore hypothetical scenarios and instead stays focused on the situation at hand.

Finally, the plaintiffs lean heavily on two Supreme Court cases which, they say, seal the deal here that immunity should not shield the defendants. Pls.' Reply at 4-5. The court, however, finds that neither case is as dispositive as the plaintiffs contend. In *Bond v. Floyd*, a duly elected candidate to the Georgia House of Representatives was not allowed to take his oath or his seat in the legislature because of comments he had made against the Vietnam war between election day and the first day of the legislative session. 385 U.S. 116, 118 (1966). Bond, an African American, alleged racial discrimination and violation of his First Amendment rights. The State of Georgia did not argue it was immune from suit and the Supreme Court did not explore (because it was not asked to) whether the situation presented in that case represented conduct of an extraordinary character that would not be entitled to immunity. Rather, the Supreme Court acknowledged that "[t]he State does not claim that it should be completely free of judicial review whenever it disqualifies an elected Representative; it admits that, if a State Legislature excluded a legislator on racial or other clearly unconstitutional grounds, the federal (or state) judiciary would be justified in testing the exclusion by federal constitutional standards." *Id.* at 130. This is not the same as the Court concluding that the conduct alleged against defendants met the extraordinary character exception. While the plaintiffs insist this case is on point because here there is also an "exclusion of an elected legislator" in "flagrant violation of Supreme Court precedent barring exclusion of an elected legislator because of their protected speech espousing a viewpoint that majority rejects," Pls.' Reply at 4, the court agrees with the defendants that this case is

factually distinguishable because Representative Libby has not been disqualified, excluded, or expelled from her elected seat. *Bond* is about a member-elect being prevented from taking his seat at all and not about a sanction imposed on a seated member of the House for violations of the Code of Ethics pursuant to a democratically passed censure. Defs.' Opp'n at 6 n.6.

Next, in *Powell*, the Supreme Court held that certain legislative employees were not entitled to the protection of legislative immunity for their roles in enforcing a resolution which excluded a member-elect from his seat in the U.S. House of Representatives. 395 U.S. at 489, 506. The Court affirmed the proposition that legislators were completely immune from suit, but a House clerk, sergeant-at-arms, and doorkeeper were not protected by immunity even though their conduct was pursuant to an express order of the House. *Id.* at 504-05. The Court relied on *Kilbourn*, where the Court had allowed a lawsuit against a sergeant-at-arms for his execution of an illegal arrest warrant resulting in an alleged false imprisonment to go forward. *Id.* at 503-04 (citing *Kilbourn*, 103 U.S. at 204). Like with *Bond*, however, the court considers Representative Libby's situation to be readily distinguishable from *Powell* because Representative Libby has not been disqualified or expelled from her seat.[9]

---

[9] The plaintiffs do not include any allegations against Clerk Hunt or provide any indication or argument in their motion about how or why any actions he has taken would qualify as extraordinary for purposes of getting around legislative immunity and so the court does not provide a separate analysis for this defendant. The law, however, is clear that, "as long as [a legislative employee's] conduct would be covered by legislative immunity were the same conduct performed by the legislator

Despite the court's take on the applicable law, especially that the appellate courts have been clear that simply alleging claims for constitutional violations does not automatically meet the high bar set for the extraordinary-character exception, the appellate courts also instruct that context is an important consideration. *See Cushing*, 30 F.4th at 52 (instructing that the court must be "sensitive to [the] context" in which the legislative act arose and must focus on the "character of the legislative act being challenged"). The court is also mindful of the serious effect the imposed sanction has on Representative Libby's ability to fulfill her duties as an elected representative of District 90, so the court will closely examine the context surrounding the imposition of the sanction to determine whether the details known at this time about the defendants' conduct will reach the high bar of this exception.

The Resolution introduced by Representative Moonen included a "resolve[]" that Representative Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." Fecteau Decl. Ex. D. Representative Libby was on notice of the potential consequence if the Resolution passed because the consequence is clearly identified in Rule 401(11). The Resolution was deeply debated on the floor of the House. Throughout the hour-long debate, Speaker Fecteau repeatedly refocused the comments from the members on the precise Resolution before the House, redirecting members on both sides of the aisle when another member raised a point of order or on his own when the comments

---

himself, the [legislature's employee] shares the immunity." *Harwood*, 69 F.3d at 631, 631 n.10.

strayed from the merits of the censure for Representative Libby's conduct. *See, e.g., Archived Hearings & Meetings: House Chamber*, at 6:17:10 PM. None of the comments discussed the precise sanction allowed by Rule 401(11) or questioned what the consequence might be if Representative Libby refused to comply with the Resolution. None of the comments raised concerns about the effect of imposing the sanction articulated in Rule 401(11). After the Resolution passed, Speaker Fecteau provided Representative Libby with an opportunity to make the satisfaction demanded by the Resolution – the apology – but she declined. Speaker Fecteau then proceeded to announce the precise sanction identified in Rule 401(11), without objection from any member of the body.

As the parties brought to the court's attention, this is not the first time that Rule 401(11) has been invoked or applied in the Maine House.[10] But this is the first time a censured Representative has refused to apologize and so the first time the

[10] Two censures passed in April 2024 pursuant to violations of House Rule 401(11) where the body found two members in "egregious violation of the decorum of the House" when they made statements on the House floor "claiming that the 2023 Lewiston mass shooting was God's response to a recent abortion law that took effect the same day." Compl. at ¶ 53 (citing to the Resolutions). The Speaker for the 131st Legislature summoned the members to the well of the House, announced the censure, and "await[ed] an assurance and an issuance of a formal apology, to be read on the House floor, to make satisfaction." Journal and Legislative Record – House, Apr. 11, 2024 at 2 [https://perma.cc/BG6W-SVTU]. Both members apologized to the House and to the public, Journal and Legislative Record – House, Apr. 11, 2024 at 3 [https://perma.cc/BG6W-SVTU], which obviated the need for any further sanction.

The parties also point this court to the first censure imposed on a House member. In 2001, the House voted to adopt a Resolution censuring a member who had "verbally abused a female Senator in the hallway outside the chamber of the House of Representatives." Journal and Legislative Record – House, Feb. 8, 2001 at 10 [https://perma.cc/GL5C-FVY7]. That member also apologized immediately following the vote to adopt the Resolution to censure him. *Id.* at 14.

Speaker imposed the consequence of the censure when satisfaction has not been made. This "first" does not in and of itself make the act extraordinary, however, because the consequence is plainly stated in the rule.

The effect of the sanction, as clearly known by now, is that Representative Libby is prohibited from speaking on the House floor during the debate of proposed legislation and voting on proposed legislation and other matters up for a vote by the full House. Fecteau Decl. at ¶ 24. Representative Libby considers the suspension of these privileges to be indefinite, but the sanction remains in place only until Representative Libby apologizes, the House votes to dispense with Rule 401(11), or the 132nd Legislature session ends. *Id.* ¶ 25. As indicated by Speaker Fecteau, a House member may move to dispense with or suspend the Resolution and a majority vote will pass the motion. *Id.* ¶¶ 41-42. At least two attempts since February 25 to do so have failed. On March 20, a member of the House made such a motion so Representative Libby could speak during the debate on the State's proposed budget, but the motion did not receive a majority vote. *Id.* ¶¶ 39-41. On March 25, a similar motion was made and failed. *Id.* ¶ 42. Of course, pursuant to Rule 401(11), Representative Libby may also choose to make satisfaction.

Representative Libby considers "speaking and voting on behalf of her District 90 constituents to be "[t]he two most critical responsibilities of a duly elected legislator." Libby Decl. at ¶ 10. This court hears the predicament but notes that the sanction does not render her unable to represent her constituents or speak in favor of or in opposition to policies and legislation in all ways. As Speaker Fecteau points

out in his declaration (and Representative Libby does not challenge), Representative Libby can:

- Fully participate on committees to which she is assigned, including voting, debating, and testifying at public hearings.
- Sponsor and co-sponsor bills and resolutions.
- Lobby other members for support or opposition to proposed legislation.
- Participate in legislative caucus meetings.
- Testify at public hearings about any pending legislation.
- Be present on the House floor during debates and votes.
- Engage in procedural actions on the House floor such as make a motion to amend or postpone a bill or raise an objection thereto.
- Use all legislative staff and offices without any restrictions.
- Be fully compensated, including travel-related expenses and meal allowances.

Fecteau Decl. at ¶¶ 28-31, 34-38. At the time of the briefing on this motion, Representative Libby had introduced several amendments to a measure regarding the State's biennial budget. *Id.* ¶ 39.

After carefully considering the case law, the details presented by the parties about the House governing rules, and the process by which the House adopted the Resolution and imposed the censure on Representative Libby, the court concludes that the suspension of Representative Libby's privilege to speak or vote on the House floor is not of such an extraordinary character that this exception to absolute legislative immunity for legislators will apply. That said, the ability to suspend an elected representative's privileges to either speak on the House floor or enter a vote on legislation pending before the entire House until the representative apologizes for censured conduct is a weighty sword to wield. However, the process Speaker Fecteau followed when he imposed the sanction ultimately reflected the will of the majority of the House members. The court must carefully heed the caution from the First Circuit

that federal judges should not "improperly intrud[e] into internal state legislative affairs [or] warring sides in partisan state legislators' battles." *Cushing*, 30 F.4th at 52. The censure and its sanction on Representative Libby is, at bottom, an internal Maine House affair. "As a rule, a legislature's regulation of the atmosphere in which it conducts its core legislative activities—debating, voting, passing legislation, and the like—is part and parcel of the legislative process, and, hence, not subject to a judicial veto." *Harwood*, 69 F.3d at 635 (citing *Eastland,* 421 U.S. at 509). And so, in this context (and with the plaintiff's plain instruction that they are challenging the application of Rule 401(11) to Representative Libby and not the Rule itself firmly rooted in mind), the imposition of the sanction plainly identified and authorized by the House Rule is not of such extraordinary character as to obliterate the formidable shield the courts have provided to legislative acts. The defendants are, therefore, immune from the plaintiffs' claims against them.

## IV.    CONCLUSION

For the reasons stated above, the plaintiffs' Motion for a Preliminary Injunction (ECF No. 8) is DENIED.

IT IS SO ORDERED.

Melissa R. DuBose
United States District Judge


April 18, 2025