**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE**

| | |
|---|---|
| LAUREL D. LIBBY, State Representative of Maine House District 90, RONALD P. LEBEL, WENDY MUNSELL, JASON LEVESQUE, BERNICE FRASER, RENE FRASER, and DONALD DUBUC, <br><br> Plaintiffs, <br><br> v. <br><br> RYAN M. FECTEAU, in his official capacity as Speaker of the Maine House of Representatives, and ROBERT B. HUNT, in his official capacity as Clerk of the House, <br><br> Defendants. | Civil Action No. 1:25-cv-83-MRD |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 1

STANDARD OF REVIEW .................................................................................................. 4

ARGUMENT ....................................................................................................................... 4

I.      Legislative immunity does not shield Defendants' actions from judicial review. ......................... 4

II.     The complaint plausibly states claims for relief .................................................................. 10

     A.    Count I: First Amendment Retaliation ................................................................. 10

     B.    Counts II: Equal Protection ............................................................................... 13

     C.    Count III & IV: Due Process and Guarantee Clause ............................................ 19

CONCLUSION ................................................................................................................... 20

CERTIFICATE OF SERVICE ........................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

*Acevedo-Garcia v. Vera-Monroig,*
204 F.3d 1 (1st Cir. 2000) ................................................................................ 5

*Acierno v. Cloutier,*
40 F.3d 597 (3d Cir. 1994) (en banc) ............................................................... 5

*Am. Encore v. Fontes,*
2024 WL 4333202 (D. Ariz. Sept. 27) ............................................................ 17

*Ammond v. McGahn,*
390 F. Supp. 655 (D.N.J. 1975) ...................................................................... 15

*Anderson v. Celebrezze,*
460 U.S. 780 (1983) ......................................................................................... 17

*Ayers-Shaffner v. DiStefano,*
37 F.3d 726 (1st Cir. 1994) ............................................................................. 17

*Bd. of Elections for Franklin Cnty. v. State ex rel. Schneider,*
191 N.E. 115 (Ohio 1934) ............................................................................... 20

*Bonas v. Town of N. Smithfield,*
265 F.3d 69 (1st Cir. 2001) ................................................................. 14, 15, 19

*Bond v. Floyd,*
385 U.S. 116 (1966) ..........................................................................8, 10, 11, 12

*Boquist v. Courtney,*
32 F.4th 764 (9th Cir. 2022) ............................................... 10, 11, 12, 13

*Buckley v. Am. Const. L. Found., Inc.,*
525 U.S. 182 (1999) ......................................................................................... 18

*Burdick v. Takushi,*
504 U.S. 428 (1992) ......................................................................................... 17

*Bush v. Gore,*
531 U.S. 98 (2000) ........................................................................................... 16

*Coffin v. Coffin,*
4 Mass. 1, 29 (1808) ................................................................................. 9, 12

*Cruz v. Trujillo,*
443 F. Supp. 2d 240 (D.P.R. 2006) .................................................................. 6

*Cushing v. Packard,*
30 F.4th 27 (1st Cir. 2022) (en banc) ...................................................5, 7, 8, 9

*Cutting v. Muzzey,*
724 F.2d 259 (1st Cir. 1984) ............................................................................ 5

*Davids v. Akers,*
549 F.2d 120 (9th Cir. 1977) .......................................................................... 15

*Davignon v. Hodgson,*
    524 F.3d 91 (1st Cir. 2008) ................................................................................10

*Duncan v. McCall,*
    139 U.S. 449 (1891) ..........................................................................................20

*Dunn v. Blumstein,*
    405 U.S. 330 (1972) ..........................................................................................15

*Fla. State Conf. of NAACP v. Lee,*
    566 F. Supp. 3d 1262 (N.D. Fla. 2021) ..............................................................18

*Gamrat v. McBroom,*
    822 F. App'x 331 (6th Cir. 2020) ........................................................................8

*Gattineri v. Town of Lynnfield,*
    58 F.4th 512 (1st Cir. 2023) ..............................................................................10

*Gravel v. United States,*
    408 U.S. 606 (1972) ..................................................................................4, 5, 6, 7

*Griffin v. Burns,*
    570 F.2d 1065 (1st Cir. 1978) ............................................................................19

*Hous. Cmty. Coll. Sys. v. Wilson,*
    595 U.S. 468 (2022) ............................................................................ 10, 11, 12, 13

*Kamplain v. Curry Cnty. Bd. of Comm'rs,*
    159 F.3d 1248 (10th Cir. 1998) ............................................................................6

*Kilbourn v. Thompson,*
    103 U.S. 168 (1880) ..........................................................................................6, 8

*Koontz v. St. Johns River Water Mgmt. Dist.,*
    570 U.S. 595 (2013) ..........................................................................................18

*Kucinich v. Forbes,*
    432 F. Supp. 1101 (N.D. Ohio 1977) ....................................................14, 15, 19

*Largess v. Supreme Jud. Ct. of Mass.,*
    373 F.3d 219 (1st Cir. 2004) ..............................................................................20

*Libertarian Party of Maine, Inc. v. Dunlap,*
    2016 WL 3039715 (D. Me. May 27) ..................................................................18

*Libertarian Party v. D.C. Bd. of Elections & Ethics,*
    682 F.3d 72 (D.C. Cir. 2012) ............................................................................17

*LWV of Ohio v. Brunner,*
    548 F.3d 463 (6th Cir. 2008) ............................................................................16

*Lyman v. Baker,*
    954 F.3d 351 (1st Cir. 2020) ..............................................................................17

*Michel v. Anderson,*
    14 F.3d 623 (D.C. Cir. 1994) ......................................................................passim

*Miller v. Town of Hull,*
    878 F.2d 523 (1st Cir. 1989) .................................................................9, 10, 12, 17

*Monserrate v. N.Y. Senate,*
    599 F.3d 148 (2d Cir. 2010) ...............................................................................18

*Nat'l Ass'n of Soc. Workers v. Harwood,*
    69 F.3d 622 (1st Cir. 1995) .............................................................................4, 8

*Negron-Gaztambide v. Hernandez-Torres,*
    35 F.3d 25 (1st Cir. 1994) ................................................................................5, 6

*Nev. Comm'n on Ethics v. Carrigan,*
    564 U.S. 117 (2011) ...............................................................................9, 14, 17

*NRA v. Vullo,*
    602 U.S. 175 (2024) ...................................................................1, 4, 9, 13

*Ocasio-Hernandez v. Fortuno-Burset,*
    640 F.3d 1 (1st Cir. 2011) ...................................................................................4

*Peeper v. Callaway Cnty. Ambulance Dist.,*
    122 F.3d 619 (8th Cir. 1997) .......................................................................14, 17

*Powell v. McCormack,*
    395 U.S. 486 (1969) ...............................................................................4, 6, 7, 10

*Powell v. Ridge,*
    247 F.3d 520 (3d Cir. 2001) ................................................................................9

*Rangel v. Boehner,*
    785 F.3d 19 (D.C. Cir. 2015) ...............................................................................8

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ...............................................................................passim

*Riley v. Nat'l Fed'n of the Blind of N.C.,*
    487 U.S. 781 (1988) .............................................................................................19

*Rosenberger v. Rector & Visitors of UVA,*
    515 U.S. 819 (1995) ..............................................................................................9

*Roth v. United States,*
    354 U.S. 476 (1957) ...........................................................................................10

*S. Middlesex Opp. Council v. Town of Framingham,*
    752 F. Supp. 2d 85 (D. Mass. 2010) ....................................................................5

*Seamons v. Snow,*
    84 F.3d 1226 (10th Cir. 1996) ...........................................................................19

*Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp,*
    574 F. Supp. 3d 1260 (N.D. Ga. 2021) ..............................................................18

*South Carolina v. Katzenbach,*
    383 U.S. 301 (1966) ...........................................................................................12

*State Emps. Bargaining Agent Coal. v. Rowland*,
   494 F.3d 71 (2d Cir. 2007).................................................................................4, 6

*Sup. Ct. of Va. v. Consumers Union of U.S.*,
   446 U.S. 719 (1980).............................................................................................6

*Sweeney v. Tucker*,
   375 A.2d 698 (Pa. 1977).......................................................................................6

*Tenney v. Brandhove*,
   341 U.S. 367 (1951)..........................................................................................4, 9

*Thornton v. Ipsen Biopharmaceuticals, Inc*,
   126 F.4th 76 (1st Cir. 2025).................................................................................4

*United States v. Brewster*,
   408 U.S. 501 (1972).....................................................................................4, 5, 9

*United States v. Johnson*,
   383 U.S. 169 (1966).............................................................................................5

*United States v. Muller*,
   2022 WL 16960971 (D. Me. Nov. 23).................................................................10

*Werkheiser v. Pocono Twp.*,
   780 F.3d 172 (3d Cir. 2015)................................................................................13

*Wesberry v. Sanders*,
   376 U.S. 1 (1964)................................................................................................14

*Whitener v. McWatters*,
   112 F.3d 740 (4th Cir. 1997).................................................................................8

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1885)............................................................................................14

**Statutes**

5 MRS §4601 .............................................................................................................1

5 MRS §4602(1)(A)-(B)..............................................................................................1

**Other Authorities**

1 Wis. Sen. J., 47th Sess. (1905)
   https://bit.ly/3RrGn48......................................................................................12

2 Debates on the Federal Constitution (J. Elliot ed. 1876)......................................20

4 Wis. Op. Att'y Gen. (1915),
   https://perma.cc/MCS3-G7S2.......................................................................12, 19

Cong. Rsch. Serv., *Expulsion, Censure, Reprimand, and Fine* (2016),
   https://perma.cc/T2P8-5Q55.............................................................................11

D.S. Hobbs, *Comment on* Powell v. McCormack,
   17 U.C.L.A. L. Rev. 129 (1969) .........................................................................15

*Deschler's Precedents* (1994),
https://perma.cc/M3ZL-9P9R ................................................................... 11, 15, 18, 19

Gerald T. McLaughlin, *Congressional Self-Discipline: The Power to Expel, to Exclude and to Punish*,
41 Fordham L. Rev. 43 (1972) ........................................................................ 15

H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025),
https://perma.cc/JU85-VNTS .............................................................................. 2

*Hinds' Precedents* (1907),
https://perma.cc/CJ3H-SVNF ........................................................................ 11, 12

J. H.R. Mass. (1784),
https://bit.ly/4ielTqk ............................................................................................ 12

J. H.R. Mass. (1808),
https://bit.ly/42qrzI0 ........................................................................................... 12

*Jefferson's Manual and Rules*, §672 (2023),
https://perma.cc/U78W-KZ2G ............................................................................ 11

*Legislative Code of Ethics*, Me. House Reps.,
https://perma.cc/RF43-JPA2 ............................................................................... 16

Mary Patterson Clarke, *Parliamentary Privilege in the American Colonies*
(Da Capo Press ed. 1971) ..................................................................................... 11

Wis. Leg. Ref. Bur., *Discipline in the Wisconsin Legislature* (2020),
https://perma.cc/FK4F-JF6L ......................................................................... 12, 15

**Constitutional Provisions**

Me. Const. art. IV, pt. 1, §4 ................................................................................ 19

Me. Const. art. IV, pt. 3, §4 ............................................................................. 9, 19

## INTRODUCTION

Maine House District 90 is without a voice or a vote in the Maine House of Representatives. Defendants refuse to count Representative Laurel Libby's votes as punishment for her social media post on an issue of public concern. That unprecedented punishment will last indefinitely, absent judicial review. And yet, Defendants take the extraordinary position that their actions disenfranchising the thousands living within District 90 are unreviewable and unremarkable. They are wrong on both counts. Legislative immunity is a shield protecting the free exchange of ideas in the House, not a sword to suppress debate and deny Mainers the promise of equal representation in their legislature. And Defendants' actions are more than remarkable; they are unconstitutional. The First Amendment prohibits Defendants from retaliating against Libby for speaking on her own time on her own social media account. And the arbitrary disenfranchisement of District 90, beyond what the Maine Constitution permits, violates the Fourteenth Amendment and the Guarantee Clause. Plaintiffs allege facts that "assessed as a whole" establish each of these claims. *NRA v. Vullo*, 602 U.S. 175, 194 (2024).

## BACKGROUND

**A.** Girls' sports have been at the forefront of public debate for the past several years. Compl. ¶22, ECF 1. Most Americans would restrict girls' sports to girls, and more than half the States have done just that. ¶¶23, 25. The issue received significant attention in the 2024 presidential election, ¶28, and President Trump immediately signed an executive order to rescind federal funds from educational programs that permit biological boys to compete in girls' sports, ¶29.

Maine refuses to comply. ¶30. Maine has enshrined protections for "gender identity," P.L. 2021, Ch. 366, including allowing students to "participate in … all extracurricular activities without discrimination because of … gender identity," 5 MRS §4601, and prohibiting "[e]xclud[ing] a person from participation in" any "extracurricular … activity" or "[d]eny[ing] a person equal opportunity in athletic programs" based on "gender identity," *id.* §4602(1)(A)-(B).

**B.** Representative Laurel Libby represents Maine House District 90 and has been a staunch advocate of protecting Maine girls in athletics and a critic of Maine's policy. Compl. ¶¶2, 10. On February 17, 2025, she posted on Facebook about the state track and field championship. ¶31. The championship was a public event, and the names, schools, and photos of participants were all publicly reported and accessible online. ¶¶32-33. Reposting that already-public information, Libby observed that the first-place girls' pole vaulter previously competed in boys' pole vault and placed fifth. ¶31. The post showed the athlete on the boys' medal podium side-by-side with the athlete on the girls' podium this year. *Id.* The male student's first-place pole vault finish propelled the Greely High School girls' team to win the overall state championship by one point. ¶34.

Libby's post went viral. ¶35. She appeared on national television and radio broadcasts and continued to speak out, criticizing Maine's policy and calling on the federal government to enforce Trump's executive order. ¶36. With Maine's policy in the national spotlight, Maine House Speaker Ryan Fecteau asked Libby to delete her initial Facebook post, but Libby refused. ¶42. Fecteau then publicly responded to Libby by urging Mainers to "reject hateful rhetoric from divisive politicians." ¶43. He framed Libby's social media activity as an issue of "privacy of Maine kids" that can "be downright dangerous for the young person involved" and "impact their health and their safety." ¶44. Yet Fecteau has posted many photos of minors on Facebook, including from public athletic events. ¶62. Here too, the photos Libby shared were already available elsewhere online. ¶¶32-33.

**C.** On February 25, Speaker Fecteau led the House to censure Libby for her speech. ¶50; *see* H.R. Res. 1, 132nd Leg., 1st Reg. Sess. (Me. 2025), https://perma.cc/JU85-VNTS. The censure resolution passed along party lines by a vote of 75 to 70. The resolution stated that Libby "posted a statement criticizing the participation of transgender students in high school sports"; the "post has received national attention that she has amplified by appearing on national television and radio broadcasts"; and the "post named the minor and used photos of the minor without that minor's consent, in an

effort to advance her political agenda." Compl. ¶50. The resolution found Libby's conduct to be "reprehensible," "in direct violation of our code of ethics," and "incompatible with her duty and responsibilities as a Member of this House and the public trust and high standards incumbent in that office." *Id.* The resolution stated that Libby "must accept full responsibility for the incident and publicly apologize to the House and to the people of the State of Maine." *Id.*

Other House members decried the resolution as "a mockery of the censure process," "set[ting] a standard … that the majority party, when they're displeased with a social media post that upsets them, can censure a member of the minority party and by a majority vote, … without them giving an apology, keep them out of the Legislature." ¶52. Others raised free-speech concerns and sought clarification on whether members who reposted Libby's post can "expect censures to come forth on them as well." ¶¶54-55. Fecteau responded, "I'm not aware of any other censures." ¶55.

After the censure resolution passed, Fecteau summoned Libby to the well of the chamber, lectured her on the House's ethics standards, and asked her to apologize. ¶57. When Libby refused to recant her views, Fecteau found Libby in violation of House Rule 401(11), providing members "guilty of a breach of any of the rules and orders of the House … may not be allowed to vote or speak, unless by way of excuse for the breach, until the member has made satisfaction." ¶¶57-58. For the rest of the legislative session, or longer should the Speaker re-impose the same punishment next legislative session, Libby's district has no voice or vote on any bill that comes to the House floor. ¶¶59, 69-70.

Libby and some of her constituents in District 90 brought this suit to restore District 90's voice and vote in the House. Defendants are the House Speaker and Clerk, charged with counting the House votes and who refuses to count Libby's. ¶¶17-18, 59, 67-70, D; *see* Me. H.R. Rule 301(3). Plaintiffs seek an injunction restoring the status quo in the House: District 90's equal representation. ¶D.

**STANDARD OF REVIEW**

A complaint plausibly states a claim "'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Ocasio-Hernandez v. Fortuno-Burset*, 640 F.3d 1, 11 (1st Cir. 2011). The Court "must assume the well-pleaded factual allegations in the complaint are true," *Vullo*, 602 U.S. at 195, and "draw[] all reasonable inferences in the pleader's favor," *Thornton v. Ipsen Biopharmaceuticals, Inc*, 126 F.4th 76, 80 (1st Cir. 2025). The complaint must be "assessed as a whole," and the Court should not take each "allegation[] in isolation." *Vullo*, 602 U.S. at 194; *see also Ocasio-Hernandez*, 640 F.3d at 15 (similar).

Defendants also invoke Rule 12(b)(1) but never develop any arguments to contest this Court's subject-matter jurisdiction. Mot. to Dismiss (MTD) 5, ECF 31. To the extent they believe legislative immunity arguments implicate this Court's jurisdiction, they are wrong. Legislative immunity is an affirmative defense that can be waived; it is not jurisdictional. *See State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 77 n.4 (2d Cir. 2007) ("It is well-settled that legislative immunity is not a jurisdictional bar, but is rather a personal defense that may be asserted to challenge the sufficiency of a complaint."); *see also Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 629 (1st Cir. 1995) (considering waiver of immunity).

**ARGUMENT**

**I.    Legislative immunity does not shield Defendants' actions from judicial review.**

"Legislative immunity does not … bar all judicial review of legislative acts." *Powell v. McCormack*, 395 U.S. 486, 503 (1969). It is "not all-encompassing." *Gravel v. United States*, 408 U.S. 606, 625 (1972). It covers only "purely legislative activities," *United States v. Brewster*, 408 U.S. 501, 512 (1972), meaning acts "integral" to the "deliberative and communicative processes" of members themselves, *Gravel*, 408 U.S. at 625. Legislative immunity ensures legislators "enjoy the fullest liberty of speech" on the floor, prohibiting judicial inquiry into their "motives" when considering legislation. *Tenney v. Brandhove*, 341 U.S. 367, 373-79 (1951). But immunity does not shield any and all conduct "*relating* to

the legislative process." *Brewster*, 408 U.S. at 515. That would impermissibly "forestall judicial review of legislative action" altogether, *Powell*, 395 U.S. at 505, contrary to the Supreme Court's observation that legislative immunity is not tantamount to legislative "supremacy," *Brewster*, 408 U.S. at 508. So long as legislators or their motives are not on trial, legislative immunity is no bar. *Gravel*, 408 U.S. at 618; *accord United States v. Johnson*, 383 U.S. 169, 183-85 (1966).

Defendants have not carried their burden to show immunity applies. *See S. Middlesex Opp. Council v. Town of Framingham*, 752 F. Supp. 2d 85, 112 (D. Mass. 2010). Denying Libby's right to speak or vote in the House is not "an integral part" of the House's "deliberative and communicative processes." *Gravel*, 408 U.S. at 625. Such acts are antithetical to the legislative process.

**A.** Not all acts are "legislative" simply because they implicate the legislature. *See Brewster*, 408 U.S. at 515. Some acts are "administrative," including those challenged here. *Negron-Gaztambide v. Hernandez-Torres*, 35 F.3d 25, 28 (1st Cir. 1994). Plaintiffs do not challenge the wisdom of the underlying censure, as unwise as it may be, but instead challenge the ongoing refusal to allow Libby to speak on the House floor and the refusal to count her votes. These are administrative acts, "singl[ing] out" Libby from all other legislators. *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 9 (1st Cir. 2000); *see Cutting v. Muzzey*, 724 F.2d 259, 261 (1st Cir. 1984) (deeming administrative a determination that a "sanction should be imposed for violation of a plan"); *accord Acierno v. Cloutier*, 40 F.3d 597, 610 (3d Cir. 1994) (en banc) ("decisions affecting a single individual or a small number of people … are administrative"). Refusing to count a single legislator's votes in no way marks the "establishment of a general policy," as compared to generally applicable voting requirements for all legislators. *Acevedo-Garcia*, 204 F.3d at 9; *compare, e.g.*, *Cushing v. Packard*, 30 F.4th 27, 49 (1st Cir. 2022) (en banc). Indeed, this singling out of Libby wasn't even in response to something occurring in the Legislature; Defendants have silenced her because of her speech made on her own time on her own social media account. It blinks reality to call Defendants' retribution, denying an entire district its equal representation in the House, a

"legislative" act. *See, e.g.*, *Negron-Gaztambide*, 35 F.3d at 28 (replacing legislative librarian with patronage pick was administrative); *Kamplain v. Curry Cnty. Bd. of Comm'rs*, 159 F.3d 1248, 1252 (10th Cir. 1998) (board's censure and exclusion from legislative meetings were "administrative acts"); *Cruz v. Trujillo*, 443 F. Supp. 2d 240, 247 (D.P.R. 2006) (no immunity for "selective application" of legislative rules).

**B.** At the very least, the Clerk's refusal to count Libby's vote is not a legislative act shielded by legislative privilege. The Court can restore District 90's equal representation by requiring the Clerk to count District 90's votes, without inquiring into any legislator's motives regarding the censure or invocation of a House rule.

The existence of some precipitating House resolution or rule does not foreclose this suit to restore District 90's equal representation in the House by having Libby's votes count. *See Powell*, 395 U.S. at 504-06; *Kilbourn v. Thompson*, 103 U.S. 168, 200, 205 (1880); *Sweeney v. Tucker*, 375 A.2d 698, 704 (Pa. 1977) (rejecting immunity for House comptroller and noting that legislative employees "act[] pursuant to express orders of the legislature does not bar judicial review of the underlying legislative decision" (citing *Powell*, 395 U.S. at 505)); *see also Sup. Ct. of Va. v. Consumers Union of U.S.*, 446 U.S. 719, 734-36 (1980) (holding "enforcement" of unconstitutional state bar rules was not immunized even though passing them was a legislative act). Where, as here, injunctive relief would "act upon the defendant … in a purely non-legislative capacity," there is "no reason why a defendant should be entitled to legislative immunity simply because the harm alleged originated, in some sense, with a legislative act." *Rowland*, 494 F.3d at 88-89 (citing *Kilbourn*, 103 U.S. at 196-205). A vote on the censure resolution or House rules cannot "in and of itself" insulate Defendants' acts. *Kamplain*, 159 F.3d at 1252 (collecting cases). Legislators and their staff are not immune for acts not "essential to legislating" even if undertaken under the auspices of a "resolution," *Gravel*, 408 U.S. at 621, including the House Clerk's act of counting (or not counting) votes, *Powell*, 395 U.S. at 504.

What Plaintiffs seek here is little different than the judicial review afforded in *Kilbourn* and *Powell*. Representative Powell could sue the Clerk to have his vote count; legislative immunity was no bar. *Id.* at 506. And in both *Kilbourn* and *Powell*, the sergeant-at-arms' enforcement of a House resolution was reviewable even though they were doing nothing more than executing House resolutions. *See id.* at 505. Legislative immunity did not preclude judicial review of those officials' acts simply because they were initially "directed by an immune legislative act" by a legislator. *Gravel*, 408 U.S. at 619. Here too, the Clerk is "responsible for [his] acts," *Powell*, 395 U.S. at 504, and nothing bars this Court from "afford[ing] relief" against the Clerk to restore Libby's voting rights. *Gravel*, 408 U.S. at 620.

Defendants' arguments to the contrary conflate the precipitating decision to censure Libby with acts taken to enforce that censure. As the foregoing cases illustrate, Plaintiffs may challenge the latter. Citing *Gravel*, Defendants say that "even if the act is performed by the House Clerk" rather than a representative, it is protected by legislative privilege. MTD 8. But *Gravel* itself distinguished between a suit barred by immunity and suits like Plaintiffs' here: While "both aide and Member should be immune with respect to the committee and House action leading to the illegal resolution," that says nothing about their immunity if an aide "*executed* an invalid resolution." 408 U.S. at 621 (emphasis added). For that, immunity does not apply. *Id.* Here too, that the Clerk acts pursuant to a resolution does not protect his enforcement of Libby's disenfranchisement from review. To redress that unconstitutional disenfranchisement, relief need only "run against an employee of the House and not a legislator," *Cushing*, 30 F.4th at 51, by requiring the Clerk to count Libby's votes as the Clerk has always done until this unprecedented moment.

**C.** Defendants' cited cases do not support their extraordinary claim that this Court has no power to review District 90's ongoing disenfranchisement. *Harwood* and *Cushing* do not state a categorical rule for all cases, and both foreshadowed legislative immunity's inapplicability in a case like this. *Harwood* did not involve singling out a House district to be disenfranchised. It concerned a

generally applicable "procedural rule" restricting lobbying, distinguishing that rule from "*punitive*" measures that do not "govern the conduct of legislative proceedings" generally. 69 F.3d at 631-633 & n.9. Similarly, *Cushing* concerned generally applicable voting "procedures" barring "remote participation" for *all* House members. 30 F.4th at 49. Both *Harwood* and *Cushing* distinguished the challenged procedures from acts "of an extraordinary character" for which immunity would not apply. *Id.* at 50 (quoting *Kilbourn*, 103 U.S. at 204), *Harwood*, 69 F.3d at 634 (same). The First Circuit has never suggested legislative immunity would shield the refusal to count a legislative district's votes for the rest of its chosen representative's term.[1]

Moreover, the First Circuit has been clear that immunity will *not* shield acts, even "legislative" ones, that are "flagrantly violative of fundamental constitutional protections," such as "invidiously discriminatory" acts. *Harwood*, 69 F.3d at 634. Defendants offer no rational basis for why the extraordinary disenfranchisement of District 90 is not such an act, but refusing to count legislators' votes in other contexts would be. Here, Libby has been "target[ed]" for the content and viewpoint of her speech, *see Cushing*, 30 F.4th at 51, contrary to 60-year-old Supreme Court precedent that legislative majorities cannot exclude a lawfully elected legislators simply because that legislator espouses a viewpoint the majority rejects, *Bond v. Floyd*, 385 U.S. 116 (1966). Denying Libby's right to vote on behalf of her district serves no "legitimate legislative purposes." *Harwood*, 69 F.3d at 634; *see* Compl. ¶60. Just the opposite—it is invidious viewpoint discrimination that is antithetical to the legislative process. *See*

---

[1] Nor do Defendants' cited out of circuit cases, MTD 9 n.12, support legislative immunity. *Rangel v. Boehner*, 785 F.3d 19 (D.C. Cir. 2015), involved a simple censure in Congress; the court had no occasion to consider whether immunity would bar a suit to restore a house district's representation because Congress does not strip members of voting rights. Likewise, in *Whitener v. McWatters*, 112 F.3d 740, 744 (4th Cir. 1997), the legislative body did not strip a member of his vote; the court simply declined to relitigate the wisdom of "legislative speech," leaving it to "the legislative body's judgment." And in *Gamrat v. McBroom*, 822 F. App'x 331 (6th Cir. 2020), the court discussed immunity for only one claim. An expelled legislator could not sue house staff for allegedly "bad faith" participation in an otherwise lawful process. *Id.* at 334. As for other alleged violations of federal law, the court simply held the legislator failed to state a claim, not that house staff was immune. *Id.* at 334-35.

*Rosenberger v. Rector & Visitors of UVA*, 515 U.S. 819, 829 (1995); *Vullo*, 602 U.S. at 187 ("viewpoint discrimination is uniquely harmful to a free and democratic society").

Allowing Defendants to invoke immunity here would be to convert it from a "shield … to preserve the integrity of the legislative process," *Brewster*, 408 U.S. at 517, into a "sword" to destroy it with no means of judicial review, *Powell v. Ridge*, 247 F.3d 520, 525 (3d Cir. 2001). That "abuse" of immunity "warrant[s] the 'extraordinary character' descriptor." *Cushing*, 30 F.4th at 52. Defendants' reliance on immunity to evade review of their ongoing disenfranchisement of District 90 "serves" no "democratic end." *Contra id.* It is entirely undemocratic. A legislator's vote "consummate[s] their duty to their constituents." *Miller v. Town of Hull*, 878 F.2d 523, 533 (1st Cir. 1989); *see also Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 126 (2011). Refusing to count that vote over and over again "strike[s] at the heart of representative government" and "run[s] counter to our fundamental ideas of democratic government." *Reynolds v. Sims*, 377 U.S. 533, 555, 564 (1964). Worse, there is no way for "voters" to "correct[] such abuse[]" here. *Tenney*, 341 U.S. at 378. Those living in District 90 cannot vote out the Speaker or replace the Clerk, and—absent the political will to expel Libby and create a vacancy to be filled by a special election—they have no means of ridding their lawfully elected representative of the speaking and voting restriction placed upon her. *Compare, e.g.*, Me. Const. art. IV, pt. 3, §4 (precluding House from re-imposing the same punishment should an expelled member be re-elected).

Defendants' sweeping view of immunity forgets that immunity is a privilege for the people whom legislators represent, not legislators or legislative officials. It "support[s] the rights of the people, by enabling their representatives to execute the functions of their office without fear of prosecutions." *Tenney*, 341 U.S. at 373-74. It operates for "the public good." *Id.* at 377. Defendants turn that principle on its head, insisting that their acts to disenfranchise the 9,000 people living with District 90 are beyond judicial review. *But see, e.g.*, *Coffin v. Coffin*, 4 Mass. 1, 29 (1808) (explaining immunity "should not unreasonably prejudice the rights of private citizens"). Defendants have prohibited a duly elected

representative from exercising her voice and vote—the precise freedoms that the privilege was intended to protect. Such extraordinary acts are judicially reviewable. Here, as in *Powell*, it is "competent and proper" for this Court to restore District 90's equal representation. 395 U.S. at 506.

## II.    The complaint plausibly states claims for relief.

### A.    Count I: First Amendment Retaliation

Defendants do not contest the actual elements of Plaintiffs' First Amendment retaliation claim and instead advance arguments that reveal their misunderstanding of such claims. The question is not whether there's "a First Amendment right to vote" on the House floor. *Contra* MTD 12. It is whether Libby **(1)** "engaged in constitutionally protected conduct," that was **(2)** "a substantial or motivating factor" leading to **(3)** "adverse action." *Gattineri v. Town of Lynnfield*, 58 F.4th 512, 514 (1st Cir. 2023). Defendants never apply this framework and have thus failed to contest that Plaintiffs state a claim. *See, e.g.*, *United States v. Muller*, 2022 WL 16960971, at *1 n.2 (D. Me. Nov. 23) (declining to consider arguments for dismissal "unaccompanied by some effort at developed argumentation").

**1.** Applying the First Amendment retaliation framework here, Defendants do not dispute that the complaint alleges **(1)** Libby's Facebook post constitutes constitutionally protected speech. Compl. ¶74 Libby expressed "ideas for the bringing about of political and social changes," *Roth v. United States*, 354 U.S. 476, 484 (1957), and simply re-posted publicly available information, *see* Compl. ¶¶32-33, 45-46, 48. Legislators, like ordinary citizens, have "the right to speak freely on questions of government policy." *Hous. Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 478 (2022); *accord Bond*, 385 U.S. at 135-37; *see, e.g.*, *Boquist v. Courtney*, 32 F.4th 764, 775 (9th Cir. 2022). Nor do Defendants' dispute that the complaint alleges **(2)** this speech motivated Defendants' decision to strip Libby of her speaking and voting rights. Compl. ¶¶50, 76. Libby cannot vote "because of the position [she] took" on Facebook. *Miller*, 878 F.2d at 533; *see* Compl. ¶50. Such adverse action would not have occurred "but for the plaintiff's speech." *Davignon v. Hodgson*, 524 F.3d 91, 106 (1st Cir. 2008).

Finally, Defendants cannot overcome the complaint's allegations that **(3)** Libby and her constituents have suffered adverse action by silencing District 90 and leaving it without a vote. Compl. ¶¶59, 75. Plaintiffs' claim is indistinguishable from *Bond*, holding that the Georgia House's exclusion of a representative because of his speech violated the First Amendment, 385 U.S. at 136-37, implicating not only Bond himself but also "the franchise of his constituents," *Wilson*, 595 U.S. at 481.

The same rules apply here. Disenfranchising District 90 is adverse action if that act is inconsistent with "long settled and established practice" and "contemporary doctrine." *Boquist*, 32 F.4th at 775 (quoting *Wilson*, 595 U.S. at 474-77). Neither history nor contemporary practice suggests a duly elected representative can be stripped of her vote for her speech. While there is a history of censuring legislators, the history is one of largely verbal censures, not stripping legislators of their voting rights. And while Defendants make the cursory claim, MTD 4, that "it was commonplace" to suspend legislators, the cited source actually states there was *no* "unanimity" that legislatures could "exclude members indefinitely from their seats" in colonial times. Mary Patterson Clarke, *Parliamentary Privilege in the American Colonies* 200 (Da Capo Press ed. 1971). Most telling, the U.S. House has long considered itself *without* the power "to deprive a Member of the right to vote" as part of a censure.[2] Nor is there any "evidence that such a sanction was regularly imposed" *in practice* in other legislative bodies, even though "temporary suspensions" were listed as possible legislative punishments *in theory*. *Boquist*, 32 F.4th at 782 (cleaned up). Defendants' reliance on *Coffin* illustrates this. MTD 3. While *Coffin* recited a similar Massachusetts House rule that could, in theory, be applied to deny a legislator's vote, it contains no

---

[2] *Jefferson's Manual and Rules*, §672 (2023), https://perma.cc/U78W-KZ2G; *see* 3 *Deschler's Precedents* Ch. 12 §§15-15.1 (1994), https://perma.cc/M3ZL-9P9R (*Deschler's*) (warning of "constitutional impediments"); *accord Michel v. Anderson*, 14 F.3d 623, 630 (D.C. Cir. 1994) (explaining the House cannot lawfully "deprive any *member* of the right to vote in the Committee of the Whole"); *accord Hinds' Precedents* §5937 (1907), https://perma.cc/CJ3H-SVNF (*Hinds'*) (declining "to assume the authority to deprive Members present in custody of the Sergeant-at-Arms of the right to vote"); Cong. Rsch. Serv., *Expulsion, Censure, Reprimand, and Fine* 10-16 (2016), https://perma.cc/T2P8-5Q55 (censures in the U.S. House are only verbal).

discussion that the rule was ever actually applied in such a destructive way. 4 Mass. at 22. Similarly, even though early U.S. House rules barred the Speaker from voting absent a tie, the Speaker voted on behalf of his district "although the rule forbade." 5 *Hinds'* §§5966-67. Here too, Defendants cannot simply point to an old House rule when it has never been applied in such an unprecedented way.[3]

What meager history Defendants can muster is inapposite. They identify only four examples of suspensions. None involved the suspension of a legislator in response to the exercise of First Amendment rights; three arose from criminal indictments and one from a physical altercation on the chamber floor.[4] None overcomes *Bond*, holding the refusal to seat an elected representative after he criticized government policy violated the First Amendment. 385 U.S. at 136-37; *see Miller*, 878 F.2d at 532-33 (First Amendment protects elected officials from being "suspended because of the position they took" when "speaking out" "on a controversial public issue"). The absence of analogous historical examples provides every "reason to think the First Amendment was designed or commonly understood to upend" any scattered practice of suspending a lawfully elected representatives' right to vote on behalf of her district. *Wilson*, 595 U.S. at 475; *see Boquist*, 32 F.4th at 783.

---

[3] In any event, even ancient state rules cannot be "used as an instrument for circumventing a federally protected right." *Reynolds*, 377 U.S. at 566; *see South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966).

[4] In 1784, the Massachusetts House suspended an indicted representative "until he shall have his trial" despite the investigative committee "find[ing] nothing in the constitution, which considers him as a person disqualified to hold his seat." J. H.R. Mass. 13, 18 (1784), https://bit.ly/4ielTqk. In 1808, the Massachusetts House suspended a representative pending "further order upon the report of the [special] committee" after his forgery conviction. J. H.R. Mass. 14-15 (1808), https://bit.ly/42qrzI0. As to the 1902 contempt of two U.S. senators for assault on the floor, the question of suspending their "right to vote … was not decided." 2 *Hinds'* §1665, https://perma.cc/R2WB-3YHL. One senator objected that denying their votes would deprive their State of "equal suffrage in the Senate," and several senators dissented from the committee report asserting the power "to suspend a Senator and thus deprive a State of its vote." *Id.* While the 1905 Wisconsin Senate temporarily suspended an indicted senator, 1 Wis. Sen. J., 47th Sess., 801-14, 862-64 (1905) https://bit.ly/3RrGn48, the State's attorney general concluded the suspension was without "authority," emphasizing that "the people of that district" were left "not represented," 4 Wis. Op. Att'y Gen. 81-84 (1915), https://perma.cc/MCS3-G7S2. Wisconsin today recognizes the "generally accepted parliamentary practice that a legislative body cannot prevent a member from voting." Wis. Leg. Ref. Bur., *Discipline in the Wisconsin Legislature* 4 (2020), https://perma.cc/FK4F-JF6L.

Still today, stripping Libby of her vote contravenes "the prevailing view … that members of the legislature do not have the power to suspend members and therefore deprive them of the right to vote." *Boquist*, 32 F.4th at 783. Again, not even the U.S. House considers itself to have such power. *Supra* p. 11 & n.2. Such retaliation "interferes with" elected officials' "ability to adequately perform their elected duties." *Werkheiser v. Pocono Twp.*, 780 F.3d 172, 181 (3d Cir. 2015). The Supreme Court has upheld censures only when they "did not prevent [an official] from doing his job" and "did not deny him any privilege of office." *Wilson*, 595 U.S. at 579-80. But here, stripping Libby of her voting rights is to strip her of the most essential feature of serving as District 90's elected representative: to cast an equally weighted vote for or against legislation. *See Boquist*, 32 F.4th at 777.

**2.** Rather than address any of these elements, Defendants mischaracterize Plaintiffs' claim. First, Defendants characterize Plaintiffs' claim as a "verbal censure[] or reprimand[]," MTD 11, even though the complaint plainly challenges the ongoing refusal to count Libby's votes or allow her to speak on the House floor, *e.g.*, Compl. ¶¶58-59, 67-70, 75 ("Barring Rep. Libby from *speaking or voting* on the House floor is a materially adverse action." (emphasis added)). As the Supreme Court explained in *Wilson*, such actions that "implicate[] the franchise of [a plaintiff's] constituents" and "exclusion from office" could be adverse, even if a verbal censure alone is not. 595 U.S. at 481. Second, Defendants mischaracterize Plaintiffs' claim as a First Amendment challenge to "restrictions upon legislators' voting," MTD 12, but again the voting restriction is the adverse action. *See* Compl. ¶75. The First Amendment-protected conduct was Libby's speech made on her own time on her own social media account. ¶74. Defendants have not carried their burden to show that Plaintiffs' allegations "assessed as a whole" fail to state a claim. *Vullo*, 602 U.S. at 194 (reversing dismissal of First Amendment claim); *see Boquist*, 32 F.4th at 780-85 (same for state legislator's First Amendment retaliation claim).

**B.    Counts II: Equal Protection**

Plaintiffs have plausibly stated a claim under the Equal Protection Clause. "No right is more

precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). Thus, "the right to vote—the wellspring of all rights in a democracy—is constitutionally protected." *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 74 (1st Cir. 2001); *see Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1885) (voting "is regarded as a fundamental political right, because [it is] preservative of all rights").

**1.** The Equal Protection Clause requires "all who participate in the election … have an equal vote," ensuring "equal state legislative representation." *Reynolds*, 377 U.S. at 557-58, 568. That requirement of equality is denied "by wholly prohibiting the free exercise of the franchise" or "by a debasement or dilution of the weight of a citizen's vote." *Id.* at 555; *see Wesberry*, 376 U.S. at 7 ("when qualified voters elect members of [a legislature] each vote [must] be given as much weight as any other vote"). And that requirement of equal representation necessarily continues after election day. It would be an empty promise if constituents had no vote, let alone an equal vote, in the House. *See Michel*, 14 F.3d at 626 ("It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor."). But exactly that has transpired in Maine. Whether labeled "disenfranchisement" or "vote dilution," denying House District 90's voting rights violates the Equal Protection Clause. Compl. ¶¶84-85.

Denying Libby's vote in the House disenfranchises Plaintiffs and thousands of others in District 90. By refusing to county Libby's votes, Defendants forget that her votes are "not personal to" her but instead "belong[] to the people." *Carrigan*, 564 U.S. at 126. That "vote is the commitment of [her] apportioned share of the legislature's power to the passage or defeat of a particular proposal." *Id.* at 125-26. Such "[r]estrictions on a public official's participation … infringe upon voters' rights to be represented." *Peeper v. Callaway Cnty. Ambulance Dist.*, 122 F.3d 619, 623 (8th Cir. 1997).

Refusing to count Libby's vote deprives Plaintiffs of representation by creating "two classes of voters": those in District 90 who effectively have no representation in the House and those in every

other district who do. *Kucinich v. Forbes*, 432 F. Supp. 1101, 1116 (N.D. Ohio 1977); *see Bonas*, 265 F.3d at 74 (identifying equal protection denial "when a discrete group of voters … will suffer disproportionately" (citing *Reynolds*, 377 U.S. at 558)). This "across-the-board disenfranchisement" for voters in District 90 "betokens an utter breakdown of the electoral process." *Bonas*, 265 F.3d at 75. Stripping members of their votes "deprives the district, which the Member was elected to represent, of representation," "effectively disenfranchis[ing]" those "who elected that person to represent them" and "undermin[ing] the basic interest of a constituency in their representative government." *Deschler's* 1738-39 (U.S. House observing constitutional impediments to denying members' voting rights); *see* Wis. Leg. Ref. Bur., *supra* n.4, at 4 (Wisconsin observing same); Gerald T. McLaughlin, *Congressional Self-Discipline: The Power to Expel, to Exclude and to Punish*, 41 Fordham L. Rev. 43, 60 (1972) (suspension "robs" a district "of its right to congressional representation"); D.S. Hobbs, *Comment on* Powell v. McCormack, 17 U.C.L.A. L. Rev. 129, 152 (1969) (suspension "deprives the suspended member's district of representation"). Courts have thus held that suspending or excluding a lawmaker and depriving constituents of representation violates the Equal Protection Clause. *See Kucinich*, 432 F. Supp. at 1116-17; *Ammond v. McGahn*, 390 F. Supp. 655, 660 (D.N.J. 1975), *rev'd on mootness grounds*, 532 F.2d 325 (3d Cir. 1976); *cf. Davids v. Akers*, 549 F.2d 120, 126 (9th Cir. 1977) (no equal-protection issue under *Reynolds* because legislator's vote was "counted, with the same weight as every other vote").

Defendants cannot contest that they have deprived District 90 of its equal representation in the House. While those outside District 90 have a say in the ongoing legislative process, Plaintiffs and thousands of others in District 90 do not. *See, e.g.*, *Kucinich*, 432 F. Supp. at 1116-17. That denial of voting rights is no different than if Plaintiffs had not participated "on an equal basis with other citizens" across Maine on election day. *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). That the "dilution occurs after the voters' representative is elected" is immaterial. *Michel*, 14 F.3d at 626. Equal protection applies to "the initial allocation of the franchise" and "the manner of its exercise." *Bush v. Gore*, 531

U.S. 98, 104 (2000). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Id.* at 104-05. As the D.C. Circuit has observed, "It could not be argued seriously that voters would not have an injury if their congressman was not permitted to vote at all on the House floor." *Michel*, 14 F.3d at 626. Just as the Maine House could not reduce the strength of District 90's vote by one-half, it cannot reduce District 90's vote to nothing. *See Reynolds*, 377 U.S. at 555-58.

**2.** Plaintiffs have also plausibly stated an equal protection claim because Defendants disenfranchised District 90 on arbitrary terms. A state is "obligat[ed] to avoid arbitrary and disparate treatment of the members of its electorate." *Bush*, 531 U.S. at 105; *see also Reynolds*, 377 U.S. at 557 (explaining "arbitrary and capricious action" can violate equal protection). But here, Defendants deprived Plaintiffs of their equal representation arbitrarily. The three other censures in Maine's nearly 200-year history concerned speech or conduct in the statehouse that disrupted the House, not social media posts that the Speaker dislikes. Compl. ¶53. As for ethics rules that Libby purportedly violated, those rules say nothing about members' social media activity outside the statehouse. ¶52; *see Legislative Code of Ethics*, Me. House Reps., https://perma.cc/RF43-JPA2. Indeed, the Speaker himself has posted photos of minors on Facebook, for reasons that are at least in part political. Compl. ¶62. And the Speaker disclaimed forthcoming censures of other members who reposted Libby's exact post. ¶55. There is a total "absence of specific standards to ensure … equal application." *Bush*, 531 U.S. at 106. Defendants unconstitutionally "utilize[d] 'non-uniform rules, standards, and procedures' that result[ed] in 'massive disenfranchisement and unreasonable dilution of the vote.'" *LWV of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008). That arbitrary deprivation violates the Equal Protection Clause.

Defendants argue that perhaps there is some reason Libby's actions were treated differently than other members' posts. MTD 16-17. But they assert no standards for drawing any distinction, and there are no such uniform standards, as the complaint alleges. ¶¶52, 86. It is exactly that "absence of

uniform standards" that shows "there [is] no rhyme or reason for the arbitrary and disparate treat-ment" of District 90. *Lyman v. Baker*, 954 F.3d 351, 370 (1st Cir. 2020).

**3.** Finally, Defendants invite the Court to apply *Anderson-Burdick* balancing to these equal pro-tection violations, but *Anderson-Burdick* is for ballot-access restrictions,[5] not the total exclusion of a legislative district from legislative votes. No Court would invoke *Anderson-Burdick* had District 90 been unconstitutionally malapportioned, denying its constituents an equal vote in the House. *See, e.g., Reyn-olds*, 377 U.S. at 568 (asking only whether seats were equally apportioned, not whether the degree of malapportionment was too burdensome). *Anderson-Burdick* does not apply here.

Even if *Anderson-Burdick* applied, disenfranchising District 90 severely burdens Plaintiffs' equal-protection rights, triggering strict scrutiny. *Ayers-Shaffner v. DiStefano*, 37 F.3d 726, 729-730 & n.9 (1st Cir. 1994). "Courts have routinely recognized that disenfranchisement is a severe burden on the right to vote." *Am. Encore v. Fontes*, 2024 WL 4333202, at *15 (D. Ariz. Sept. 27); *see Libertarian Party v. D.C. Bd. of Elections & Ethics*, 682 F.3d 72, 77 (D.C. Cir. 2012) (explaining strict scrutiny applies "where voting is literally prohibited" and state has "disenfranchised a segment of voters"). And "[r]estrictions on an officeholder after election also infringe upon voters' rights to be represented *even more severely* than when a state similarly restricts candidacy." *Peeper*, 122 F.3d at 623 (emphasis added). Defendants cite nothing for their shocking claim that denying Libby's vote imposes a "modest" burden because Libby can continue committee work and "use legislative staff and services." MTD 15. Libby's *floor vote* is District 90's "apportioned share of the legislature's power," *Carrigan*, 564 U.S. at 125, and how she "consummate[s] [her] duty to [her] constituents," *Miller*, 878 F.2d at 533.

Defendants have not justified that severe burden. They claim a generalized interest in the House "upholding its reputation and integrity." MTD 14. But the complaint alleges that Libby simply

---

[5] *Anderson v. Celebrezze*, 460 U.S. 780 (1983), involved filing deadlines for independent candidates. *Burdick v. Takushi*, 504 U.S. 428 (1992), involved a prohibition on write-in candidates.

shared her views on a political issue on her own time on social media, reposting information that was already publicly reported and widely available online. Compl. ¶¶31-33, 45-46. Her post violated no laws, and there was "nothing … threatening" about it. ¶48. Defendants' suggestion that Libby "inflicted" "considerable" "damage" to the "House's reputation and integrity" is beyond the complaint and thus beyond the Court's consideration in this motion-to-dismiss posture. *See, e.g.*, *Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp*, 574 F. Supp. 3d 1260, 1278 (N.D. Ga. 2021) (denying motion to dismiss where Defendants' *Anderson-Burdick* argument "relies on facts not asserted in the" complaint); *see also Fla. State Conf. of NAACP v. Lee*, 566 F. Supp. 3d 1262, 1286 (N.D. Fla. 2021) (denying motion to dismiss and explaining "the relevance of context and specific circumstances" makes the *Anderson-Burdick* test "particularly difficult to apply at the motion to dismiss stage"). Even if it weren't, there are far more narrowly tailored ways for Defendants to have addressed that concern, including with a verbal censure alone. *See Libertarian Party of Maine, Inc. v. Dunlap*, 2016 WL 3039715, at *11-12 (D. Me. May 27); *see also Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182, 196 (1999) (holding state's "justification" for restriction on ballot initiatives was already "served by" other means).

Defendants' reliance on *Monserrate* is inapposite. *Contra* MTD 15. The New York Senate voted to *expel* Monserrate after his conviction for domestic violence; a new senator took his place by special election. *Monserrate v. N.Y. Senate*, 599 F.3d 148, 152-53 (2d Cir. 2010). That's a stark contrast to this case, where a bare majority eliminated District 90's voice and vote. Unlike *Monserrate*, there will be no special election to "reduce" some temporary "burden imposed on voting rights." *Id.* at 155. Libby remains District 90's lawfully elected representative with no way to restore her vote, save for the unconstitutional solution of Libby's apologizing to the Speaker's liking.[6] *See Deschler's* 1739 (explaining

---

[6] Any forced apology would raise its own constitutional questions, including being an unconstitutional condition or unconstitutionally compelled speech. *See, e.g., Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606 (2013) (unconstitutional conditions doctrine bars coercively withholding

"there can be no replacement for the punished member" absent expulsion, so "a constituency would be left without a voice … for the duration of the Congress"); 4 Wis. Op. Att'y Gen. 84 (similar).

### C.    Count III & IV: Due Process and Guarantee Clause

**1.** Plaintiffs have also stated a due process claim from the disenfranchisement of District 90. Due process is denied where the electoral process "reaches the point of patent and fundamental un-fairness," *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978), including a "total and complete disen-franchisement of the electorate" in violation of state law, *Bonas*, 265 F.3d at 75. The denial of District 90's representation works the same harm. *See Michel*, 14 F.3d at 626; *Kucinich*, 432 F. Supp. at 1117.

Applied here, District 90 is deprived of its vote in the House even though their elected repre-sentative meets all qualifications: she is a U.S. citizen; she is over age 21; and she has long been a resident of Maine and her district. Compl. ¶10; *see* Me. Const. art. IV, pt. 1, §4. Interpreting similar provisions of the U.S. Constitution, the U.S. House concluded that "the only way" to exclude a con-gressman from representing his district is by expulsion. *Deschler's* 1738-39. Here too, a two-thirds vote is required to expel Libby. Me. Const. art. IV, pt. 3, §4. Without that margin, Defendants cannot effectuate a *de facto* expulsion by denying Libby the right to vote for the rest of her term. Just as state officials cannot cancel elections in violation of state law, *Bonas*, 265 F.3d at 78, Defendants cannot cancel Libby's votes in violation of the Maine Constitution's provisions for House membership. That violates due process. *See, e.g., id.* at 75-76; *Griffin*, 570 F.2d at 1078-79.

**2.** For similar reasons, Plaintiffs have adequately pled a Guarantee Clause violation. While the outer bounds of the clause are debated, *see Largess v. Supreme Jud. Ct. of Mass.*, 373 F.3d 219, 226 (1st

---

benefits from those who exercise fundamental rights); *Riley v. Nat'l Fed'n of the Blind of N.C.*, 487 U.S. 781, 796-97 (1988) (First Amendment "necessarily compris[es] the decision of both what to say and what *not* to say"); *see also Seamons v. Snow*, 84 F.3d 1226, 1236-39 (10th Cir. 1996) (student stated free-speech claim where he was removed from team for "refusing to apologize" for reporting a hazing incident).

Cir. 2004), there is little dispute over its core guarantee: "that the people should choose whom they please to govern them." 2 Debates on the Federal Constitution 257 (J. Elliot ed. 1876). Mainers "set bounds to their own power" in their state constitution. *Duncan v. McCall*, 139 U.S. 449, 461 (1891); *see Bd. of Elections for Franklin Cnty. v. State ex rel. Schneider*, 191 N.E. 115, 120 (Ohio 1934) (noting state constitutional violations implicated Guarantee Clause). Defendants violate the Guarantee Clause by exceeding those bounds, effectuating a *de facto* expulsion of District 90's qualified representative without a two-thirds concurrence. *Supra* III.C.1; Compl. ¶¶101, 103-106.

Logic defies Defendants' assertion that the House "remain[s] accountable" to District 90. MTD 19. That local electorate has no voice or vote in the House, nor could they vote out the Speaker or replace the Clerk. The ongoing disenfranchisement is the sort of "egregious circumstance[]" violating the Guarantee Clause. *Largess*, 373 F.3d at 227. It deprives Plaintiffs of "the distinguishing feature" of a republican form of government "to choose their own officers for governmental administration, and pass their own laws in virtue of the legislative power reposed in representative bodies, whose legitimate acts may be said to be those of the people themselves." *Duncan*, 139 U.S. at 461.

**3.** Defendants' generalized arguments do not address with whether Plaintiffs' particular Guarantee Clause claim is justiciable. As Defendants acknowledge, there is no "categorical bar on Guarantee Clause claims. MTD 18; *see Largess*, 373 F.3d at 229. As explained in Plaintiffs' preliminary injunction motion, their particular Guarantee Clause claim—turning on the Republican form of government already prescribed in the Maine Constitution—is neither too "political" nor devoid of "manageable standards." *See* PI Mot. 16-17. It requires the Court to decide only whether Defendants have derogated those pre-existing constitutional limits.

## CONCLUSION

The Court should deny Defendants' motion to dismiss.

Dated: April 22, 2025

Taylor A.R. Meehan*
Daniel M. Vitagliano*†
Marie E. Sayer*†
Consovoy McCarthy PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
taylor@consovoymccarthy.com
dvitagliano@consovoymccarthy.com
mari@consovoymccarthy.com

*Admitted *pro hac vice*

†Supervised by principals of the firm
admitted to practice in VA

Respectfully submitted,

*/s/ Patrick N. Strawbridge*
Patrick N. Strawbridge (Bar No. 10024)
   *Lead Counsel*
Consovoy McCarthy PLLC
Ten Post Office Square
8th Floor South PMB #706
Boston, MA 02109
(703) 243-9423
patrick@consovoymccarthy.com

*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on April 22, 2025, I electronically filed a true and correct copy of Plaintiffs'
reply in support of motion for preliminary injunction through the Court's CM/ECF system, which
will provide service to all parties.

*/s/ Patrick N. Strawbridge*